# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI
### WESTERN DIVISION

**GORDON VANCE JUSTICE, JR., ET AL.**                **PLAINTIFFS**

**v.**                                              **CIVIL CASE NO. 3:11CV138-A-A**

**DELBERT HOSEMANN, ET AL.**                        **DEFENDANTS**


**Secretary of State Delbert Hosemann and Attorney General Jim Hoods'
Memorandum in Opposition to Plaintiffs' Motion for
Temporary Restraining Order and Preliminary Injunction**

**Harold E. Pizzetta, III**
**MS Bar #99867**
**Assistant Attorney General**
**Chief, Civil Litigation Division**
**Office of the Attorney General**
**Post Office Box 220**
**Jackson, Mississippi 39205**
**Telephone: (601) 359-3816**
**Facsimile: (601) 359-2003**

**OVERVIEW**

Mississippi, along with the federal government, other states, and many localities, requires individuals or groups who seek to directly influence voters to vote for or against ballot measures or candidates to disclose certain basic information about themselves, the money they raise, and their expenditures. Campaign disclosure requirements are the primary tool that states have to shed the cleansing light of sunshine on direct attempts to influence voters. Before the voters on the November 8th ballot are three ballot initiatives which, if passed, will profoundly change the relationship between citizens and their government, including changes to property rights, imposing a new requirement on the basic right of adult citizens to cast votes, and expanding the legal definition of a person. These all- important matters of life, liberty, and personal property will be placed before the voters as citizen legislators. If this Court enjoins the State from enforcing its campaign disclosure laws in the critical final week of the election, entities will be able to engage in electioneering with anonymity. Voters will be left completely in the dark as to who is attempting to influence their votes. The fair, honest, and open electoral system for ballot measures will be severely undermined.

The United State Supreme Court has long recognized both the importance and constitutionality of disclosure requirements. "[P]rompt disclosure of expenditures," especially since the "advent of the Internet," provides a "transparency [that] enables the electorate to make informed decisions and give proper weight to different speakers and messages." *Citizens United v. Fed. Election Comm'n*, 130 S.Ct. 876, 916 (2010). "Public disclosure . . . promotes transparency and accountability in the electoral process to an extent other measures cannot." *Id*. at 916; *Doe v. Reed*, 130 S.Ct. 2811, 2837 (2010) (Scalia, J., concurring) ("Requiring people to

stand up in public for their political acts fosters civic courage, without which democracy is doomed."). While Plaintiffs argue that disclosure and transparency are impermissible burdens, the Supreme Court has found the burden to be minimal and greatly outweighed by the benefit to society: "[i]t is undoubtably true that public disclosure of contributions to candidates and political parties will deter some individuals who otherwise might contribute," but "disclosure requirements certainly in most applications appear to be the least restrictive means of curbing the evils of campaign ignorance and corruption." *Buckley v. Valeo ,* 424 U.S. 1, 68 (1976).

Plaintiffs' request for a temporary restraining order should be denied for three reasons. First, it lacks a likelihood of success on the merits. Second, the balance of the equities and public policy would be harmed by allowing undisclosed electioneering in the critical final week of campaigning. Third, Plaintiffs' request for extraordinary relief at this late hour is barred by laches. Plaintiffs do not seek emergency relief to maintain the *status quo* . Instead they seek emergency relief that would alter the *status quo* for the balance of this election cycle; relief that could not be later undone by this Court after the election has passed. Mississippi's disclosure laws have not changed in years and it has been publically known that the three initiatives would appear on the November 2011 ballot for over a year. These politically active Plaintiffs waited to file suit until 19 days prior to the election, requesting a hearing a mere 12 days after filing. Federal courts routinely deny eleventh hour "emergency" requests to enjoin election laws when the emergency is of plaintiffs' making. For example, the First Circuit recently affirmed the denial of preliminary injunction motion seeking to enjoin parts of Maine's election law, including its disclosure requirement. *Respect Maine PAC v. McKee*, 622 F.3d 13, 16 (1st. Cir. 2010). Noting that those plaintiffs filed suit on August 5, which the court categorized as "shortly

2

before the November 2 elections," the court found that the litigation '"emergency' is largely one of [plaintiffs'] own making" and concluded that "[g]iven the potential harm to Maine and to all candidates if the emergency injunction were granted, and the public interest in maintaining the *status quo* during the period of the Court's deliberations, we deny the emergency motion." *Id*. Similarly, the pending emergency motion should be denied.

## FACTS

### Reporting Requirements in Mississippi and Other States for Those Who Seek to Influence Voters on Ballot Initiatives

Mississippi solicits basic information in a less burdensome, less intrusive, and less complex manner than many, if not most, states. Also, Mississippi's $200 reporting thresholds are higher than the thresholds in a number of states. These important disclosure requirements apply only to persons or groups who desire to directly influence voters to vote for or against ballot measures or candidate. They do not apply to persons or groups engaging in general issue advocacy without connection to an election.

### A.     Reporting Requirements for Political Committees

There are three primary components to reporting requirements utilized by Mississippi and other states. First, the "registration threshold" is the financial threshold at which a group seeking to influence voters must register as a political committee. Second, the "contribution itemization threshold" is the dollar amount over which an individual contribution received by the committee must be disclosed, including information about the person making the contribution. Third, the "expenditure itemization threshold" is the dollar amount over which an expenditure by the committee must be itemized. In Mississippi, all three thresholds are set at $200.

3

### 1.     The Registration Threshold in Mississippi.

A group of persons that has collected or spent in excess of $200 to influence voters for or against a ballot measure must complete a one page form disclosing basic information about the group.  Miss. Code Ann. §§ 23-17-47; 23-17-49(1).  The form, attached as Exhibit A, asks six basic questions, none of which could be classified as complicated.  In contrast, some states require as part of registration that the committee open a separate bank account within the state, prohibit cash contributions and expenditures above $100, and require a committee to appoint a registered agent.[1]  Mississippi has no such requirements.

Once a committee reaches the registration threshold, it must file a one page monthly financial report, attached as Exhibit B, disclosing the total of contributions and expenditures for that month and year-to-date.  Miss. Code Ann. § 23-17-51(1).  When the committee finishes collecting contributions or making expenditures, it files a "termination report" which ends its reporting requirement.  *See* Miss. Code Ann. § 23-17-51(3).  The same form is used for the monthly and termination reports.  *See* Exhibit B.  If the committee  may file a monthly and termination report on the same form.

### 2.     The Registration Threshold in Other States.

Mississippi's $200 registration threshold is neither the highest nor the lowest in the United States.  For example, several states follow the Washington state model and require a group to register as a political committee within a mere three business days after "it first has the expectation of receiving contributions or making expenditures."  *See* RCW 42.17.040(1) (if not within three weeks of an election, registration must be filed within two weeks of the

---

[1]  *See infra* Argument Section II(c).

expectation).  Ohio follows this model and requires any group seeking to support or oppose a ballot initiative to register as a "ballot issue committee" "prior to receiving any contributions or making any expenditures."  *See* Ohio Campaign Finance Handbook at 8-3, Exhibit N.  Similarly, in Massachusetts a group must register as a committee "prior to raising or spending any funds" to promote or oppose a ballot initiative.  *See* Massachusetts Campaign Finance Guide  at 5, Exhibit J; Massachusetts Statement of Organization, Exhibit K.  In North Dakota, a group seeking to influence voters on a ballot measure must register prior to the "receipt of <u>any</u> contribution or expenditure of funds."  *See* North Dakota Campaign Finance Disclosure Requirements at 5 (emphasis in original), Exhibit O.

Other states, like Oregon, require a committee to register upon the receipt or expenditure of the "first dollar" of contributions.  *See* Oregon ORS 260.118(2) (requiring registration within three business days of receiving "a contribution or mak[ing] an expenditure relating to an initiative").  Oregon's committee registration form is similar to Mississippi's.  *See* Oregon Statement of Organization, Exhibit F.  Similarly, in Montana, a committee must register within five days of "making an expenditure to support or oppose a candidate or ballot issue."  *See* Montana Form C-2, Exhibit G.

