**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**Western Division**

GORDON VANCE JUSTICE, JR.; SHARON BYNUM;
MATTHEW JOHNSON; ALISON KINAMAN AND
STANLEY O'DELL;

      Plaintiffs,

                                        Civil Action No.
v.                              3:11-CV-138-SA-SAA

DELBERT HOSEMANN, in his official capacity as
Mississippi Secretary of State; JIM HOOD, in his
official capacity as Attorney General of the State
of Mississippi,

      Defendants.

---

**MEMORANDUM IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

---

## INTRODUCTION

Campaign finance laws like Mississippi's registration, reporting, and mandatory disclosure requirements are universally acknowledged to burden the exercise of speech and association rights at the core of the First Amendment. Accordingly, at a minimum, the government must justify its regulatory scheme under "exacting scrutiny" and prove "a substantial relation between the . . . requirement(s) and a governmental interest. To withstand this scrutiny, the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights." *Doe v. Reed*, 130 S. Ct. 2811, 2818–19 (2010) (internal citations and quotation marks omitted). The government cannot make its showing here.

These laws are not supported by any sufficiently important interest. Plaintiffs are engaging in independent speech about ballot issues, speech that, as a matter of settled law, presents no threat of corruption. Neither does Plaintiffs' speech implicate the so-called

1

"informational interest," as speech about ballot issues does not give rise to such an interest at all, and certainly not at the very minimal levels of speech—just $200 worth—as Mississippi regulates. Finally, whatever minimal informational interest that may exist at the nominal level Mississippi regulates cannot justify the heavy burdens that Mississippi places on Plaintiffs to obtain that information.

Plaintiffs were not able to litigate their claims to completion prior to the 2011 election, yet they want to speak out about ballot initiatives in future elections. They therefore ask this court to join the legal trend—as exemplified in recent decisions from the Tenth, Ninth, Eighth, and Seventh Circuits—of at least protecting the political expression of small groups like theirs from burdensome campaign finance laws.

## STATEMENT OF UNCONTESTED FACTS

Plaintiffs' political speech and association have been and continue to be limited by Mississippi's campaign finance laws (§ I, *infra*). These complicated laws force formal formation, registration, record-keeping, record-retention, and reporting requirements on Plaintiffs and speakers like them (§ II.A-C, *infra*). Indeed, these laws are so complex that the State itself cannot consistently interpret them, gives erroneous guidance to speakers about them, and cannot comply its own forms to them (§ II.D, *infra*). These laws have real-world, negative effects on Mississippians' ability to talk about salient political issues of the day (§ III, *infra*). Not only do these laws impose significant costs on would-be speakers, they provide virtually no informational benefits to voters, (§ IV, *infra*), the only interest they purport to further.

## I.   Plaintiffs Wish to Speak About Constitutional Amendment Ballot Issues.

Plaintiffs Vance Justice, Sharon Bynum, Matt Johnson, Alison Kinaman, and Stan O'Dell are like-minded friends and neighbors in Oxford, Mississippi. Verified Compl. ("Compl.") ¶¶ 8-

12, 16.[1]  One issue about which Plaintiffs feel strongly is property rights, and, specifically, the impact of eminent domain on those rights.  Compl. ¶ 18.  Plaintiffs therefore supported the passage of Initiative 31, a ballot measure to amend the Mississippi Constitution that appeared on the November 2011 ballot, because it was a "strong deterrent" to eminent domain abuse.  Initiative 31 Educational Brochure, Ex. 8.

Plaintiffs, however, curtailed their political activities in support of Initiative 31 because of Mississippi's campaign finance laws.  Compl. ¶ 56.  It is impossible for individuals or groups to engage in more than a bare minimum of speech—$200 worth—before subjecting themselves to Mississippi's campaign finance scheme.  Plaintiffs therefore refrained from purchasing a quarter page advertisement in their local newspaper because it was impossible to do so and remain under the threshold for political committee status.  Compl. ¶ 46.  Plaintiffs also limited the number of posters and flyers they used to speak because the costs would have resulted in their becoming a political committee.  Compl. ¶¶ 47-48.

The burdens of Mississippi's campaign finance laws not only curtailed Plaintiffs' speech during the 2011 election, they continue to do so.  Plaintiffs are all politically active and want to be able to spend their own money, associate freely with one another and with others, and speak out in the future about ballot initiatives without fear or threat of being prosecuted or investigated for violating the campaign finance laws.  Compl. ¶ 62.  So long as Mississippi's statutory scheme remains in place, Plaintiffs will continue to curtail their political association and the amount of political speech they will engage in regarding ballot measures.  Compl. ¶ 61.

---

[1] "On summary judgment, factual allegations set forth in a verified complaint may be treated the same as when they are contained in an affidavit."  *Hart v. Hairston*, 343 F.3d 762, 765 (5th Cir. 2003).

II.     **Mississippi's Statutory Scheme.**

    A.     **There are two sets of statutes mandating registration, reporting and disclosure for groups like Plaintiffs'.**

Mississippi's campaign finance statutory scheme is complex—and is made more so because speech about constitutional amendment ballot measures at issue here is potentially subject to two separate but overlapping series of regulations: Mississippi Code Annotated §§ 23-17-47 *et seq.*, and Mississippi Code Annotated §§ 23-15-801 *et seq.* Based on their plain language, both sets of statutes apply to constitutional amendment ballot measure political committees. For purposes of Mississippi Code Annotated §§ 23-17-47 to -53 and -61, a political committee subject to regulation is defined as "any person, other than an individual, who receives contributions or makes expenditures for the purpose of influencing the passage or defeat of a *measure on the ballot*." Miss. Code Ann. § 23-17-47(c) (emphasis added). For purposes of Mississippi Code Annotated §§ 23-15-801 *et seq.*, a political committee subject to regulation is defined as any group who receives contributions or makes expenditures "for the purpose of influencing or attempting to influence the action of voters for or against" any "*balloted measures*." Miss. Code Ann. § 23-15-801(c) (emphasis added).[2]

Under both sets of statutes, a group of individuals becomes a political committee subject to regulation once they raise or spend more than $200 in "contributions or expenditures." Miss. Code Ann. §§ 23-15-801(c); 23-17-49(1), -51(1). Within ten days of crossing the $200 threshold, they must file a Statement of Organization with the State. Miss. Code Ann. §§ 23-15-801(a); 23-17-49(1). The statement must include the names and addresses of all committee

---

[2] It is not clear why there are multiple code chapters applicable to constitutional amendment ballot measure committees. Sections 23-15-801 through -813 are a part of the general Mississippi Election Code and were enacted in 1986. Laws 1986, Ch. 495, § 247(1) through (7). Sections 23-17-47 through -53 and -61 were added to the Mississippi Code in 1993 as part of a larger enactment providing procedures by which Mississippians may initiate amendments to their constitution. Laws 1999, Ch. 514, §§ 24 through 27. But, in 1999, after the enactment of Chapter 17, Chapter 15 was amended to apply to constitutional amendment ballot measure political committees. Laws 1999, Ch. 301, § 8 (amending Miss. Code Ann. § 23-15-805(a) to include "every committee, which . . . makes reportable contributions to or expenditures in support of or in opposition to *a statewide ballot measure* . . . .") (emphasis added).

officers, and it must designate a Director and a Treasurer who is legally responsible to keep the books and accounts. Miss. Code Ann. §§ 23-15-803(b); 23-17-49(2).