**3.      The Contribution and Expenditure Itemization Threshold in Mississippi.**

If a committee receives more than $200 from one donor during the month, the committee must list the contribution by reporting that donor's name, address, and employer.  Miss. Code Ann. § 23-17-53.  The Secretary of State supplies a form for itemized contributions, attached as Exhibit C.  If a committee pays more than $200 during the month to a single payee, the

committee must list that expenditure by disclosing the payee.  Miss. Code Ann. § 23-17-53  The

Secretary of State supplies a form for itemized disbursements, attached as Exhibit D.

           **4.**        **The Contribution and Expenditure Itemization Threshold in Other States.**

Oregon requires its political committees to disclosure the name and address of any donor

contributing more than $100 in a calendar year, as opposed to Mississippi's $200 in a month

threshold.  ORS 260.083(1)(a)(A).  Oregon also requires disclosure of the name and address of

any person receiving more than $100 from the committee.  ORS 260.083(1)(b)(A).  In Montana,

a committee must list every donor by name, address, occupation and employer for every donation

over a mere $35.  *See* Montana Political Committee Financial Report at 3, Exhibit H.  In

Massachusetts, the committee must report by name and address any contribution exceeding $25

and by name, address, occupation, and employer for any contribution exceeding $200.  *See*

Massachusetts Ballot Question Committee Finance Report at 2, Exhibit L.  All expenditures over

$50 must be also be itemized.  *Id*. at 3.

In Ohio, where a committee must register before receiving or spending any funds, all

contributions must be separately itemized except for "contributions totaling $25 or less received

at a specific fund-raising activity."  *See* Ohio Campaign Finance Handbook at 8-6, 8-10, Exhibit

N.  All expenditures overs $25 must be separately reported along with the committee's check or

receipt marked "paid."  *Id*. at 8-9.  In North Dakota, a political committee must itemize each

contribution in excess of $100 by donor name and address.  *See* North Dakota Campaign Finance

Disclosure Requirements at 11, Exhibit O; North Dakota Campaign Contribution Statement,

Exhibit P.  Similarly, all expenditures over $100 must be itemized.  *See* Finance Disclosure

Requirements at 11, Exhibit O.

A federal court decision in 2009 documented that many states have set the threshold to itemize contributions between $100 and $300. *ProtectMarriage.com v. Bowen*, 599 F.Supp.2d 1197, 1221 n.10 (E.D.Cal. 2009). Only Nebraska, West Virginia, and New Jersey had higher itemization thresholds than Mississippi's $200 threshold. *Id*. at 1221 n.10 ($250 and $300).

**B.      Reporting Requirements for Individuals.**

**1.      Reporting Requirements for Individuals in Mississippi.**

An individual who spends in excess of $200 to influence voters for or against a ballot measure must file the report of receipts and disbursements attached as Exhibit B. Miss. Code Ann.§ 23-17-51(2). If the reporting person provided more than $200 to any payee, he must separately itemize that expenditure, including the name and address of the payee. Miss. Code Ann. § 23-17-53(c)(iv); Exhibit D.

**2.      Reporting Requirements for Individuals in Other States.**

In Massachusetts, any individual who makes an expenditure of $250 or incurs a liability of $250 or more to influence the vote on any ballot measure must report those expenditures on a form similar to Mississippi's. *See* Massachusetts Report of Ballot Question Expenditures, Exhibit M. In Ohio, if an individual expends funds in support or opposition to a ballot issue (but not in coordination with a registered committee), that individual must disclose all such expenditures; there is no minimum threshold. *See* Ohio Campaign Finance Handbook Administrative Rule at C-10, C-11 (citing Administrative Rules 111-3-02, 111-3-03), Exhibit Q; Ohio Independent Expenditure Form, Exhibit R. In Washington, an individual who expends more than $100 "supporting or opposing a candidate or ballot measure" must file an expenditure

report.  *See* RCW 42.17.100(2); Washington Electioneering Communications at 2, Exhibit AA.

    **C.**    **$200 Thresholds in Mississippi Law.**

    While plaintiffs dismiss $200 as an insignificant sum, the Mississippi Legislature and the State's criminal laws establish otherwise.[2]  Two hundred dollars far exceeds the amount required to make many crimes a felony in this State.  For example, writing a worthless check in excess of $100 is a felony subject to imprisonment in the State Penitentiary for up to three years.  Miss. Code Ann. § 97-19-67(1).  Similarly, use of a credit card to obtain money, goods or services worth over $100 with intent to defraud is also a felony subject to imprisonment in the State Penitentiary for up to three years.  Miss. Code Ann. § 97-19-21(3).

    **D.**    **Mississippi's Disclosure Forms are Neither Complex nor Intrusive in Comparison to Other States or Other Forms.**

    Mississippi's disclosure forms are less complex and require less disclosure than many of the campaign forms required in other states.[3]  *Compare* Mississippi's forms (Exhibits A, B, C, and D) *with* Exhibits F, G, H, K, L, M, P, R; *see also* Washington's Campaign Disclosure Instructions (67 pages on political committees alone), Exhibit BB; Montana's Accounting & Reporting Manual for Political Committees (46 pages), Exhibit I.

    Mississippi's campaign disclosure forms are significantly less complex or intrusive than many of the forms completed by average citizens on a routine basis.  The forms are equal to or

---

    [2]  *See ProtectMarriage.com v. Bowen*, 599 F.Supp.2d 1197, 1223 (E.D.Cal. 2009) (affirming reporting threshold and discussing statutes with similar dollar amounts).

    [3]  As a circuit court noted in a similar situation, Plaintiff "does it offer any support for its assertion that [plaintiff], by its nature, is unable to comply with [the statue's disclosure] requirements."  *Human Life of Washington Inc. v. Brumsickle*, 624 F.3d 990, 1021-22 (9th Cir. 2010).

less complex than a Mississippi driver's license application, an application to open a basic bank account, an application to join a gym, the on-line process to place a classified ad in a newspaper, or a motor boat registration form. *See* Driver's Application, Exhibit T; Bank Application, Exhibit U; Gym Application, Exhibit V; Classified Advertisement On-Line Form, Exhibit W; Mississippi Motor Boat Registration Application, Exhibit Z. The amount of instructions and legal knowledge required to complete the forms is less than the instructions and legal knowledge relevant to complete an application for a fishing or trapping license. *See* Mississippi License Application at 2, Exhibit S. The disclosure forms are significantly less complex and shorter than the application for a firearm permit. *See* Firearm Permit Application, Exhibit Y.

## ARGUMENT

### I.    Standard for Granting Extraordinary Injunctive Relief.

"A preliminary injunction is considered extraordinary relief, and a determination as to whether a set of circumstances warrant such relief rests in the discretion of the district court subject only to four preconditions enumerated by the Fifth Circuit." *Blair v. GMAC Mortg., LLC*, 2009 WL 324053 at *2 (N.D.Miss. 2009); *see also King v. Corrections Corp. of America*, 2008 WL 244319 (N.D.Miss. 2008) (finding "the powerful remedy" is only to be "used sparingly in cases with extraordinary circumstances."). Courts must "pay[] more than lip service to the axiom that a preliminary injunction is an extraordinary remedy." *Martin v. Streeter*, 2011 WL 2604341 at *1 (N.D.Miss. 2011). Indeed, such extraordinary relief is "not to be granted routinely, but only when the movant, by a clear showing, carries [the] burden of persuasion." *Id*. "The decision to grant a preliminary injunction is to be treated as the exception rather than the rule." *Id*. In this matter, Plaintiffs fail to satisfy their burden on at least three of the four well-

9

established requirements for extraordinary injunctive relief.