Mississippi uses the same Statement of Organization form for both 23-15 and 23-17 political committees, *see* Statement of Organization, Ex. 1, even though each set of statutes has different requirements. Section 23-17-49(2)(c) requires a committee to identify the measure that the committee seeks to pass or defeat, though there is no such legal requirement for 23-15 committees. Section 23-17-49 requires any changes to the statement to be reported within ten days, but Section 23-15-803(c) gives until "the next regularly scheduled report" to report changes in information.

Under both sets of statutes, contributions and expenditures are defined, in essence, as anything of value given to influence the election or defeat of a measure. Miss. Code Ann. §§ 23-15-801(e)(i) & (f)(i); 23-17-47(a) & (d). These broad definitions, however, exclude different things from their reach. "Contribution" does not include "the value of services provided without compensation by any individual who volunteers on behalf of a . . . political committee" for purposes of some regulations. Miss. Code Ann. § 23-15-801(e)(ii). But for other regulations, "contribution" only excludes "noncompensated, nonreimbursed volunteer *personal* services." Miss. Code Ann. § 23-17-47(a) (emphasis added). Notably, the 23-15 regulations exclude "any news story, commentary or editorial distributed through the facilities of any broadcasting station, newspaper, magazine, or other periodical publication . . . " from the broad definition of expenditure. Miss. Code Ann. § 23-15-801(f)(ii). The 23-17 regulations, however, contain no such exemption. Miss. Code Ann. § 23-17-47(d).[3]

---

[3] The separate definition of "expenditure" in Miss. Code Ann. § 23-17-47 dates only to 1999. Laws 1999, Ch. 301, § 17. Although prior to 1999, the meaning of "expenditure" in Miss. Code Ann. § 23-17-47(c)'s definition of "political committee" may have been understood by reference to Section 23-15-801, the new, different, definition implies that the legislature intended a different meaning of "expenditure."

**B.    Monthly Reports—Sections 23-17-47 *et seq*.**

Monthly reports are required of both political committees and individuals who have passed the $200 contribution or expenditure threshold under Sections 23-17-47 *et seq*.  Miss. Code Ann. § 23-17-51.  All monthly reports must contain the name, address, and telephone number of the group or individual making the report.  Miss. Code Ann. § 23-17-53(a).

Section 23-17-53(b) requires monthly reports for political committees to further contain:

- The total amount of contributions received during the period covered by the report;

- The total amount of expenditures made during the period covered by the report;

- The cumulative amount of those totals for each measure;

- The balance of cash and cash equivalents on hand at the beginning and the end of the period covered by the report;

- The total amount of contributions received during the period covered by the report from persons who contributed Two Hundred Dollars ($ 200.00) or less, and the cumulative amount of that total for each measure;

- The total amount of contributions received during the period covered by the report from persons who contributed Two Hundred Dollars ($ 200.00) or more, and the cumulative amount of that total for each measure; and

- The name and street address of each person from whom a contribution(s) exceeding Two Hundred Dollars ($ 200.00) was received during the period covered by the report, together with the amount contributed, the date of receipt, and the cumulative amount contributed by that person for each measure.

Section 23-17-53(c) requires monthly reports for individuals to further contain:

- The total amount of expenditures made during the period covered by the report;

- The cumulative amount of that total for each measure; and

- The name and street address of each person to whom expenditures totaling Two Hundred Dollars ($ 200.00) or more were made, together with the amount of each separate expenditure to each person during the period covered by the report and the purpose of the expenditure.

- The total amount of contributions received during the period covered by the report, the cumulative amount of that total for each measure, and the name and street address of each person who contributed more than Two Hundred Dollars ($ 200.00) and the amount contributed.

6

### C.      Other Reports—Sections 23-17-801 *et seq*.

Political committees that pass the $200 contribution or expenditure threshold under Section 23-15-801 *et seq*. must file three kinds of reports.  Miss. Code Ann. § 23-15-807(b).  The pre-election report is required in any calendar year in which there is a regularly scheduled election and must be filed by the seventh day before the election in which the committee wishes to raise and spend money for its speech.  Miss. Code Ann. § 23-15-807(b)(i).  The periodic reports are required in every fourth year after 1987 and are due no later than May 10, June 10, July 10, October 10, and January 10.  Miss. Code Ann. § 23-15-807(b)(ii).[4]  In remaining years, political committees must file annual reports covering that calendar year, which are due no later than January 31 of the following calendar year.  Miss. Code Ann. § 23-15-807(b)(iii).  In the pre-election, periodic, and annual reports, committees must report:

- the name, address, occupation, and name of employer for each person who contributes more than $200 during the reporting period, along with the date and amount of the contribution;

- the name, address, occupation, and name of employer of each person or entity to whom the committee makes an expenditure of more than $200 during the reporting period, along with the date and amount of the expenditure;

- the total amount of all contributions and expenditures; and

- the total amount of cash on hand.

Miss. Code Ann. § 23-15-807(d).

### D.      Mississippi's Own Guidance Documents and Forms Do Not Comply with Section 23-17-47 *et seq*.

During discovery, Mississippi asserted, for the first time, that, despite the clear language of the statues, it does not enforce Mississippi Code Annotated §§ 23-15-801 *et seq*., against constitutional amendment ballot measure committees; it only enforces Mississippi Code Annotated §§ 23-17-47 *et seq*. against those committees.  This is because Mississippi claims that

---

[4] Despite this clear language, Mississippi's current Campaign Finance Guide states that periodic reports are due in 2012 as well.  Exhibit 4.

the Section 23-17-47(c) definition of political committee is "more specific than the general definition" of political committee in Section 23-15-801(c). Dep. of Kimberly P. Turner, Ex. 11 at 20:23–21:1. And, "to the extent that a section . . . pertains to [a] more specific subject as opposed to [a] more general subject, the specific section takes precedent over a more general section." *Id.* at 18:23–19:2.