## II.    Plaintiffs Have Not Established a Likelihood of Success on the Merits.

Mississippi's campaign reporting and disclosure laws are constitutional because there is a substantial relation between the disclosure requirement and the significantly important government interest of combating what the Supreme Court has called the societal "evils of campaign ignorance and corruption." *Buckley v. Valeo*, 424 U.S. 1, 68 (1976) ("*Buckley I*").

The well established governmental interest in requiring basic disclosures from groups who seek to influence voters for or against a ballot measure has been a fundamental principle upon which campaign related First Amendment jurisprudence has been built. Courts have squarely recognized that disclosure requirements are constitutional under First Amendment analysis. "Given the Supreme Court's repeated pronouncements, we think there can be no doubt that states may regulate express ballot-measure advocacy through disclosure laws." *California Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1104 (9th Cir. 2003) (citing *McIntyre v. Ohio Elections Com'n*, 514 U.S. 334, 347 (1995); *Buckley I*, 424 U.S. 1. In fact, the importance, effectiveness, and constitutionality of disclosure laws is so well recognized that the Supreme Court has used the existence of disclosure requirements as the basis upon which to strike down other, more burdensome, campaign regulations. For example, in *Buckley v. American Constitutional Law Foundation*, 525 U.S. 182 (1999) ("*Buckley II* "),  the Court struck Colorado's regulations concerning the state's petition process but upheld the regulation requiring "sponsors of ballot initiatives to disclose who pays petition circulators, and how much." 525 U.S. at 205. The Court found that the State's "legitimate[]" disclosure and reporting requirements effectively protected and informed voters by disclosing "the source and amount of money spent

by proponents to get a measure on the ballot." *Id*. at 203.  In *Citizens Against Rent Control v. City of Berkeley*, 454 U.S. 290 (1981), the Supreme Court struck down state limitations on money contributions to political committees supporting or opposing a ballot measure. Importantly, in doing so, the Court rejected the City of Berkeley's argument that the limitations were necessary to protect the electoral process ***because*** "[t]he integrity of the political system will be adequately protected if contributors are identified in a public filing revealing the amounts contributed; if it is thought wise, *legislation can outlaw anonymous contributions*." *Id*. at 299-300 (emphasis added).  Disclosure laws are the very foundation upon which permissible campaign regulations rest.

The Supreme Court reiterated the importance, effectiveness, and constitutionality of disclosure requirements recently in *Reed* and *United Citizens*.  *Reed*, 130 S.Ct. 2811 (rejecting First Amendment challenge to disclosure of ballot petition signatures); *Citizens United*, 130 S.Ct. 876 (2010).  Plaintiffs' suggestion that the *Citizens United* undermined disclosure requirements is simply wrong.  In previous elections, corporations and unions were banned from using their general treasury funds in federal elections.  130 S.Ct. at 886.  Instead, they could only participate in federal elections by setting up political action committees, or PACs, which could then be used to make donations to candidates or fund independent expenditures.  *Id*. at 887-888.  PACs are subject to regulation by the Federal Election Commission and can only accept up to $5,000 a year from each individual donor, thereby restricting how much they can spend.  The Court found that corporations had the right to directly use their general treasury funds to support candidates and could not be required to funnel their funds through PACs.  The Court found that the "prohibition on corporate independent expenditures is thus a ban on speech."  *Id*. at 898.

11

Relevant to this action, the *Citizens United* then distinguished disclosure requirements from bans on speech and upheld the disclosure requirement at issue. "Disclaimer and disclosure requirements may burden the ability to speak, but they 'impose no ceiling on campaign-related activities,' and 'do not prevent anyone from speaking.'" *Id*. at 914 (quoting *Buckley I*, 424 U.S. at 64). As the Court noted:

> In *Buckley*, the Court explained that disclosure could be justified based on a governmental interest in "provid[ing] the electorate with information" about the sources of election-related spending. 424 U.S., at 66, 96 S.Ct. 612. The *McConnell* Court applied this interest in rejecting facial challenges to BCRA §§ 201 and 311. 540 U.S., at 196, 124 S.Ct. 619. There was evidence in the record that independent groups were running election-related advertisements " 'while hiding behind dubious and misleading names.' " *Id.*, at 197, 124 S.Ct. 619 (quoting *McConnell I*, 251 F.Supp.2d, at 237). The Court therefore upheld BCRA §§ 201 and 311 on the ground that they would help citizens " 'make informed choices in the political marketplace.' "

*Citizens United*, 130 S.Ct. at 914. *Citizens United* did not strike down disclosure laws; it fully endorsed and upheld the constitutionality of disclosure laws. As the *Citizens United* opinion concluded, "[p]ublic disclosure . . . promotes transparency and accountability in the electoral process to an extent other measures cannot." 130 S.Ct. at 916; *see also Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 400 (2000)(Breyer, J., concurring)("constitutionally protected interests lie on both sides of the legal equation" regarding campaign disclosures).

Furthermore, while today's Plaintiffs decry the burden and "chilling effect" of disclosure requirements, the Supreme Court in *Citizens United* and other decisions has found the benefit to free speech and to society to greatly outweigh these concerns. As the Supreme Court noted in *Buckley I* while "[i]t is undoubtedly true that public disclosure of contributions to candidates and political parties will deter some individuals who otherwise might contribute," "disclosure

12

requirements certainly in most applications appear to be the least restrictive means of curbing the evils of campaign ignorance and corruption." 424 U.S. at 68; *Citizens United*, 130 S.Ct. at 915 (2010) ("disclosure is a less restrictive alternative to more comprehensive regulations of speech").

A.      **"Exacting Scrutiny," Not "Strict Scrutiny," is the Appropriate Standard.**

According to the Supreme Court's 2010 *Reed* opinion, reporting requirements in the electoral context are reviewed under the "exacting scrutiny," not strict scrutiny, test. 130 S.Ct. at 2818; *see Human Life of Washington Inc. v. Brumsickle*, 624 F.3d 990,1005 (9th Cir. 2010) (discussing *Reed*). In *Reed*, the Supreme Court reviewed a statute requiring public disclosure of the signatories to a ballot initiative. In applying the less demanding standard of "exacting scrutiny" rather than "strict scrutiny," the *Reed* Court emphasized that the statute at issue was "not a prohibition on speech, but instead a disclosure requirement." *Id.* at 2818; *Citizens United*, 130 S.Ct. at 914. The *Reed* Court continued:

> We have a series of precedents considering First Amendment challenges to disclosure requirements in the electoral context. These precedents have reviewed such challenges under what has been termed "exacting scrutiny." That standard requires a substantial relation between the disclosure requirement and a sufficiently important governmental interest.

130 S.Ct. at 2818 (citations and internal quotation marks omitted).[4]

---

[4]  *Reed* also disposes of Plaintiff's half-hearted claim of a fear of reprisal. *Reed* rejected the argument that a general fear of reprisal was sufficient to strike down a requirement that those signing a ballot initiative petition be publically disclosed. 130 S.Ct. at 2821 (Plaintiffs "have provided us scant evidence or argument beyond the burdens they assert disclosure would impose on R-71 petition signers or the signers of other similarly controversial petitions. . . . . Several other petitions in the State 'have been subject to release in recent years,' plaintiffs tell us, . . . but apparently that release has come without incident. *Cf. Citizens United*, supra, at ----, 130 S.Ct., at 916 ('Citizens United has been disclosing its donors for years and has identified no instance of harassment or retaliation').")

Parenthetically, many disclosure requirements were previously analyzed and upheld under the strict scrutiny test in both the ballot measure and candidate context. *See, e.g,, Alaska Right To Life Committee v. Miles*, 441 F.3d 773, 788, 441 F.3d 773 (9th Cir. 2006) (affirming disclosure requirements under strict scrutiny); *Olson v. City of Golden, Colo.* 2011 WL 3861433, 10 (D.Colo. 2011) (affirming disclosure requirements under a standard that "approaches, if not equals, strict scrutiny"). Mississippi's regulations would satisfy either test.