Mississippi's new position demonstrates the difficulty of understanding its campaign finance laws. This statutory interpretation conflicts with the State's own guidance to constitutional amendment ballot measure committees: Its Constitutional Amendment Initiative Guide refers such committees to both sets—Chapters 15 and 17—of campaign finance statutes. Initiative Guide, Ex. 6, at 10. And the State's new position, if correct, means that the campaign finance guidance it provides to constitutional amendment ballot measure committees is, at best, useless, if not outright misleading. Moreover, it means that Mississippi's supposedly "simple forms" for such committees do not themselves comply with the applicable statutes.

### 1.    Mississippi's Campaign Finance Guidance Documents.

The Constitutional Amendment Initiative Guide makes "[n]o attempt to include all campaign finance disclosure requirements" and instead refers readers to the Campaign Finance Guide. Initiative Guide, Ex. 6, at 10. But neither the 2011 nor 2012 Campaign Finance Guides provide any guidance as to Sections 23-17-47 *et seq.* Both Guides tell all political committees to file reports that are now claimed inapplicable to constitutional amendment ballot measure committees (the "periodic, pre-election, and pre-runoff reports") and never mention the reports that constitutional amendment ballot measure committees are to file (the monthly reports). 2012 Campaign Finance Guide, Ex. 4, at 14; 2011 Campaign Finance Guide, Ex. 5, at 14. Both guides provide "Reporting Schedule[s]" that have no applicability to the monthly reports that people speaking about constitutional amendment measures must file. 2012 Campaign Finance Guide, Ex. 4, at 7; 2011 Campaign Finance Guide, Ex. 5 at 7. Both Guides provide the wrong standard

for constitutional amendment ballot measure committees to amend their Statements of Organization. 2012 Campaign Finance Guide, Ex. 4, at 14; 2011 Campaign Finance Guide, Ex. 5, at 13. Both Guides say that reporting must continue until a termination report is filed. 2012 Campaign Finance Guide, Ex. 4 at 15; 2011 Campaign Finance Guide, Ex. 5, at 14. But termination reports are not a requirement for constitutional amendment ballot measure committees—such committees (and individuals) have a different standard for ceasing reporting obligations—and such committees are required "[i]n all cases" to file a report "thirty (30) days following the election on a measure." *Compare* Miss. Code Ann. § 23-17-51(3), *with* Miss. Code Ann. § 23-15-807(a).

### 2. Mississippi's Campaign Finance Forms.

Mississippi's initiative monthly report form, Exhibit 3, does not comport with the statutory requirements of Section 23-17-53. Instead of requesting cumulative contributions and expenditures as required by Section 23-17-53(b)(iii), the form requests calendar year-to-date figures. Rather than requiring balances of cash on hand at the beginning of the period and at the end of the period per Section 23-17-53(b)(iv), the form only requests one figure. While the form requests the sum of contributions received during the period from persons who contributed $200 or less, it does not request the cumulative amount of that sum for the measure as required by Section 23-17-53(b)(v). Similarly, it requests a sum of contributions received in the period from persons who contributed $200 or more, but does not request the cumulative amount of such contributions for the measure as required by Section 23-17-53(b)(vi).

Furthermore, the form requests information that is not required by statute. It requires a committee to report expenditures as "itemized" or "non-itemized," i.e., those greater than and less than $200. But while Section 23-17-53(b)(v) and (vi) requires such a breakdown for *contributions*, there is no such requirement for *expenditures*. Indeed, Section 23-17-53(b)(ii) and

(iii) require the reporting only of the "total amount of expenditures made during the period," and the cumulative amount of expenditures.

Moreover, Mississippi's "Itemized Receipt" form, Exhibit 7, conflicts with the legal requirements of Section 23-17-47 *et seq*. First, the form requires the disclosure of a $200 contributor's employer and occupation which is not required by the relevant statutes. *Compare* Itemized Receipts Form, Exhibit 7, *with* Miss. Code Ann. § 23-17-53(b)(vii) and (c)(iv). Second, the form requires disclosure of each person who has contributed more than $200 in the aggregate, year-to-date, even though constitutional amendment ballot measure committees must only disclose "each person from whom a contribution(s) exceeding Two hundred Dollars ($200.00) was received *during the period covered by the financial report*," *i.e.*, the month reported. Miss. Code Ann. § 23-17-53(b)(vii) and (c)(iv) (emphasis added). Regardless, because Mississippi's forms require reporting of $200-cumulative contributors, committees must keep track of all contributions (including in-kind contributions) to ensure that they can report those donors who exceed the reporting threshold of $200 and their cumulative totals.

## III.  Real-World Effects of Mississippi's Campaign Finance Scheme.

### A.  Atlee Breeland and Parents Against Personhood.

Atlee Breeland is a Mississippi mother of three. Dep. of Atlee Breeland, Ex. 12, at 6:7-8. Prior to the 2011 election, she had never really been involved in politics. *Id.* at 7:19-22, 9:24-10:13. But infertility treatment is something that she feels "very, very strongly and passionately about" because she and her husband "used infertility treatment to conceive [their] daughters." *Id.* at 7:22-25. Ms. Breeland was therefore very concerned when Initiative 26—the Personhood Initiative, *see* Mississippi Secretary of State, Initiative 26 Educational Brochure, Exhibit 16—was approved for the ballot because "It would stop people like [her] from being able to have children through infertility treatment." Dep. of Atlee Breeland, Ex. 12, at 8:16-9:1.

10

Ms. Breeland therefore created a website designed to inform people about the unintended consequences of Initiative 26. *Id.* at 9:7-20. But she never intended to conduct "traditional political campaigning." *Id.* at 17:25-18:1. Nevertheless, at the urging of an acquaintance familiar with Mississippi's reporting requirements, *id.* at 19:4-14, Ms. Breeland called the Secretary of State's office and discovered that, "because [she is] a professional computer programmer, all of the activity that [she does] related to website design and production would be considered in-kind contributions." *Id.* at 22:21-24. She was informed that her "registering of the domain, setting up the website, [and] doing the . . . work necessary to build the framework of the website," subjected her to reporting because the two hours she spent on work, for which she normally charged $100 per hour, caused her to exceed the reporting threshold. *Id.* at 23:9-24:13.