### B.    The Recognized Important Governmental Interest in Disclosure.

Because disclosure requirements do not ban or limit speech, a state's important interests expand well beyond fighting corruption. The government may point to any "sufficiently important" governmental interest that bears a "substantial relation" to the disclosure requirement. *Citizens United*, 130 S.Ct. at 914 (quoting *Buckley*, 424 U.S. at 64, 66). The Supreme Court has recognized three compelling interests in support of public reporting provisions: (1) providing "the electorate with information 'as to where political campaign money comes from ...'" in order to educate and aid voters in evaluating the speech (*Buckley I*, 424 U.S. at 66 (footnote omitted); (2) "gathering the data necessary to detect violations" of other campaign finance laws (*Buckley I*, 424 U.S. at 67-68), and (3) preventing corruption and the "appearance of corruption by exposing large ... expenditures to the light of publicity" *(Buckley II*, 525 U.S. at 202 (quotations and citation omitted). All three interests are advanced to varying degrees by disclosure requirements in the ballot measure context. Compelling interests one and two will be discussed immediately below; compelling interest three will be discussed in the section addressing how the balance of the equities and the public interest are harmed by the requested injunctive relief.

First, disclosure requirements educate and inform the public. "Providing information to

14

the electorate is vital to the efficient functioning of the marketplace of ideas, and thus to advancing the democratic objectives underlying the First Amendment." *Brumsickle*, 624 F.3d at 1005-06. The First Amendment protects the "interests of individual citizens seeking to make informed choices in the political marketplace." *McConnell*, 540 U.S. at 197 (quoting the D.C. Circuit's opinion with approval). In a statement equally applicable to this matter, "Plaintiffs never satisfactorily answer the question of how 'uninhibited, robust, and wide-open' speech can occur when organizations hide themselves from the scrutiny of the voting public." *Id.* (again quoting with approval the D.C. Circuits' opinion); *see also Buckley*, 424 U.S. at 14-15 ("In a republic where the people are sovereign, the ability of the citizenry to make informed choices among candidates for office is essential."). "Thus, by revealing information about the contributors to and participants in public discourse and debate, disclosure laws help ensure that voters have the facts they need to evaluate the various messages competing for their attention." *Brumsickle*, 624 F.3d at 1006. Importantly, informing the electorate has been "repeatedly" "recognized as a sufficiently important, if not compelling, governmental interest" satisfying both exacting and strict scrutiny. *Id.*

Plaintiffs' suggestion that there is less need for an informed electorate when considering ballot measures is troublesome and wrong. As the *Getman* court found, the same considerations set forth in *Buckley I* "apply just as forcefully, if not more so, for voter-decided ballot measures." 328 F.3d at 1105. First, placing initiative measures on the general ballot is an exercise in direct democracy in which the voters act as citizen-legislators. "Interest groups and individuals advocating a measure's defeat or passage act as lobbyists; both groups aim at pressuring the public to pass or defeat legislation." 328 F.3d at 1106. Mississippian's citizen-legislators have

15

an unquestionable and important interest in knowing who is lobbying for their vote, just as members of Mississippi Legislature and Congress require lobbyists to disclose who is paying for their services and how much. *See Citizens United*, 130 S.Ct. at 915; *Getman*, 328 F.3d at 1106.

Second, ballot measures are often complex and given the generally short time in which voters focus on these complex initiatives, "being able to evaluate who is doing the talking is of great importance." *Getman,* 328 F.3d at 1105. In *Buckley I*, the Court explained that compelled disclosure of political contributions and expenditures serves the important interest of informing the electorate about the sources and uses of funds expended. "Even more than candidate elections, initiative campaigns have become a money game, where average citizens are subjected to advertising blitzes of distortion and half-truths and are left to figure out for themselves which interest groups pose the greatest threats to their self-interest." David S. Broder, *Democracy Derailed: Initiative Campaigns and the Power of Money* at 18 (2000) (cited by *Getman*, 328 F.3d at 1106). "Knowing which interested parties back or oppose a ballot measure is critical, especially when one considers that ballot-measure language is typically confusing, and the long-term policy ramifications of the ballot measure are often unknown." *Getman*, 328 F.3d at 1106.

Initiative 31 regarding eminent domain aptly demonstrates the complexity of initiatives. Leaving aside the eminent domain is a legal term of art, the text of the initiative itself is 186 words long and includes such terms and phrases as: non-governmental entity; public-private partnership; drainage and levee facilities; bridges for public conveyance; common carriers or facilities for public utilities; entities used in the generation, transmission, storage or distribution of telephone, telecommunication, gas carbon dioxide, electricity, water, sewer, natural gas,

liquid hydrocarbons or other utility products; and public nuisance. *See* Initiative 31 Pamphlet, Exhibit X. The initiative has been characterized as a contest between property rights of individuals and economic development by corporations. *See* Pamphlet at 2, Exhibit X. With respect to this complex initiative, the following adage is undoubtably true: "At least by knowing who backs or opposes a given initiative, voters will have a pretty good idea of who stands to benefit from the legislation." *Getman*, 328 F.3d at 1106; *see also Citizens Against Rent Control*, 454 U.S. at 298 (recognizing in the ballot initiative context the interest of voters in knowing "the identity of those whose money supports or opposes a given ballot measure").

Third, "[t]he state's interest in informing the electorate about 'where political campaign money comes from and how it is spent' is only amplified in the ballot initiative context as more and more money is poured into ballot measures nationwide." *Human Life of Wash., Inc. v. Brumsickle*, 2009 WL 62144, at *13 (W.D.Wash. 2009) (citation omitted). The *Brumsickle* district court found that the "state therefore retains an *extremely compelling interest* in 'following the money' in the ballot initiative context so that the electorate's decision may be an informed one." *Id.* (emphasis supplied). As circuit court affirming the *Brumsickle* district court persuasively concluded in the context of ballot initiatives,

> Campaign finance disclosure requirements thus advance the important and well-recognized governmental interest of providing the voting public with the information with which to assess the various messages vying for their attention in the marketplace of ideas. An appeal to cast one's vote a particular way might prove persuasive when made or financed by one source, but the same argument might fall on deaf ears when made or financed by another. The increased "transparency" engendered by disclosure laws "enables the electorate to make informed decisions and give proper weight to different speakers and messages." *Citizens United*, 130 S.Ct. at 916. As the Supreme Court has stated: "[T]he people in our democracy are entrusted with the responsibility for judging and evaluating the relative merits of conflicting arguments. They may consider, in making their

judgment, the source and credibility of the advocate." *Bellotti*, 435 U.S. at 791-92,
98 S.Ct. 1407. Disclosure requirements, like those in Washington's Disclosure
Law, allow the people in our democracy to do just that.

*Brumsickle*, 624 F.3d at 1008.[5]

      <u>Second, the disclosure requirements gather data necessary to deter and detect violations
of campaign finance laws.</u>  For example, it is illegal for foreign nationals to make contributions
in connection with any state or local election.  2 U.S.C. § 441e(1).  Similarly, it is illegal for any
political action committee to "solicit, accept, or receive a contribution or donation" from a
foreign national.  2 U.S.C.A. § 441e(2).  Requiring the disclosure of the identity of those forming
or contributing to initiative committees provides information critical to the enforcement of this
and other campaign laws.  Similarly, when a committee reports contributions it has received,
regulators are able to review the list of contributors to determine whether any unregistered
committees are improperly expending undisclosed funds.  As an integral part of Mississippi's
campaign finance regulation, disclosure  provisions aid the State in deterring and detecting
violation of campaign finance laws.  Without the requirement that committees disclose their
existence and the contributors, the State would have no ability to detect direct and indirect efforts
to circumvent campaign finance laws.