Ms. Breeland, along with two friends who were also concerned about Initiative 26, registered as a political committee called Parents Against Personhood. *Id.* at 15:4-17:8, 31:21-32:20. It was never Ms. Breeland's intent to start a political committee: "[W]e were never, we were not thinking about traditional political campaigning. We really just wanted to be able to use the Internet and use this wonderful tool for speech that's freely available to everybody." *Id.* at 17:14-18:4. Nevertheless, Mississippi's campaign finance laws forced them to change their plans and, ultimately, to expand their activity beyond the website because "if you're forced by the State of Mississippi to have that framework and to do all of the reporting, you might as well be able to get some benefit out of it." *Id.* at 26:4-7.

Ms. Breeland testified to how Mississippi's campaign finance laws burdened her political speech and association. Without the advice of a friend knowledgeable about the laws, she would not have known she had to file a Statement of Organization just for creating a website. *Id.* at 19:2-21:2. "The receipt keeping" that she had to do to comply with the reporting requirements "was definitely hard to manage, internally." *Id.* at 35:21-22. She did not know how to

11

characterize certain financial transactions, so, although Parents Against Personhood set up an online store to sell bumper stickers and other merchandise, they elected to "just not make anything off of that." *Id.* at 37:5-16. And completing the monthly reports took "several hours." *Id.* at 46:4. Throughout the process, she "was always very concerned about 'Am I doing it right? Am I reporting everything that needs to be reported? Have I done it wrong, and is somebody going to come back and try to slap me for it?'" *Id.* at 46:12–16.

Ms. Breeland also testified to the chilling effects Mississippi's reporting and disclosure requirements had on her political speech and association. The State itself recommended that Ms. Breeland not report and disclose information about contributors who gave less than $200 in order to avoid the privacy concerns associated with reporting. *Id.* at 26:19-27:7. Ms. Breeland told potential donors that if they were concerned about the disclosure of their identity in association with their donation, they should give $199—$1 less than the reporting threshold—so as to allow their contributions to remain anonymous. *Id.* at 50:10–25. She received several donations of exactly $199 in order to avoid reporting. *Id.* at 51:3-4.

Mississippi's cumulative $200 threshold for contribution reporting also created further paperwork for Ms. Breeland. She was told by the State that

> I did need to track everything very, very carefully so that if somebody gave me $25 now and if somebody then later gave me more money, that I would be able to report that total threshold once that we crossed the two hundred dollar threshold.
>
> So she said I needed to track every contribution, if I was going to accept monetary contributions. I needed to continue to track my own hours and report those, and that they all had to be reported as part of the statement that would be filed every month, and itemized if they crossed that two-hundred-dollar threshold.

*Id.* at 27:8-21.

### B. Mississippi's Campaign Finance Report Database Exhibits Numerous Errors.

The State has previously insisted that its campaign finance forms for constitutional amendment ballot measure committees are relatively simple. *See* Mem. Op., DOC 18 at 20.

But, a review of these forms on the on Mississippi Secretary of State's on-line database finds numerous errors. One group, Working Assets Funding Service, Inc., filed an "independent expenditure" report form, even though there is no such thing as an independent expenditure in a ballot measure election. Dep. of Kimberly P. Turner, Ex. 11, at 65:8–11; D. Simpson Decl., Ex. 15, at ¶ 63. At least one group filed both monthly and periodic reports, D. Simpson Decl., Ex. 15, at ¶¶ 47, 62, even though the latter are now claimed to be not necessary. Several committees had trouble filing timely monthly reports. *Id.* at ¶¶ 51-54, 57, 59-60, 62. At least one rather large committee late filed its Statement of Organization. *Id.* at ¶ 37, Ex. A. Several committees never filed the mandatory report 30 days following the election. *Id*. at ¶ 44. Ultimately, no group identified by the State was able to completely comply with Mississippi law, *see id*. at ¶¶ 81-83, even though nearly all constitutional amendment ballot measure political committees in Mississippi are significantly larger than the $200 threshold and at least some employ lawyers. *Id.* at ¶ 68, Ex. A.

**IV.    Dr. Primo's Expert Report.**

Plaintiffs further submitted the Expert Report of Dr. David Primo. Ex. 14. Dr. Primo's report is derived from his earlier original research and academic literature review and concludes that campaign finance disclosure laws for ballot measures provide virtually no informational benefits to voters but impose costs on individuals who wish to participate in the debate over such measures. Expert Report of David M. Primo, Ph.D., Ex. 14, at 13. Dr. Primo also reviewed Mississippi's campaign finance disclosure laws and forms and news articles about Mississippi's 2011 initiatives to demonstrate how his conclusions applied to Mississippi. *Id.* at 5. Notably, Dr. Primo's conclusions bolster, and in turn are bolstered by, the real-world experience of Mississippians, such as Plaintiffs and Ms. Breeland, and by the State's own campaign finance database.

13

## LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(c). On summary judgment, the Court is to view the evidence and draw inferences in a light most favorable to the nonmoving party. However, to defeat a motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

## ARGUMENT

Plaintiffs are challenging Mississippi's registration, reporting, and mandatory disclosure requirements as they apply to groups speaking about constitutional amendment ballot initiatives. These laws burden speech that rests "at the core of our electoral process and of the First Amendment freedoms." *Buckley v. Valeo*, 424 U.S. 1, 39 (1976) (internal quotation omitted); *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995) ("[t]he principles enunciated in *Buckley* extend equally to issue-based elections"). As the Supreme Court has made clear repeatedly, "political speech must prevail against laws that would suppress it, whether by design or inadvertence." *Citizens United v. FEC*, 130 S. Ct. 876, 898 (2010).

To resolve this challenge, the Court is faced with several legal questions that have not yet been resolved by the Fifth Circuit, including (1) whether the so-called informational interest applies to groups speaking about ballot measures, (2) if that interest applies, the level of its importance, (3) whether, or to what degree, the informational interest applies to the very low level of speech—just $200 worth—that Mississippi regulates. As this Court has noted during the preliminary injunction proceedings, there is something of a lack of clear guidance from the Supreme Court and split among the several circuits on these issues. *See* Mem. Op., DOC 18 at 8-17. Since the preliminary injunction proceedings, several federal circuit courts have ruled that, at a minimum, the Constitution demands the courts protect speakers like the Plaintiffs from

14

registration, reporting, and mandatory disclosure laws, as the chilling effects of these laws are not justified because government does not have an interest in information about small amounts of spending on political speech.