    **C.**      **There Exists a Substantial Relationship Between the Disclosure and
Important Governmental Interests.**

      The Supreme Court has stated multiple times that disclosure requirements are "the least
restrictive means of curbing the evils of campaign ignorance and corruption."  *Buckley I*, 424

---

      [5]  According to one survey, more than seven out of ten voters stated that it is "important
to know the identity of the source and amount of campaign contributions to the ballot measure by
both supporters and opponents, including unions, businesses or other interest groups."
*ProtectMarriage.com*, 599 F.Supp.2d at  1209.

U.S. at 68; *Citizens United*, 130 S.Ct. at 915 ("disclosure is a less restrictive alternative to more comprehensive regulations of speech"). Following the Supreme Court's guidance, several courts have rejected First Amendment challenges to disclosure requirements in both candidate and ballot initiative settings. In many such cases courts have upheld registration and itemization thresholds that were significantly lower than Mississippi.

For example, after *Citizens United*, the *Brumsickle* court reviewed and affirmed Washington's disclosure law that required a committee to form on the mere "expectation" of any contributions or expenditures, as opposed to Mississippi's $200 threshold. 624 F.3d at 997 (emphasis supplied). A group merely "expecting" to raise or expend funds is required to: (1) appoint a treasurer, (2) open a bank account in the state of Washington and (3) register with the State by filing a two-page Political Committee Registration Form which discloses the committee's name and address; the names and addresses of related and affiliated committees and persons; the names, addresses, and titles of the committee's officers and any persons authorized to make expenditures for the committee; a statement of whether the organization will continue past this election; the ballot proposition or candidate that the committee supports or opposes; how surplus funds will be distributed in the event of dissolution; and the name, address, and title of anyone who works for the committee to perform ministerial functions. *Id*. The last two requirements go far beyond any requirement under Mississippi law. In addition to registering, if the political committee raises more than $500 from any single donor in a year (or raises or spends more than $5,00 in a year), the committee must file detailed periodic and monthly reports disclosing, among other information, all contributions and expenditures in excess of $200. *Id*. at 998.

19

Even more burdensome that Mississippi's law, Washington requires that a committee report any "independent expenditures" (an expenditure not otherwise reported) exceeding $100. *Id*. If an expenditure exceeds $100, an entity must submit "an initial report of all independent expenditures made during the campaign" up until that point in time. *Id*. Three updates to the initial report are required on certain dates pegged to the election at issue: (1) the twenty-first day before the election, (2) the seventh day before the election, and (3) the tenth day of the month after the election. *Id.*

In light of the substantial governmental interest in educating voters, the *Brumsickle* court found the reporting requirements to be "somewhat modest," "not unduly onerous,"and "substantially related to the government's interest" so as to be constitutional. 624 F.3d at 997, 1013-14. "Like the requirements in *Citizens United*, Washington State's political committee disclosure requirements are not unconstitutionally burdensome relative to the government's informational interest. Rather, they are narrowly tailored such that the required disclosure increases as a political committee more actively engages in campaign spending and as an election nears." *Id*. at 1013.

Similarly, in *Alaska Right To Life Committee v. Miles*, 441 F.3d 773, 791(9th Cir. 2006), Alaska's requirement that an entity making a campaign related independent expenditure must file disclosure reports "provided that the entity's annual operating budget is more than $150" was found constitutional even under the more stringent strict scrutiny analysis. The reporting requirements were similar to those Mississippi.[6] Citing *Buckley I*, the *Miles* court found the

---

[6] The reporting requirements, set forth in footnotes 3 and 4 of the *Miles* opinion, required disclosure of the name, address, principal occupation, and employer of the individual filing the report, and an itemized list of expenditures. The report shall be filed no later than 10 days after

reporting requirements to be "not particularly onerous" and to be "justified by compelling state interests" of informing the electorate. *Id*. at 791.

The *Miles* and *Brumsickle* decisions affirming the constitutionality of registration and disclosure requirements with a "zero dollar" threshold and $150 threshold respectively are part of a larger, well established majority position. In *Vote Choice, Inc.*, the First Circuit found a requirement that a political committee must form and file disclosures upon the receipt of the "first dollar" of contributions was not *per se* unconstitutional because it severed a "sufficiently cogent" goal of informing voters about who supports a candidate or ballot. 4 F.3d 26, 33, 32 (1st Cir. 1993).[7]

Similarly, in *ProtectMarriage.com v. Bowen*, the court applied strict scrutiny and

---

the expenditure is made. Except when fund-raising nets contributions under $50 each, each entity shall disclose (1) the name and address of each officer and director of the nongroup entity; (2) the aggregate amount of all contributions made to the nongroup entity for the purpose of influencing the outcome of an election; (3) for all contributions described in (2) the name, address, date, and amount contributed by each contributor and, for all contributions described in (2) in excess of $250 in the aggregate during a calendar year, the principal occupation and employer of the contributor; and (4) the date and amount of all contributions made by the nongroup entity, and, with some exceptions, all expenditures made, incurred, or authorized by the nongroup entity. Each contribution to a nongroup entity for the purpose of influencing the outcome of an election that exceeds $250 and that is made within nine days of the election must be reported within 24 hours of receipt by the nongroup entity. 441 F.3d at 790-791 n.3 & n.4.

[7] The court did strike down the "first dollar" requirement under an as-applied analysis but for a reason that supports the constitutionality of Mississippi's $200 threshold. The court found the threshold unconstitutional as-applied because under the law "PACs must disclose the identity of every contributor, regardless of amount, while individual candidates need disclose the identities only of contributors who donate upwards of $100." 4 F.3d at 35. Here, Mississippi's $200 threshold and reporting requirements are similar for both political committees and candidates. Furthermore, the First Circuit further noted that "[a]s legislatures must tread carefully in this complicated area, so, too, must courts. We decline to rule out categorically the legislative tool of first dollar disclosure; that tool may in certain contexts-although not here-serve sufficiently compelling government interests to be upheld." *Id*. at 36.

21

affirmed a requirement that a committee disclose the name, address, occupation, and employer of every person who contributed $100 or more in support of a ballot measure. 599 F.Supp.2d 1197, 1207, 1220 (E.D.Cal. 2009). That court rejected the argument that $100 is insignificant, finding that "the legislative line drawn is narrowly tailored to the State's compelling informational interest, that the threshold need not be indexed for inflation, and that a contrary holding would call into question scores of statutes in which the legislature or the people have sought to draw similar lines." *Id*. at 1220; *see also SpeechNow.org v. Federal Election Com'n*, 599 F.3d 686, 697 (D.C. Cir. 2010) (recognizing strong "governmental interest in 'provid[ing] the electorate with information' about the sources of political campaign funds" and noting that "Plaintiffs do not disagree that the government may constitutionally impose reporting requirements").

In *Olson*, the federal court rejected a First Amendment challenge to reporting requirement for any expenditure of $50.00 or more "by any person or organization for the purpose of expressly advocating the election or defeat of any candidate, ballot issue, ballot question or issue." *Olson v. City of Golden, Colo.*, 2011 WL 3861433, at *1 (D.Colo. 2011). After discussing the relevant Supreme Court authority, the court concluded that

> the 2005 Ordinance served a compelling purpose in providing information to the public about the source of non-campaign funds expended on behalf of a candidate or issue and deterring corruption or the appearance of corruption. In addition, Golden has shown that the 2005 Ordinance was narrowly tailored to that purpose. The disclosure requirements were not onerous, involving only the reporting of expenditures over $50. The report required identifying and contact information about the person making such expenditure, the candidate or issue that the expenditures were intended to support or oppose, information about the vendors and a description of the expenditure, and the date and amount of the expenditure. This provided the information the public would need to understand who spent money on behalf of a candidate or issue, how much, how, and what the effect of that expenditure might be.

*Id*. at * 9.

In sum, in light of the fact that many states have adopted lower thresholds than Mississippi's, and given the persuasive analysis in the above opinions affirming the constitutionality of thresholds lower than Mississippi's, Plaintiffs' legal challenge has no merit.