## I.      Applicable Level of Scrutiny.

This Court has recognized that the Supreme Court has issued some conflicting statements regarding the level of scrutiny to be applied here.  Mem. Op. DOC 18 at 8-12.  The Fifth Circuit has recently stated that "disclosure laws" are to receive "exacting rather than strict scrutiny." *Asgeirsson v. Abbott*, No. 11-50441, 696 F.3d 454, ___, 2012 U.S. App. LEXIS 20068 at *20 (5th Cir. Sept. 25, 2012).  Plaintiffs maintain that the registration, reporting, and mandatory disclosure laws at issue here are subject to strict scrutiny.[5]  Even under exacting scrutiny, however, Plaintiffs are entitled to judgment as a matter of law.

## II.      Mississippi Lacks an Important Interest in Compelling Plaintiffs to Comply with Its Burdensome Registration, Reporting, and Mandatory Disclosure Laws.

Exacting scrutiny requires the government to prove "a substantial relation between the [challenged] . . . requirement and a governmental interest.  To withstand this scrutiny, the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights."  *Doe v. Reed*, 130 S. Ct. at 2818 (internal citations and quotation marks omitted).

Government may impose PAC requirements—formation, registration, record-keeping, record-retention, and reporting—on speakers only based on an anti-corruption interest.  *Citizens United*, 897-98, 901 (imposition of PAC requirements operate as a ban on speech; bans on speech can only be justified by governmental interest in the prevention of quid pro quo

---

[5] Plaintiffs maintain that strict scrutiny should apply to their claims for the reasons they previously argued, *see* Mem. of Law in Support of Plfs' Mot. for TRO and Prelim. Inj., DOC 4 at 20-21, and recently highlighted by the Eight Circuit, *see Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 874-75 (8th Cir. 2012) (questioning whether "Allowing states to sidestep strict scrutiny by simply placing a 'disclosure' label on laws imposing the substantial and ongoing burdens typically reserved for PACs risks transforming First Amendment jurisprudence into a legislative labeling exercise.").

corruption). In regard to the imposition of disclosure requirements, the Court has identified only three even possibly legitimate governmental interests. The first two relate to contribution limits and the threat of corruption. *See Buckley*, 424 U.S. at 67-68 (disclosure laws "are an essential means of gathering the data necessary to detect violations of . . . contribution limitations" and that publicizing large contributions and expenditures can "deter actual corruption and avoid the appearance of corruption" and can facilitate detection of post-election favoritism). The third justification is an "informational interest." *Id.* at 67. None of these interests applies here.

### A. The Anti-corruption Interest Does Not Apply to Ballot Issue Speech.

Spending for speech in ballot issue elections poses no threat of corruption because ballot issues involve no candidate who can be corrupted. *Citizens Against Rent Control v. City of Berkeley*, 454 U.S. 290, 298 (1981); *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 790 (1978). Accordingly, the anti-corruption interest cannot support reporting, registration, and mandatory disclosures laws that apply to ballot measure committees. *Canyon Ferry Road Baptist Church of East Helena, Inc. v. Unsworth*, 556 F.3d 1021, 1031-32 (9th Cir. 2009).

### B. The Informational Interest Does Not Apply to Ballot Issue Speech.

Whether the informational interest applies to ballot-issue campaigns and whether that interest is "important" are open questions in the Fifth Circuit and there currently exists a split among the circuits on this issue. Mem. Op., DOC 18 at 15-17 (comparing *Sampson v. Buescher*, 625 F.3d 1247, 1256-57 (10th Cir. 2010), with *Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1105-06 (9th Cir. 2003)). This Court has previously ruled that the informational interest is an 'important interest' that does apply to speech about ballot measures. *Id.* at 17. Plaintiffs maintain that the informational interest does not apply to speech about ballot measures and is not 'important.' [6] Moreover, the marginal informational benefits of disclosure are practically

---

[6] *See* Memorandum in Support of Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction, DOC 4 at 14-17. Those Supreme Court cases actually addressing the informational interest have been specifically

imperceptible: "[T]here are virtually no informational benefits from looking at disclosure-related data." Expert Report of David M. Primo, Ph.D., Ex. 14, at 10. This is particularly the case for Mississippi constitutional amendment ballot measures, because these measures prompt numerous informational "cues" to voters that do not rely on information mandated by campaign finance registration, reporting, and disclosure laws. *Id.* at 10-13.

### C. Even if the Informational Interest Can Apply to Ballot Issue Speech, It Does Not Justify the Burdens Placed on Plaintiffs' Speech and Association.

Even assuming that the informational interest can generally apply to speech about ballot measures, Plaintiffs are still entitled to judgment as a matter of law because that interest is too weak at the low level of speech that Mississippi regulates to support its burdensome registration, reporting, and mandatory disclosures laws.

### 1. Mississippi's Campaign Finance Burdens Are Substantial.

The burdens Mississippi has placed on protected political speech are clear on their face, proven in discovery, and precisely those that other courts have found unconstitutional, especially when applied to small groups and individuals.

### a. Red Tape Burdens.

Campaign finance laws create numerous red-tape burdens that chill the exercise of political speech and association. "Faced with the need to assume a more sophisticated organizational form, to adopt specific accounting procedures, to file periodic detailed reports . . .

---

limited to candidates. *E.g., Brown v. Socialist Workers '74 Campaign Committee*, 459 U.S. 87, 92 (1982); *Buckley v. Valeo*, 424 U.S. at 67, 79-80. The Supreme Court recently declined the opportunity to accept the "informational interest" as a "sufficiently important" state interest, to support a disclosure regime. *Doe v. Reed*, 130 S. Ct. 2811, 2818–19 (2010). *See also McIntyre*, 514 U.S. at 348-49 (the informational interest was "plainly insufficient" to support mandatory disclaimers for speech about ballot issues). And the few times the Supreme Court has alluded to the utility of disclosure laws in the ballot issue context, it has done so only in dicta and only in cases in which it struck down laws that burdened speech about ballot issues. *See Buckley v. Am. Const. Law Found.*, 525 U.S. 182, 202-204 (1999); *Citizens Against Rent Control*, 454 U.S. at 298-300; *Bellotti*, 435 U.S. at 791-92 & n.32; *see also McIntyre*, 514 U.S. at 353-54 (noting that discussion of disclosure in *Bellotti* was dicta). Moreover, the informational interest is logically unlimited, *see Doe v Reed* 130 S. Ct. at 2824-25 (Alito, J., concurring), and the Supreme Court is very wary of logically unlimited state interests in the campaign finance context. *E.g., Citizens United*, 130 S. Ct. at 910 ("Reliance on a generic favoritism or influence theory . . . is at odds with standard First Amendment analyses because it is unbounded and susceptible to no limiting principle." (internal quotation marks omitted, alteration in original)). *See generally, Sampson v. Buescher*, 625 F.3d 1247, 1256-59 (10th Cir. 2010).