### D. Threshold Determinations are Entitled to Deference and are Upheld Unless "Wholly Without Rationality."

The crux of plaintiffs' argument is a challenge to the Mississippi Legislature's determination that a $200 threshold for registration and itemization is appropriate given the relatively inexpensive cost of goods and services in this state. Even without the persuasive opinions of other courts affirming lower thresholds, this type of challenge runs head long into the Supreme Court's requirement that courts defer to legislative determinations regarding reporting thresholds. In *Buckley I*, the Supreme Court evaluated whether a $10 recordkeeping threshold and a $100 disclosure threshold passed constitutional review. 424 U.S. at 83. The Court admonished that decisions about "the appropriate level at which to require recording and disclosure" are "necessarily ... judgmental" and "complex" and, therefore, best left to legislative discretion. *Id.* ("we cannot require Congress to establish that it has chosen the highest reasonable threshold");[8] *see also Vote Choice, Inc.*, 4 F.3d at 32 (discussing *Buckley I*). So long as legislatively determined thresholds are not "wholly without rationality," courts must defer to the legislative judgment. *Buckley I*, 424 U.S. at 83; *see also Reed*, 130 S.Ct. at 2819 ("States

---

[8] The *Buckley I* court noted that complexity of the issue lead to the guiding principle that while "[i]t might as well or nearly as well be a little more to one side or the other[,] when it is seen that a line or point there must be, and that there is no mathematical or logical way of fixing it precisely, the decision of the legislature must be accepted unless we can say that it is very wide of any reasonable mark." 424 U.S. at 83, n.11 (quoting *Louisville Gas Co. v. Coleman*, 277 U.S. 32, 41 (1928) (Holmes, J., dissenting)).

allowing ballot initiatives have considerable leeway to protect the integrity and reliability of the initiative process, as they have with respect to election processes generally."); *cf. California Prolife Council Political Action Comm. v. Scully*, 989 F.Supp. 1282, 1293 (E.D.Cal.1998) ("as a general matter, the court will not second guess a legislative determination as to where the line for contribution limits should be drawn"). Deference to the legislature's judgment on the appropriate threshold recognizes the State's "hard lesson of circumvention" that has historically plagued the campaign finance context. *McConnell*, 540 U.S. at 165; *see also Citizens United*, 130 S.Ct. at 912 ("Political speech is so ingrained in our culture that speakers find ways to circumvent [these] campaign finance laws."); *McConnell*, 540 U.S. at 176 ("Experience under the current law demonstrates that Congress' concerns about circumvention are not merely hypothetical.").

As demonstrated above, Mississippi's $200 threshold for registration is a higher monetary threshold than adopted by several states, including but not limited to Washington, Ohio, Massachusetts, North Dakota, Oregon, and Montana. Also, Mississippi's requirement that only contributions exceeding $200 in a month by a particular donor be disclosed in an itemized manner is actually one of the ***highest*** thresholds in the nation. In 2009, the *Bowen* court rejected a challenge that a state requirement that all contributions in excess of $100 per reported by donor was an unconstitutional burden on free speech. 599 F.Supp.2d at 1221. The *Bowen* court listed the reporting thresholds of all states and noted that they fall in a "range from no threshold requirement to $300." *Id.* Only Nebraska, West Virginia, and New Jersey had higher thresholds ($250 and $300). *Id.* at 1221 n.10. Also, Mississippi's $200 threshold is consistent with it legislative judgment in other areas that certain criminal acts with a value over $100 constitute a

felony. *See, e.g.,* Miss. Code Ann. § 97-19-21(3) (fraudulently procuring goods by credit card in excess of $100 is a felony); Miss. Code Ann. § 97-19-67(1)(d) (worthless check in excess of $100 is a felony).

**E.    Plaintiffs' Reliance on *Sampson*, *Swaffer*, and *Hatchett* is Misplaced.**

Plaintiffs primarily rely on three decisions which analyzed statutory requirements that were very different from Mississippi's, which failed to even discuss the required deference to the legislature, and which failed to appreciate the compelling interest of disclosure in ballot measure contexts.

**1.    *Swaffer* and *Hatchett*.**

*Swaffer v. Cane* and *Hackett v. Barland* are cases decided by the same court regarding two different versions of a Wisconsin statute. In *Swaffer*, the registration threshold applied to any group spending $25 in a calendar year to influence a ballot measure. *Swaffer*, 610 F.Supp.2d 962, 966 (E.D.Wis. 2009). In *Hackett*, the registration threshold applied to any group spending $750 in a calendar year to influence a ballot measure. 2011 WL 4336740, at *16 (E.D.Wis. 2011). Wisconsin's law progressed far beyond Mississippi's requirements and, in fact, went far beyond mere reporting requirements. Wisconsin then limited the committee's actions in a manner completely absent from Mississippi's law. Among other requirements, the statute directed that "[a]ny anonymous contribution exceeding $10 received by an individual or group treasurer may not be used or expended. The contribution shall be donated to the common school fund or to any charitable organization at the option of the treasurer." *Id.* The statute prohibited the receipt of any contribution and the expenditure of any funds "at a time when there is a vacancy in the office of treasurer." *Id.* The statute required the group or person to open a

25

separate bank account for its funds. *Id*. "All contributions, disbursements and incurred obligations exceeding $10 shall be recorded by the group treasurer or the individual." *Id*. Finally, the group was required to provide an itemized disclosure giving the name and address of any contributor giving more than $20 in a calendar year. W.S.A. 11.06(1)(a). These requirements greatly exceed any requirements necessary for disclosure, go well beyond any requirement imposed under Mississippi law, and led the *Swaffer* and *Hatchett* courts to conclude that the totality of burdens imposed by these requirements was unconstitutional. The facts of these cases simply do not apply here.

Further each decision has limited persuasive value. *Swaffer* suffered from a lack of vigorous defense by the defendants. The *Swaffer* court chastised the defendants for not articulating arguments in support of the statute and noted that "the court is under no obligation to make the defendants' case for them." 610 F.Supp.2d at 967. Even more curious, *Hatchett* court rejected the argument advanced by the current Plaintiffs that reporting requirements are "PAC-style" burdens which are unconstitutional under strict scrutiny. 2011 WL 4336740, at *19. Also, contrary to the argument advanced by the current Plaintiffs, the *Hatchett* court found that the level the legislature established as the threshold "trigger amount is immaterial . . . because it does not affect the alleged constitutional flaws in the statute, which lie with the trigger itself, and the lack of consideration of an entity's major purpose, not the specific amount of the trigger." *Id*. at *19. Thus, the *Hatchett* court's conclusion that no specific statutory threshold amount would be constitutional is unquestionably wrong. Finally, the *Hatchett* court considered the area of disclosure requirements to be "too unsettled for this Court to facially invalidate these statutes." *Id.* at *25. In contrast, other courts have found that "[g]iven the Supreme Court's repeated

26

pronouncements, we think there can be no doubt that states may regulate express ballot-measure advocacy through disclosure laws." *Getman*, 328 F.3d at 1104.

> ### 2. *Sampson*

*Sampson v. Buescher,* 625 F.3d 1247 (10th Cir. 2010), is distinguishable because of the requirements of Colorado's disclosure laws were much more burdensome than those of Mississippi and because the court's legal premises were wrong.