it would not be surprising if at least some groups decided that the contemplated political activity was simply not worth it." *Mass. Citizens for Life v. FEC*, 479 U.S. 238, 255 (1986) ("*MCFL*") (plurality opinion).  Moreover, these laws force speakers "to navigate a maze of rules, sub-rules, and cross-references in order to do nothing more than project a basic political message." *N.C. Right to Life, Inc. v. Leake*, 525 F.3d 274, 296 (4th Cir. 2008).  "[T]hese regulatory burdens—or even just the daunting task of deciphering what is required under the law," mean that small groups and individuals "reasonably could decide the exercise is simply not worth the trouble. And who would blame them?"  *Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 873-74 (8th Cir. 2012).

Plaintiffs can pool or spend no more than $201 of their own money before being designated a "political committee."  Miss. Code Ann. § 23-17-47(c); 23-17-49(1).  Political committee status carries significant consequences for the unwary or unsophisticated, including mandatory filing, revision, and disclosure deadlines that speakers may not be aware of.  *See* Dep. of Atlee Breeland, Ex. 12, at 19:2-21:2.  And speakers must "take on a more sophisticated organizational form," *MCFL*, 479 U.S. at 255, by designating a Director and a Treasurer who is legally responsible to keep the books and accounts, and by reporting their activities to the State using very particular accounting, Miss. Code Ann. §§ 23-17-49, -51, -53; 23-15-803, -807(b), -807(d).  All this mandatory paperwork Plaintiffs must do correctly, under threat of fines and imprisonment.  Miss. Code Ann. §§ 23-17-61, 23-15-811.

Thus, groups of individuals cannot speak (in an amount greater than $200) except through a political committee, subject to the same kind of onerous regulations that led the Supreme Court to recognize a ban on speech even when applied to large, rich, sophisticated corporations.  *Citizens United*, 130 S. Ct. at 899; *see id.* at 897 ("every PAC must appoint a treasurer, forward donations to the treasurer promptly, keep detailed records of the identities of

the persons making donations, preserve receipts for three years, and file an organization statement and report changes to this information within 10 days"); *id.* at 898 (having to "file detailed monthly reports" is another burden). "If a multinational corporation can speak without being subjected to this burden, it is hard to explain why [five] individuals with modest resources cannot." *Worley v. Roberts*, 749 F. Supp. 2d 1321, 1325–26 (N.D. Fla. 2010). Moreover, even if individuals choose not to associate to speak, Mississippi still foists reporting requirements on them. Miss. Code Ann. §§ 23-17-51(2); 23-17-53(a) and (c) (individual reporting requirements).

Were these regulatory burdens not enough, speakers must also struggle with the "daunting task of deciphering what is required under the law." *Swanson*, 692 F.3d at 873-74. Because "contribution" and "expenditure" are defined as literally "anything of value," a Mississippian may find herself in violation of campaign finance laws without having spent a single dollar. Dep. of Atlee Breeland, Ex. 12, at 10:21–11:2, 22:21–23:8. And even if a speaker knows her speech has triggered the campaign finance laws, the State's own database demonstrates that just filling out the forms is difficult, even for big groups. D. Simpson Decl., Ex. 15, at ¶¶ 21-68. As Atlee Breeland testified, the State's "simple" monthly report took her "hours" to complete. Dep. of Atlee Breeland, Ex. 12, at 46:9–11. This is not surprising, it has previously been demonstrated that people struggle—and fail—to complete campaign finance forms correctly even for very small groups. Expert Report of David M. Primo, Ph.D., Ex. 14, at 6. These facts belie the State's previous assertion that this challenge is just about simple forms, rather than complex statutes. *See* Mem. Op., DOC 18 at 20. Put most succinctly, to fill out the "simple" forms, a person must understand the complex laws. *See, e.g.* Expert Report of David M. Primo, Ph.D., Ex. 14, at 7.

Exacerbating this confusion is the fact that Mississippi has—at least potentially—two separate sets of statutes that apply to constitutional amendment ballot measure committees. *See*

Uncontested Facts § II.D, *supra*. Although the State now claims that only one of these sets is enforced against constitutional amendment ballot measure committees, it reached that conclusion only through close lawyerly parsing of the relevant language. Dep. of Kimberly P. Turner, Ex. 11, at 18:23–19:2 ("to the extent that a section . . . pertains to [a] more specific subject as opposed to [a] more general subject, the specific section takes precedent over a more general section.") That the statutes require such lawyerly parsing itself effects an unconstitutional chilling of speech. *Citizens United*, 130 S. Ct. at 889. ("The First Amendment does not permit laws that force speakers to retain a campaign finance attorney . . . or seek declaratory rulings before discussing the most salient political issues of our day."). But further, the State's interpretation of the statute here is in direct conflict with its own official campaign finance guidance to constitutional amendment ballot measure committees, Initiative Guide, Ex. 6, at 10, demonstrating not just how difficult it is to understand the laws but also the threat of potentially arbitrary enforcement of the laws. *Swanson*, 692 F.3d at 873 n.8 (we cannot "expect potentially regulated associations to rely on [the state's] informal assurance that it would not enforce the plain meaning of the statute"). Moreover, if Mississippi's new interpretation is correct, then its own guidance documents mislead would-be constitutional amendment ballot measure committees as to their legal requirements and its own forms fail to comply with the laws themselves. *See* Uncontested Facts § II.D, *supra*.

Mississippi's confusing campaign finance laws thus force on even small groups numerous registration, organization, record keeping, and reporting—"red-tape"—burdens through unclear laws backed by serious penalties, just for trying to speak about politics. These collective burdens can only be characterized as "substantial." *Swanson*, 692 F.3d at 873 at 871; *accord MCFL*, 479 U.S. at 255 (plurality opinion) (faced with red-tape burdens "it would not be

surprising if at least some groups decided that the contemplated political activity was simply not worth it.").