First, *Sampson* relied heavily upon its conclusion that the State's interest in disclosure "appl[ies] only partially (or perhaps not at all) to ballot-issue campaigns." *Id.* at 1255. This is legally wrong and counterintuitive. Several courts and scholars have reached the opposite conclusion, finding disclosures to be more important when the voter is the legislator and is being lobbied to vote on complex ballot initiatives. *See, e.g., Reed*, 130 S.Ct. at 2819 (acknowledging State's interest in protecting integrity of ballot initiative elections); *Citizens Against Rent Control*, 454 U.S. at 298 (recognizing in the ballot initiative context the interest of voters in knowing "the identity of those whose money supports or opposes a given ballot measure"); *Getman*, 328 F.3d at 1105-06. Further, campaign finance regulation is an interwoven set of laws that cannot be viewed in isolation. Ballot issues and the committees that support them are part of the general election. Candidates appear on the same ballot as the initiatives. Candidates are often heavily involved in promoting, or receiving promotions from, committees associated with initiatives. In Mississippi and other states, candidates tie themselves to ballot measures as a means to further their campaign. Such close association is perfectly legal and underscores that disclosure requirements for ballot initiatives are just as important, if not more so, than disclosure requirements for candidate campaigns. *Cf. Citizens United*, 130 S.Ct. at 916 ("The First

27

Amendment protects political speech; and disclosure permits citizens . . . to react to the speech of corporate entities in a proper way. This transparency enables the electorate to make informed decisions and give proper weight to different speakers and messages.")

Second, the *Sampson* court concluded that Colorado's particular laws were so complex that the "average citizen cannot be expected to master on his or her own the many campaign financial-disclosure requirements set forth in Colorado's constitution, the Campaign Act, and the Secretary of State's Rules Concerning Campaign and Political Finance." 625 F.3d at 1259. Mississippi's four forms could not be argued to be beyond the understanding of the "average citizen" as they are less complex than many of the forms completed by average citizens on a routine basis.

Third, as was the case with the Wisconsin statutes, the Colorado statute went well beyond mere disclosure requirements and far exceeded any burden associated with Mississippi's law. After registration, the following requirements not found in Mississippi law were imposed: (1) must report the names and address of anyone who contributes $20 or more; (2) all monetary contributions received  must be deposited in a separate account in the committee's name; (3) no contribution or expenditure exceeding $100 could be in cash; (4) the group must have a registered agent; (5) the group must register before accepting any contributions; and (6) the group must disclosure the name and address of the financial institution used.  Further, any change in information supplied upon registration must be reported within five days, as opposed to Mississippi's requirement that the new information be  reported on the next regularly scheduled report.  *See* Miss. Code Ann. § 23-15-803(c).

    **3.**       **Neither *Swaffer*, *Hattchett*, nor *Sampson* Deferred to the Legislature's**

**Judgment Regarding Thresholds as Required by the Supreme Court.**

Absent from *Swaffer*, *Hattchett*, and *Sampson* is any consideration of the central issue of this case as framed by the Supreme Court: legislative deference.   As the Supreme Court has admonished, legislative decisions about "the appropriate level at which to require recording and disclosure" are "necessarily ... judgmental" and "complex" and, therefore, best left to legislative discretion.  *Buckley I*, 424 U.S. at 83; *see also Vote Choice, Inc.*, 4 F.3d at 32 (discussing *Buckley I*).   Courts must defer to the legislature's judgment unless the thresholds are "wholly without rationality."  *Buckley I*, 424 U.S. at 83 *cf. Scully*, 989 F.Supp. at 1293. ("as a general matter, the court will not second guess a legislative determination as to where the line for contribution limits should be drawn.").   Because the cases relied upon by Plaintiff did not follow the admonition of the Supreme Court on the crucial point now pending before this Court, those cases should not be followed on that basis alone, notwithstanding the fact that those courts were reviewing regulatory burdens very different from those in Mississippi.

**III.   Plaintiffs' Request for Extraordinary Relief is Contrary to the Public Interest, Unsupported by the Balance of the Equities, and Barred by Laches.**

As the *ProtectMarriage.com* recognized, the impact on the state's electorate weighs in favor of denying any attempt to preliminarily enjoin ballot related campaign disclosure laws. "[I]f disclosure is prevented, the people of California will be denied the ability to fully inform themselves of the circumstances surrounding the passage of Proposition 8. For the reasons already articulated, the balance of hardships favors the Plaintiffs and consideration of the public interest weighs against injunctive relief.  599 F.Supp.2d at 1226.

In this matter, Plaintiffs' emergency motion seeks to unalterably and fundamentally

change the State's election disclosure laws in the final week in which voters will consider three complex and very important amendments to the Mississippi Constitution. The injunction would prohibit the State from vindicating its compelling state interest of informing the electorate, "curbing the evils of campaign ignorance," and enforcing other campaign related laws. The harm that will befall the State and its citizens mandates the denial of the motion. Furthermore, when these harms are placed in the context of Plaintiffs' significant delay in filing this matter, the doctrine of laches justifies denying this eleventh hour relief. Had Plaintiffs filed this action over a year ago, when it was publically announced that the initiatives would appear on the general election ballot, the State would have had the opportunity to pass legislation curing any constitutional infirmity identified by this Court in time for disclosure requirements to remain in place during the campaign season. By waiting until less than three weeks before the election, Plaintiffs have prejudiced the State's ability to protect its citizens even in the event that this Court finds their claims have merit. Accordingly, denial of the motion is appropriate.

The United States Supreme Court has made it clear that a court may refuse to grant equitable relief where such relief threatens to disrupt or disturb the electoral landscape in the face of a rapidly approaching election. *See Reynolds v. Sims*, 377 U.S. 533, 585 (1964) ("Under certain circumstances, such as where an impending election is imminent and a State's election machinery is already in progress, equitable considerations might justify a court in withholding relief[.]"); *see also Miller v. Bd. of Commissioners of Miller County*, 45 F. Supp. 2d 1369, 1373 (M.D. Ga. 1998) ("[T]here is authority for applying the defense of laches to voting rights actions wherein voters seek preliminary injunctive relief[.]") (citations omitted)); *McNeil v. Sprinfield Park Dist.*, 656 F. Supp. 1200 (C.D. Ill. 1987); *Knox v. Milwaukee County Bd. of Elections*

30

*Commissioners*, 581 F. Supp. 399, 402 (E.D. Wisc. 1984). Additionally, the Fifth Circuit has

noted that a court may impose the doctrine of laches when the plaintiff seeks injunctive relief

aimed at altering settled election laws. *Lauderdale County Sch. Dist. v. Enterprise Consolidated*

*Sch. Dist.*, 24 F.3d 671, 692 (5th Cir. 1994) ("The doctrine of laches . . . may prevent a plaintiff

from enjoining changes effected without preclearance as required by the Voting Rights Act of

1965.") (citation omitted)); *see also Lopez v. Hale County*, 797 F. Supp. 547, 551 (N.D. Tex.

1992) (taking into account the disservice to the public interest in holding that plaintiff's attempt

to enjoin election was barred by laches)

This Court should reject this manufactured emergency motion on the basis of laches

because Plaintiffs (1) delayed in asserting the right or claim; (2) the delay was not excusable; and

(3) the delay has prejudiced the State and voters. *See Goodman v. Lee*, 78 F.3d 1007, 1014 (5th

Cir. 1996).

### A.    Plaintiffs Delayed in Asserting Their Claims.

The Fifth Circuit employs an "objective standard" under which the length of delay is

determined by asking when the plaintiff "knew or should have known" of the allegedly illegal

activity. *Armco, Inc. v. Armco Burglar Alarm Co., Inc.*, 693 F.2d 1155, 1161 (5th Cir. 1982).

Plaintiffs have clearly delayed for months, if not for over a year, in seeking a TRO or

preliminary injunction. It has been public knowledge since late October of 2010 that the ballot

initiative that the Plaintiffs seek to promote the passage of (Initiative 31) would appear on the

November 2011 general election ballot. See Eminent Domain Ban on Ballot, Associated Press,

Oct. 23, 2011, Exhibit CC; October 25, 2011, Secretary of State Press Release, Exhibit E. Plus,

the Initiative 31 petitioners were gathering signatures for twelve months prior to the

31

announcement that it would be on the ballot. Further, the statutes which the Plaintiffs are requesting this Court to enjoin the enforcement were all enacted in their present form in 1999 and have been enforced by the Defendants in every election since that time. *See e.,g.,* Miss. Code Ann. §§ 23-17-47.