### b.     Fear of Disclosure.

The detailed campaign finance reports that must be filed further chill political speech and association through the mandatory disclosure of personal information. Every political committee must disclose the name and address of every individual officer. Miss. Code Ann. § 23-17-49(2)(a). An individual who spends more than $200 of her own money must also provide her name, address, and telephone number. Miss. Code Ann. § 23-17-53(a). Both committees and individuals must also disclose the name and street address of each person who has contributed more than $200 cumulatively. Dep. of Kimberly P. Turner, Ex. 11, at 58:24–59:9.[7] Further, the forms mandated by the Secretary of State require the disclosure of a $200 contributor's employer and occupation—above and beyond what is actually required by the initiative monthly reporting statute. *Compare* Itemized Receipts Form, Ex. 7, *with* Miss. Code Ann. § 23-17-53(b)(vii) and (c)(iv).

The "deterrent effect which [compelled] disclosures may well have on the free exercise [of the] constitutionally protected right of association" has long been recognized. *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 463 (1958). One study has shown that disclosure of their name and address would lead "about 60 percent" of the study participants "to think twice about contributing to a ballot measure campaign." Expert Report of David M. Primo, Ph.D., Ex. 14, at 5. Real-world experience in Mississippi bolsters these observations. Several contributors to Atlee Breeland's constitutional amendment ballot measure committee gave exactly $199 because it was the most that they could give while maintaining their anonymity. Dep. of Atlee

---

[7] Of course, this requirement is in conflict with the actual statute that Mississippi claims is applicable to constitutional amendment ballot measure committees. *See* Miss. Code Ann. § 23-17-53(b)(vii) and (c)(iv); Uncontested Facts, § II.D.2, *supra*.

Breeland, Ex. 12, at 50:10-51:4.  Even the State recognizes the threat of disclosure—the Secretary of State's office specifically instructed Ms. Breeland not to disclose information about sub-$200 contributors in order to protect their privacy.  *Id.* at 26:19–27:7.

### 2.    Federal Courts Protect Small Groups Like Plaintiffs From Burdensome Campaign Finance Laws Like Mississippi's.

Federal courts across the country have recognized that campaign finance registration, reporting, and mandatory disclosure requirements cannot apply to small groups and individuals like Plaintiffs under the exacting scrutiny standard.  These courts have made the "'common-sense'" observation that the value of campaign finance registration, reporting, and mandatory disclosure "'declines drastically as the value of the expenditure or contribution sinks to a negligible level.'"  *Sampson*, 625 F.3d at 1260 (quoting *Canyon Ferry*, 556 F.3d at 1033).  Ultimately, the strength of Mississippi's interest in information about speakers like the Plaintiffs does not reflect the seriousness of heavy burdens that Mississippi places on Plaintiffs' First Amendment rights.  *Cf. Doe v. Reed*, 130 S. Ct. at 2818.

### 3.    Cases That Pre-Date the Preliminary Injunction Proceedings Support Plaintiffs.

Based on these minimal interests and heavy burdens, the Ninth Circuit has held that the application of campaign finance laws to a Church that engaged in de minimis political activities was a violation of the First Amendment.  *Canyon Ferry*, 556 F.3d at 1034.  The Tenth Circuit found Colorado's registration, reporting, and mandatory disclosure requirements unconstitutional as applied to a group of neighbors who had spent $782.02 for signs, a banner, postcards, and postage in their efforts to oppose the annexation of their neighborhood into a neighboring town. *Sampson*, 625 F.3d at 1251, 1254.  In *Swaffer v. Cane*, the court found two Wisconsin registration, reporting and mandatory disclosure statutes unconstitutional as applied to a plaintiff who spent as little as $500.  610 F. Supp. 2d 962, 968-69 (E.D. Wis. 2009).  And in *Hatchett v. Barland*, the court found the same statutes unconstitutional again when the amount at issue was

$750.  816 F. Supp. 2d 583, 605-06 (E.D. Wis. 2011) ("Even if Hatchett spends $1,000 on the next referendum, his expenditure would be sufficiently small which in turn would provide little information about his financial interest on a given issue.").

### 4.  Decisions From the Seventh and Eighth Circuits Since the Preliminary Injunction Proceedings Support Plaintiffs.

Since the preliminary injunction proceedings, both the Seventh and Eighth Circuits have recognized the need to protect small groups and individuals like Plaintiffs from campaign finance registration, reporting, and mandatory disclosure requirements.  The Eighth Circuit, sitting en banc, found that Minnesota's "independent expenditure law almost certainly fails [exacting scrutiny] because its ongoing reporting requirement—which is initiated upon a $100 aggregate expenditure, and is untethered from continued speech—does not match any sufficiently important disclosure interest."  *Swanson*, 692 F.3d at 876.  Observing that "[t]he Supreme Court has not hesitated to hold laws unconstitutional under" exacting scrutiny, the court recognized that campaign finance laws "manifestly discourage[] associations, particularly small associations with limited resources, from engaging in protected speech."  *Id.* at 874, 876.  The Seventh Circuit also recognized that the informational interest cannot justify campaign finance laws when applied to small groups like Plaintiffs' because "the state's interest in disseminating such information to voters is at a low ebb" in such cases.  *Ctr. for Individual Freedom v. Madigan*, No. 11-3693, ___ F. 3d ___, 2012 U.S. App. LEXIS 18956 at *40-41 (7th Cir. Sept. 10, 2012) (citing *McIntyre*, 514 U.S. at 348-49, and *Sampson*, 625 F.3d 1247).

### 5.  The Ninth Circuit Has Distinguished the Cases the State Relied On and Embraced *Sampson* and *Canyon Ferry*.

Since the preliminary injunction proceedings here, the Ninth Circuit has held that claims like Plaintiffs' are to be governed by *Sampson* and *Canyon Ferry*.  In *Family PAC v. McKenna*, 685 F.3d 800 (9th Cir. 2012), the Ninth Circuit drew a distinction between two different kinds of challenges to campaign finance laws.  The question of whether a group may be required to

register with the government and report its activity is separate from the question of when details about individual contributors may be required to be disclosed by groups that are required to register and report. *Id*. at 810 n.10. On the initial question of whether a group can be required to register and report, the Ninth Circuit has pointed to *Sampson* and *Canyon Ferry*—both of which found registration, reporting, and mandatory disclosure laws unconstitutional as applied to small groups and upon which Plaintiffs rely—as the leading cases. *Id.*

      *Canyon Ferry* is the only case from the Ninth Circuit involving the imposition of registration and reporting requirements on small groups and individuals. *Human Life of Wash., Inc. v. Brumsickle*, 624 F.3d 990 (9th Cir. 2010) and *Alaska Right to Life Committee v. Miles*, 441 F.3d 773 (9th Cir. 2006)—upon which the State has previously relied—involved formal organizations with national affiliations that spend more money than Plaintiffs would or could. In neither of these cases was the effect of campaign finance laws on small groups and individuals at issue.[8] Further, the Ninth Circuit has re-endorsed the "generally sound premise[s] . . . that the informational interest in disclosure applies with greater force to large contributions than to small ones," and that "[a]s the size of the contribution falls, and the informational value of disclosure thereby declines, the deterrent effect of disclosure may actually increase." *Family PAC*, 685 F.3d at 809 & n.7.