Plaintiffs allege in their Complaint that they are well-informed, politically astute individuals who have engaged in political advocacy for years. *See* Compl. at ¶¶ 16-19. Indeed, the issue of whether the government should be permitted, pursuant to its time-honored eminent domain authority, to take property from an individual and transfer it to a private entity has been on the Plaintiff's radar screen since 2005 when the United States Supreme Court issued the *Kelo v. City of New London*, 545 U.S. 469 (2005) decision. Compl. at ¶¶ 18-19. Yet the Plaintiffs waited until the eleventh hour – October 20, 2011, 19 days before the November election – to file this suit and seek emergency injunctive relief from this Court. Clearly, the Plaintiffs knew or should have known that Initiative 31 was going to be placed on the November 2011 ballot at least since the end of 2010. See Compl. at ¶ 21 ("Plaintiffs have researched and discussed the initiative and eminent domain abuse at several of their meetings."). Moreover, they knew or should have known about the allegedly unconstitutional application of the relevant Mississippi state statutes to their proposed political advocacy for Initiative 31 for at least several months. According to the Complaint they have been contemplating publicly supporting the passage of Initiative 31 for quite some time. *See* Compl. at ¶¶ 21, 55 (noting that plaintiffs have been purchasing Initiative 31 flyers and posters). Plaintiffs could have easily filed the present suit months prior to the election. Instead, they chose to sleep on their constitutional rights, putting this Court in the position of deciding weighty constitutional issues under rushed circumstances. Accordingly, the

Defendants have established that the Plaintiffs have delayed in asserting their right to the injunctive relief requested in the present motion.

**B.    Plaintiff's Delay is Not Excusable**

"It is well established that in election-related matters, extreme diligence and promptness are required." *McClafferty v. Portage Count Bd. of Elections*, 661 F. Supp. 2d 826, 839 (N.D. Ohio 2009).  Courts generally look with disapproval upon any attempt to seek emergency injunctive relief in the context of an imminent election. *See Respect Maine PAC*, 622 F.3d at 16 (finding injunction of campaign laws, including disclosure requirements, would harm public; affirming denial of preliminary injunction); *ProtectMarriage.com*, 599 F.Supp.2d at 1226 (finding injunction of campaign disclosure law regarding ballot initiatives would harm public; denying preliminary injunction).  The Plaintiffs' delay in bringing this action (and seeking injunctive relief) is unreasonable not just because they knew or should have known for several months both that Initiative 31 was going to be on the November ballot and that Mississippi's laws would require them to register as a political committee, but also because they waited until the election was less than three weeks away before seeking injunctive relief.  *Cf. Reynolds*, 377 U.S. at 585 (stating that "a court is entitled to and should consider the proximity of a forthcoming election and the mechanics and complexities of state election laws" when determining whether to grant request for an injunction). [9]

_____

[9]    *See also Fulani v. Hogsett*, 917 F.2d 1028, 1031 (7th Cir.1990) (finding delay unwarranted where plaintiffs filed suit three weeks before election to challenge decisions by Secretary of State made public eleven weeks before); *Simkins v. Gressette*, 631 F.2d 287, 295-96 (4th Cir. 1980) (refusal to enjoin election when the preliminary injunction hearing could not be held until 5 ½ weeks before the election); *Dillard v. Crenshaw*, 640 F. Supp. 1347, 1362 (M.D. Ala. 1986) (despite decision favoring plaintiffs on the merits, court refused to enjoin elections which were three months away); *Marshall v. Meadows*, 921 F. Supp. 1490, 1494 (E.D. Va. 1996)

C. **The State Will Suffer Undue Prejudice, and the Voting Public Will be Harmed, if Ballot Measure Disclosure Laws are Struck Down in the Final Week Before this Critical Election.**

Given the timing of the present request for emergency injunctive relief, the State have been unduly prejudiced in the following ways: (1) the State and this Court will lack sufficient time to respond to, brief, and carefully consider the constitutional arguments; and (2) the State of Mississippi will not have enough time to legislatively fix any constitutional infirmities in the relevant statutes if they are struck down by this Court, which, in turn, will prevent the State from requiring any disclosure from ballot initiative groups in the critical last week of the election.

The Plaintiffs' wholly unwarranted delay in pursuing injunctive relief has prejudiced the State by forcing it to attempt to defend the constitutionality of the statutes at issue under severe time constraints. The Plaintiffs' request for emergency injunctive relief has also resulted in prejudice to the administration of justice, since the Court will not have adequate time to fully weigh and consider the parties' arguments regarding the constitutionality of the relevant statutes. *Cf. Nelson v. Campbell*, 541 U.S. 637, 650 (2004) ("[T]here is a strong equitable presumption against the grant of a stay [of execution] where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay.").

As noted above, the United State Supreme Court and other courts have long recognized both the State's compelling interest in campaign disclosures. *See, e.g., Citizens United*, 130 S.Ct. at 916 (disclosure laws provide "transparency [that] enables the electorate to make informed decisions and give proper weight to different speakers and messages"). Striking down disclosure requirements in the final week of the election will eliminate what the Supreme Court

_____

(suit filed within 95 days of election).

34

has found to be "the least restrictive means of curbing the evils of campaign ignorance and corruption." 424 U.S. at 68. If the Court determines that the statutes which the Plaintiffs claim are unconstitutional and enjoins their enforcement in the days before the election (including, most importantly, the $200 threshold for registering as a political committee), there will not be enough time for the State of Mississippi to amend the statutes and create a constitutional disclosure requirement prior to the election. As a result, no group seeking to influence the outcome of the vote on the three ballot initiatives would have to comply with any of the statutory disclosure requirements.[10] Such a scenario would clearly prejudice the State and voters, since they would not be able to "ensure that voters have the facts they need to evaluate the various messages competing for their attention." *Brumsickle*, 624 F.3d at 1006.

As was the case in *Respect Maine PAC*, this litigation "'emergency' is largely one of [plaintiffs'] own making" and the emergency relief should be denied "[g]iven the potential harm to Maine and to all candidates if the emergency injunction were granted, and the public interest in maintaining the status quo during the period of the Court's deliberations." *Respect Maine PAC v. McKee*, 622 F.3d 13, 16 (1st. Cir. 2010).

## CONCLUSION

For the reasons set forth above, the motion for emergency injunctive relief should be denied.

---

[10] Further, an injunction of the current law would allow unlimited amounts of campaign funds to be anonymously spent to influence voters. This would undermine the third compelling state interest pertaining to disclosure requirements: disclosure requirements preventing corruption and the "appearance of corruption by exposing large ... expenditures to the light of publicity." *See Buckley II*, 525 U.S. at 202 (quotations and citation omitted, emphasis added).

35

THIS the 27th day of October, 2011.

BY: **JIM HOOD, ATTORNEY GENERAL**
**STATE OF MISSISSIPPI**


BY: <u>S/Harold E. Pizzetta, III</u>
Harold E. Pizzetta, III (Bar No. 99867)
Assistant Attorney General

*Counsel for Mississippi Secretary of State Delbert*
*Hosemann and Mississippi Attorney General Jim Hood*


Office of the Attorney General
Post Office Box 220
Jackson, MS 39205-0220
Telephone: (601) 359-3680
Facsimile: (601) 359-2003
hpizz@ago.state.ms.us

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document has been filed electronically with the Clerk of Court using the Court's ECF system and thereby served on the following persons:

Russell Latino, III
Post Office Box 131
Jackson, MS  39205-0131
rlatino@wellsmarble.com

Paul V. Avelar
398 S. Mill Avenue, Suite 301
Tempe, AZ 85281
pavelar@ij.org

Steven M. Simpson
901 North Glebe Road, Suite 900
Arlington, VA 22203-1854
ssimpson@ij.org

THIS the 27th day of October, 2011.

S/Harold E. Pizzetta, III
Harold E. Pizzetta, III