      **D.**    **The "Wholly Without Rationality" Standard Does Not Apply.**

      At the preliminary injunction stage, this Court noted that there was a split of authority, with some courts applying a unitary exacting scrutiny to the statutory scheme as a whole and some courts separately applying a 'wholly without rationality' standard to the question of the monetary threshold for registration, reporting, and disclosure requirements. Mem. Op., DOC 18

---

[8] The same is true of the First Circuit's National Organization for Marriage cases. *Nat'l Org. for Marriage v. McKee*, 649 F.3d 34 (1st Cir. 2011) (involving independent expenditures about candidates by a group that spent $1.8 million); *Nat'l Org. for Marriage v. McKee*, 669 F.3d 34 (1st Cir. 2012) (ballot measure expenditures by same organization; political committee threshold set at $5000).

at 18-19.  Since this Court's last opinion, additional decisions from other courts show that courts are applying exacting scrutiny to the case as a whole and are not using the "wholly without rationality review."  *Ctr. for Individual Freedom v. Madigan*, 2012 U.S. App. LEXIS 18956 at *19, 40-41; *Swanson*, 692 F.3d at 875 (and questioning whether strict scrutiny should instead apply); *see also* Mem. Op., DOC 18 at 19 (noting that *Sampson*, *Hatchett*, and *Swaffer* applied exacting scrutiny, not wholly without rationality review); *cf. Swanson*, 692 F.3d at 884 (dissenting opinion calling for wholly without rationality review instead of exacting scrutiny); *Family PAC*, 685 F.3d at 810 n.8 (both *Canyon Ferry* and *Sampson* apply to arguments like Plaintiffs' even though they applied different standards).  Application of the wholly without rationality standard here conflicts with recent Supreme Court pronouncements, *e.g. Citizens United*, 130 S. Ct. at 898, 914 (applying strict and exacting scrutiny); *Davis v. FEC*, 554 U.S. 724, 744 (2008) (applying exacting scrutiny); *Buckley v. American Constitutional Law Foundation, Inc.*, 525 U.S. 182, 202 (1999) ("'exacting scrutiny' is necessary when compelled disclosure of campaign-related payments is at issue"), the Fifth Circuit's recent holding, *Asgeirsson*, 2012 U.S. App. LEXIS 20068 at *20 (disclosure laws reviewed under exacting scrutiny), and the weight of case law from the various other circuits.

Moreover, applying the wholly without rationality standard threatens to turn Plaintiffs' challenge to laws that chill core political speech and association into a mere rational basis case— a turn of events that the Supreme Court surely would not countenance.  If "[a]llowing states to sidestep strict scrutiny by simply placing a 'disclosure' label on laws imposing the substantial and ongoing burdens typically reserved for PACs risks transforming First Amendment jurisprudence into a legislative labeling exercise," then allowing states to sidestep even exacting scrutiny by labeling a challenge from a small group of friends and neighbors a "threshold" issue certainly does the same.  *Swanson*, 692 F.3d at 876.

25

## CONCLUSION

The minimal governmental interest in "financial information" cannot possibly reflect the seriousness of the actual burden on Plaintiffs' First Amendment rights. This is especially the case given the incredibly low level of speech at which Mississippi imposes its registration, reporting, and mandatory disclosure burdens. The trend among the federal courts is to protect small groups and individuals just like Plaintiffs from these burdens in order to give full effect to the Supreme Court's remonstrance that "political speech must prevail against laws that would suppress it, whether by design or inadvertence." *Citizens United*, 130 S. Ct. at 898. Plaintiffs therefore request that this Court join the trend, find Mississippi's campaign finance statutes that apply to constitutional amendment ballot measure committees unconstitutional,[9] and permanently enjoin their enforcement.

Dated: November, 16, 2012

Respectfully Submitted on Behalf of Plaintiffs

WELLS MARBLE & HURST, PLLC
/s/ Russell Latino III
Russell Latino III
(MS Bar No. 102281)
P. O. Box 131
Jackson, MS 39205-0131
Telephone: 601.605.6900
Facsimile: 601.605.6901
Email: rlatino@wellsmar.com
ljennings@wellsmarble.com

INSTITUTE FOR JUSTICE
/s/ *Paul V. Avelar*
Paul V. Avelar
398 South Mill Avenue, Suite 301
Tempe, AZ 85281
Telephone: 480.557.8300
Facsimile: 480.557.8305
Email: pavelar@ij.org
*Pro Hac Vice*

Steven M. Simpson
901 North Glebe Road, Suite 900
Arlington, VA 22203
Telephone: 703.682.9320
Facsimile: 703.682.9321

---

[9] Mississippi Code Annotated §§ 23-17-47, -49, -51, -53, and -61. This Court should also find Mississippi Code Annotated §§ 23-15-801, -803, -805, -807, -811, and -813, unconstitutional as applied to constitutional amendment ballot measure committees, even though the State now says it does not enforce those laws against such committees, because those statutes apply to such committees based on their plain language and the State's own documents say those statutes do apply to such committees, meaning that those statutes do have a chilling effect. *See Swanson*, 692 F.3d at 873 n.8 (cannot "expect potentially regulated associations to rely on [the state's] informal assurance that it would not enforce the plain meaning of the statute").

Email: ssimpson@ij.org
*Pro Hac Vice*

## <u>CERTIFICATE OF SERVICE</u>

       I hereby certify that the foregoing Memorandum in Support of Plaintiff's Motion for Summary Judgment has been filed electronically with the Clerk of Court using the Court's ECF system and thereby served on the following persons:

Harold E. Pizzetta, III
Assistant Attorney General
Office of the Attorney General
Post Office Box 220
Jackson, MS 39205-0220
hpizz@ago.state.ms.us

THIS the 16th day of November, 2012.

                                 /s/ Paul Avelar
                                 Paul V. Avelar