UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
WESTERN DIVISION

GORDON VANCE JUSTICE, JR., ET AL.                                      PLAINTIFFS

v.                                                    CIVIL CASE NO. 3:11CV138-A-A

DELBERT HOSEMANN, ET AL.                                              DEFENDANTS

**The State Defendants' Opposition to Plaintiffs' Motion for Summary Judgment**

While all parties agree that summary judgment is appropriate, the parties remain far apart on the law. However, most of Plaintiffs' summary judgment arguments were reviewed and rejected in this Court's opinion denying their motion for preliminary injunction. *See Justice v. Hosemann*, 829 F.Supp.2d 504 (N.D.Miss. 2011). This Court's opinion has already been cited by district courts in California, Maine, and Vermont upholding disclosure requirements. Further, many of Plaintiffs' arguments were anticipated and addressed in the State Defendants' own summary judgment memorandum. The State Defendants will endeavor not to be repetitive in this opposition.

**I.    Exacting scrutiny, not strict scrutiny, is the proper standard.**

As this Court previously concluded, First Amendment challenges to campaign related disclosure requirements are reviewed under the "exacting scrutiny" test rather than "strict scrutiny." 829 F.Supp.2d at 510-511. Plaintiffs now effectively concede that standard to be correct. Pl. Sum. Br. at 15. Therefore, Mississippi's disclosure law is constitutional if there exists a "substantial relation" between the disclosure requirements and a "sufficiently important government interest." *See Reed*, 130 S.Ct. at 2818. Importantly, this Court has already found the State's disclosure requirements to satisfy exacting scrutiny. 829 F.Supp.2d at 519.

**II.     It is well recognized that states have an important government interest in informing voters who are considering constitutional initiatives.**

As they did in connection with their unsuccessful preliminary injunction motion, Plaintiffs again contend that the government does not have an important interest in informing voters who are considering constitutional ballot initiatives.  Pl. Sum. Br. at 16.  Plaintiffs' argument is contrary to the established law and defies commonsense.  Plaintiffs concede that there exists an important government interest in informing voters about candidates through disclosure laws.  When compared to the act of voting for a candidate, the informational interest is arguably more compelling when voters are considering initiatives and thereby acting as citizen legislators or as constitutional drafters.  This Court's preliminary injunction opinion thoroughly analyzed the applicable law and, joining the nearly unanimous finding of other courts, concluded that the government's important informational interest most certainly applies to ballot initiatives.  *See* 829 F.Supp.2d at 512-516.[1]  Furthermore, since this Court's opinion, the Seventh Circuit has also recognized the existence of the informational interest in ballot measure disclosures.  *See Center for Individual Freedom v. Madigan*, 697 F.3d 464, 480 -481 (7th Cir. 2012) ("Educating voters is at least as important, if not more so, in the context of initiatives and referenda as in candidate elections.").  Given the Supreme Court's pronouncement in *Citizens United* that "the public has an interest in knowing who is speaking about a candidate shortly before an election

---

[1]  The State Defendants would quarrel with this Court's statement that the Supreme Court's numerous statements in favor of the informational interest for ballot measures were all dicta.  829 F.Supp.2d at 513.  In *Citizens Against Rent Control v. City of Berkeley*, 454 U.S. 290, 298 (1981), the court struck down an ordinance capping contributions to ballot initiative committees while noting that the ordinance's disclosure requirements were alone adequate to fulfill the city's informational interest in knowing "whose money supports or opposes a given ballot measure."  *Id.* at 298.  The existence of the informational interest was a necessary and important part of the court's reasoning.

...” and that “the informational interest alone” is sufficient to justify disclosure requirements, it is difficult to imagine how that same important interest is not applicable to constitutional initiatives.  *See Citizens United v. Federal Election Com'n*, 130 S.Ct. 876, 915-916 (2010).

## III.  The “wholly without rationality” standard exists and applies to Plaintiffs’ challenge to the State’s $200 thresholds.

Plaintiffs argue that this Court erred when it applied the “wholly without rationality” standard articulated by the Supreme Court in *Buckley* and applied by numerous courts because, in Plaintiffs’ view, the standard does not exist.  Pls Sum. Br. at 24; 829 F.Supp.2d at 516-517.

First, Plaintiffs contend that the weight of authority demonstrates that the wholly without rationality standard does not exist.  Pls. Sum. Br. at 25.  Here Plaintiffs rely on *Sampson*, *Hatchett*, and *Swaffer*.  This Court has previously concluded that those cases inappropriately departed from the Supreme Court’s clear pronouncement in *Buckley*.  829 F.Supp.2d at 517-518.  Actually, the weight of authority and, more importantly, the Supreme Court’s explicit pronouncement in *Buckley*,[2] evidence that the wholly without rationality standard exists and is applicable to Plaintiffs’ challenge to the $200 thresholds.  *See, e.g.*, *National Organization for Marriage, Inc. v. McKee*, 669 F.3d 34, 41 (1st Cir. 2012) (“The applicable inquiry is whether the legislature’s judgment to set a $100 reporting threshold is ‘wholly without rationality.’ Our analysis in *NOM I* confirms that it is not”); *Family PAC v. McKenna*, 685 F.3d 800, 811 (9th Cir.

---

[2]  The explanation by the *Buckley* court is directly on-point and worth repeating: “[i]t might as well or nearly as well be a little more to one side or the other[,] when it is seen that a line or point there must be, and that there is no mathematical or logical way of fixing it precisely, the decision of the legislature must be accepted unless we can say that it is very wide of any reasonable mark.”  *Buckley v. Valeo*, 424 U.S. 1, 83 n.11 (1976) (quoting *Louisville Gas Co. v. Coleman*, 277 U.S. 32, 41 (1928) (Holmes, J., dissenting)).

2012) (applying "wholly without rationality" standard and noting "[t]his deference is all the more appropriate when, as here, the state's thresholds are comparable to those in other states"); *Jackson v. Leake*, 476 F.Supp.2d 515, 526 (E.D.N.C. 2006); *Vote Choice, Inc. v. Di Stefano*, 814 F.Supp. 195, 202 (D.R.I. 1993); *Corsi v. Elections Comm.*, 2012 WL 4955230, 8 (Ohio App. 10 Dist. 2012); *see also Doe v. Reed*, 130 S.Ct. 2811, 2819 (2010) ("States allowing ballot initiatives have considerable leeway to protect the integrity and reliability of the initiative process, as they have with respect to election processes generally.").

Second, Plaintiffs argue that the wholly without rationality standard conflicts with exacting scrutiny and that the Supreme Court post-*Buckley* has adopted exacting scrutiny as an alternative to rationality. Pls. Sum. Br. at 25.[3] Plaintiffs fail to grasp that the wholly without rationality standard applies specifically to an argument that the state has set the dollar thresholds too low while the exacting scrutiny analysis governs the general argument as to whether disclosure in general is sufficiently related to an important government interest.[4] Numerous courts have employed the wholly without rationality standard along side of the exacting scrutiny analysis. *See, e.g., McKee*, 669 F.3d at 39, 41; *McKenna*, 685 F.3d at 805-806, 811. Further, in none of the subsequent Supreme Court cases did the Court indicate it was overruling that part of

---

[3] Plaintiffs argument here conflicts with its contention that exacting scrutiny is inapplicable. *Compare* Pl. Sum. Br. at 25 (citing cases in which the Supreme Court applied exacting scrutiny) *with* Pl. Sum. Br. at 15 n.5 (arguing for strict scrutiny).

[4] The Fifth Circuit had no occasion to reference the wholly without rationality standard in *Asgeirsson v. Abbott*, 696 F.3d 454 (5th Cir. 2012), because the case did not involve a challenge to the dollar threshold for disclosure requirements. The *Asgeirsson* plaintiffs alleged that the open meeting act (applicable to governmental bodies) violated the elected officials' First Amendment rights. The Fifth Circuit rejected that argument in part by characterizing the open meetings law as a disclosure law.

*Buckley*.

## IV. There exists a substantial relationship between Mississippi's disclosure requirements and the important government interest of informing the electorate regarding constitutional initiatives.

Plaintiffs continue their previously unsuccessful assertion that the State's "interest is too weak at the low level of speech that Mississippi regulates to support its burdensome" disclosure laws. Pl. Sum. Br. at 17. This Court has accurately categorized the crux of Plaintiffs' argument in the following manner:

> The Court must next assess the "fit" between Mississippi's disclosure requirements and the State's informational interest. *See Canyon Ferry*, 556 F.3d at 1034. The inquiry is "one of degree, not kind, for it is well established that, in the ordinary case, a state informational interest is sufficient to justify the mandatory reporting of expenditures and contributions in the context of ballot initiatives." *Id.* (citing *Alaska Right to Life Comm. v. Miles*, 441 F.3d 773, 789–92 (9th Cir.2006); *Cal. Pro–Life Council, Inc. v. Randolph*, 507 F.3d 1172, 1189 (9th Cir.2007) ( *CPLC II* )). The Plaintiffs argue that "no informational interest can exist at the point that Mississippi imposes those burdens [registration, reporting, or disclosure provisions of Mississippi's campaign finance laws]." In other words, Plaintiffs argue that the statutes' threshold amount for registration and disclosure is too low relative to the burdens it imposes.

829 F.Supp.2d at 516. It is here that Plaintiffs run directly into the deference to the legislature embodied in the "wholly without rationality" test. *See Buckley*, 424 U.S. at 83; *McKee*, 669 F.3d at 41; *McKenna*, 685 F.3d at 811. Importantly, whether exacting scrutiny and the wholly without rationality standards are satisfied are questions of law appropriate for resolution on summary judgment. *See McKee*, 669 F.3d 34 (affirming summary judgment granted to State); *McKenna*, 685 F.3d 800 (same); *ProtectMarriage.com v. Bowen*, 830 F.Supp.2d 914, 946 (E.D.Cal. 2011) (granting summary judgment to state); *Vermont Right to Life Committee, Inc. v. Sorrell*, 2012 WL 2370445, 21-22  (D.Vt. 2012) (same).

A.      **Plaintiffs do not dispute that Mississippi's thresholds are well in line with other states.**

This Court and other courts have found it to be particularly persuasive when the challenged state's thresholds are "within the spectrum of those mandated by its sister states." *Justice*, 829 F.Supp.2d at 519 (quoting *Bowen*, 599 F.Supp.2d at 1221).  While this Court has previously found the *Bowen* opinion denying a preliminary injunction to be persuasive, the *Bowen* court recently revisited the issue when it granted the state's motion for summary judgment.  *ProtectMarriage.com v. Bowen*, 830 F.Supp.2d 914, 946 (E.D.Cal. 2011).  The *Bowen* court reiterated in its 2011 summary judgment opinion that "California's current $100 threshold falls well within spectrum of those mandated by its sister states, which range from no threshold requirement to $300. In fact, only six states in the United States have higher threshold requirements."  *Id.*  (finding the "disclosure thresholds set in other states to be instructive"). Given that Mississippi's $200 in-a-month threshold is one of the higher thresholds in the county, it is not wholly without rationality.

In response, Plaintiffs contend that "Federal courts across the country" have protected "small groups like Plaintiffs" from disclosure requirements, citing only *Sampson* and *Canyon Ferry*.[5]  Pl. Sum. Br. at 22.   But such is simply not the case.  Courts have, with near uniformity,

---

[5]  In *Canyon Ferry*, the court found that requiring a church to register as a political committee solely on the basis of the church's *de minimis* in-kind contributions did not survive the wholly without rationality test.  *Canyon Ferry Road Baptist Church of East Helena, Inc. v. Unsworth*, 556 F.3d 1021, 1034 (9th Cir. 2009).  The *Canyon Ferry* church had allowed the initiative sponsor to photocopy the petition form on the church's copy machine, with her own paper; placed the petitions in the church's foyer; and the pastor had exhorted his parishioners to sign the petition during a regularly scheduled sermon.  *Id*. at 1029.  Of those actions, only the use of the photocopier was an election expenditure and that was unquestionably *de minimus*. Mississippi's $200 threshold would not have required the *Canyon Ferry* church to register.  In contrast, Plaintiffs' stated desire to influence voters by purchasing newspaper advertisements,

affirmed the constitutionality of reporting requirements below the $200 threshold. *See, e.g.,*
*Buckley*, 424 U.S. at 82–83 (finding Congress's $10 threshold for reporting contributors' names
and addresses and its $100 threshold for reporting contributors' names, addresses, occupations,
and principal place of business not "wholly without rationality"); *Family PAC*, 685 F.3d at 811
(affirming a $25 threshold for reporting contributors' names and addresses and a $100 threshold
for reporting names, addresses, occupations, and employers, and noting that "disclosure
thresholds, like contribution limits, are inherently inexact; courts therefore owe substantial
deference to legislative judgments fixing these amounts"); *Nat'l Org. for Marriage v. Daluz*, 654
F.3d 115, 119 (1st Cir.2011) (finding Rhode Island's $100 reporting threshold not "wholly
without rationality"); *Nat'l Org. for Marriage v. McKee*, 649 F.3d 34, 60–61 (1st Cir.2011)
(affirming a $100 reporting threshold even though it was not indexed for inflation); *Daggett v.
Comm'n on Governmental Ethics & Election Practices*, 205 F.3d 445, 466 (1st Cir.2000)
(finding a $50 reporting threshold not illegitimate); *Vermont Right to Life Committee, Inc.*, 2012
WL 2370445, 21-22  (Vermont's $100 threshold above which a committee must disclose a
donor's name, address and date of contribution is not "wholly without rationality"); *Olson*, 2011
WL 3861433, at 1 (upholding reporting requirement for any expenditure of $50.00 or more "by
any person or organization").

### B. Plaintiffs do not dispute that Mississippi's forms are simple and comparatively less complex than the disclosure forms of many other states.

Whether the forms are unconstitutionally complex – as Plaintiffs' argue – is a matter of

---

distributing posters, and distributing fliers is not *de minimis*.  *See* Pl. Sum. Br. at 3.  Indeed,
Plaintiffs admit that they desired to spend at least $200, and have not actually indicated what
their maximum expenditures might be.  *Id.*

law.  Although, Plaintiffs supply no relevant criteria, or on-point case law, articulating at what level forms become unconstitutionally complex.  However, there are no disputed facts pertaining to the forms themselves.  The forms are in evidence before this Court.  *See* Exhibits A-D to the State Defendants' Motion for Summary Judgment.  Comparable forms from other states, as well as other forms completed by average citizens, are also before this Court.  This Court's previous findings regarding the nature of the forms remains correct.

> The requirements here do not limit the amount of money that may be raised or expended by the Plaintiffs. They do not unduly inhibit the ability of the Plaintiffs to raise money, nor do they impose overly burdensome structural requirements on the Plaintiffs. The information required by Mississippi's registration and disclosure forms is not overly intrusive nor do the forms seem particularly complex.

*Justice*, 829 F.Supp.2d at 519.[6]

### C.    Plaintiffs wrongly believe any burden is unconstitutional and any form is too complex.

Implicit in Plaintiffs' argument is the contention that disclosure requirements burden speech and any burden on speech is impermissible.  For an individual or a group of individuals who desire to influence voters with respect to a constitutional initiative, it is undoubtable true that *any* disclosure and reporting requirement will carry with it a "burden," whether it be the burden of consulting the Secretary of State's website, filling out the two applicable forms, or retaining the receipts necessary to complete the forms.  Plaintiffs err as a matter of law when

---

[6] Plaintiffs' statement that their witness, Atlee Breland, testified that the forms took "hours" to complete is misleading.  As set forth below, Breland filled out the initial registration and subsequent monthly reports by herself.  *See* Breland Dep. at 32, Ex. A.  She testified that downloading, completing, and filing the initial committee registration for took about an hour.  *Id.* at 35.  Only later, after the committee began to receive (and expend) over $22,000 in contributions did the reporting forms require additional time to complete.  *Id.* at 45-46.

they conclude that the burden violates the First Amendment.

### 1. The Supreme Court has rejected Plaintiffs' claim that disclosure requirements unconstitutionally deter donors.

Plaintiffs allege that the fear of disclosure will deter some donors and that deference is an unconstitutional burden. Pl. Sum. Br. at 21. In contrast, the Supreme Court has found the burden to be minimal and greatly outweighed by the benefit to society: "[i]t is undoubtably true that public disclosure of contributions to candidates and political parties will deter some individuals who otherwise might contribute," but "disclosure requirements certainly in most applications appear to be the least restrictive means of curbing the evils of campaign ignorance and corruption." *Buckley v. Valeo*, 424 U.S. 1, 68 (1976).[7]

### 2. Plaintiffs' reliance on *Citizens United* and similar cases is wrong.

Plaintiffs' memorandum is rife with selective quotations from cases that sound supportive but, upon closer inspection, are revealed to be from cases with holdings directly contrary to Plaintiffs' contentions. For example, Plaintiffs quote *Worley v. Roberts*, 749 F.Supp. 1321, 1325-26 (N.D. Fla. 2010), which stated that "If a multinational corporation can speak without being subjected to this burden, it is hard to explain why [five] individuals with modest resources cannot." Pl. Sum. Br. at 19. This is part of Plaintiffs' incorrect argument that Mississippi's disclosure requirements force individuals to form PAC's (political action committees) before

---

[7] Plaintiffs point to Breland's testimony as evidence of unconstitutional deterrence. As set below, Plaintiffs make much of Breland's testimony that some donors gave only $199 in order to avoid being disclosed as donors. Pl. Sum. Br. at 12. Breland testified that only "five, maybe six" persons were concerned about being identified and, therefore, donated under $200. Dep. at 51, Ex. A. Of those, two were husband and wife. *Id*. Breland has no idea how much more, if any, those donors would have given if they could have remained anonymous. Dep. at 61. Further, Breland did not identify a single potential donor who refused to donate at all based on a disclosure concern. At best, a five donors decreased their desired donations.

9

they can speak and that *Citizens United* struck down just such requirements. Pl. Sum. Br. at 18-19. Indeed, the *Worley* court rejected an attempt to apply *Citizens United* to the type of reporting requirement used by Mississippi.

> The plaintiffs next challenge the requirement that they register as a "political committee" and comply with the regulatory burdens that attend that status. They rely primarily on *Citizens United v. Federal Election Commission*, ––– U.S. –––, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010). There the Supreme Court struck down a federal statute that prohibited a corporation or union from spending its treasury funds to advocate the election or defeat of a candidate. The Court said that allowing a corporation or union to speak through a political action committee did not save the statute, first because speech by a PAC was not speech by the corporation or union itself, and second because PACs are "burdensome alternatives; they are expensive to administer and subject to extensive regulations." 130 S.Ct. at 897.

> The plaintiffs assert, and for present purposes I assume, that a "political committee" under Florida law is not materially different from a PAC under the federal provisions at issue in *Citizens United*. Even so, *Citizens United* does not resolve the question of whether Florida can regulate the plaintiffs as a political committee. *Citizens United* involved an outright ban on election-related speech **by a single speaker**. The only purported justification for the ban was that the speaker was a corporation. The Court rejected the proposition that, for this purpose, a corporation had no right to speak, and it held that the ability to speak through a PAC did not save the otherwise-unconstitutional ban on direct speaking by the corporation.

> Here, in contrast, Florida law does not prohibit a plaintiff from speaking. Each plaintiff is free to speak as much as the plaintiff chooses and need not register as a political committee in order to do so. It is only the plaintiffs' decision to act jointly—and to pool their funds—that triggers the application of the Florida political-committee provisions. The law has long recognized, in many contexts including this one, that there is a difference between individual and joint action.

*Worley,* 749 F.Supp.2d at 1325 -1326 (emphasis supplied; concluding that "plaintiffs are not likely to prevail on the claim that they have a First Amendment right to act jointly without being subjected to regulation as a political committee" and denying preliminary injunction).

Further, this Court has already correctly distinguished the ban on expenditures struck

down in *Citizens United* with the very different disclosure requirements at issue here. *Justice*, 829 F.Supp.2d at 512 ("Although the Court found PAC requirements to be 'burdensome,' the most salient feature of § 441(b) was that it amounted to an 'outright ban,' because it did not allow corporations to speak on their own behalf. Instead, they could only speak through a separate entity such as a PAC."). The burdens of *Citizens United* do not exist in the disclosure requirements used by Mississippi and many other states.

> **D.** **Plaintiffs are attempting to manufacture a claim that the requirements are confusing, therefore burdensome, and therefore unconstitutional.**

In light of Plaintiffs' unpersuasive arguments regarding the State's important government interest under exacting scrutiny, and unsuccessful attempt to establish the thresholds to be wholly without rationality, Plaintiffs attempt to manufacture a claim that the reporting requirements are confusing and that this confusion results in an unconstitutional burden. Although, Plaintiffs supply no relevant criteria, or on-point case law, articulating at what level of alleged confusion results in an unconstitutional statute. Plaintiffs manufacture this issue by wrongly claiming that constitutional initiatives are governed by *both* Miss. Code Ann. §§ 23-15-801 *et seq*. (which governs candidates, candidate committees, political parties and non-constitutional initiatives) and Miss. Code Ann. §§ 23-17-47 *et seq*. (which explicitly and exclusively governs constitutional initiatives). Plaintiffs are wrong; only Section 23-17-47 governs constitutional initiatives. However, Plaintiffs build on their error by claiming that the Secretary of State's published guides are incorrect because they do address compliance with Section 23-15-801. Finally, Plaintiffs contend that the citizens are confused because they failed to follow the reporting guidelines in Section 23-15-801. In fact, 23-15-801 does not apply and the alleged confusion is of Plaintiffs' own making.

11

1. **Miss. Code Sections 23-17-47 through 23-17-61 explicitly and exclusively govern constitutional initiatives.**

Plaintiffs filed this lawsuit alleging that they desired to spend funds in support of Constitutional Initiative 31. *See* Pl. Sum. Br. at 3.[8] The constitutional initiative process in Mississippi is separate from the general election of candidates and separate from all other forms of initiatives (such as initiatives on the local or county level). The constitutional initiative process is grounded in Art. 15, § 273 of the Mississippi Constitution. The statutory requirements for the initiative process, including the registration and disclosure requirements at issue in this suit, are set forth in the election code at Miss. Code Ann. §§ 23-17-1 through 23-17-61. In fact, Title 23, Chapter 17 is entitled "Amendments to the Constitution by Voter Initiative" and Section 23-17-1(1) defines "measure" for the purposes of that chapter to be: "an amendment to the Mississippi Constitution proposed by a petition of qualified electors under Section 273, Mississippi Constitution of 1890."

It is within Sections 23-17-47 through -61 that the State has set forth the applicable definitions of "political committee," "expenditures," and "contributions," as well as the reporting requirements, as they pertain to *constitutional* initiatives. *See* Miss. Code Ann. §§ 23-17-47 through -61. It is the disclosure requirements in Section 23-17-47 through 23-17-61 – and only those requirements – that apply to Plaintiffs' desire to campaign in support of Constitutional Initiative 31.

In contrast, Sections 23-15-801 *et seq*. are the State's generally applicable campaign finance statutes governing reporting requirements for candidates, candidate committees, political

---

[8] Constitutional Initiative 31 sought to amend the Mississippi Constitution to provide certain rights to property owners with respect to eminent domain actions. *See* Pl. Sum. Br. at 3.

12

parties, and *non-constitutional* initiatives.[9]  *See generally* Miss. Code Ann. § 23-15-801; *see also* Miss. Code Ann. § 23-15-801(c).  Plaintiffs have not challenged the reporting requirements applicable to non-constitutional initiatives.  At no time have Plaintiffs indicated that they desired to spend funds in support any initiative other than Constitutional Initiative 31.[10]

Plaintiffs' are incorrect, as a matter of law, that the registration and reporting requirements of Section 23-15-801 govern constitutional initiatives.  Indeed, the State Defendants memorandum in opposition to the preliminary injunction cited only Sections 23-17-47 *et seq*. as the applicable statutes.  *See* State Defendants' Memorandum at 3-8 [Docket No. 14].

The only explicit cross-reference between Section 23-17-47 and Section 23-15-801 is Section 23-15-813 which sets forth the administrative enforcement mechanism for a willful failure to file required disclosure reports.  *See* Miss. Code Ann. § 23-15-813(1). That the legislature chose to utilize the same enforcement mechanism for the general campaign finance statutes and the statutes governing constitutional initiatives is neither confusing nor surprising as both statutes are administered by the Secretary of State.

Plaintiffs cite the deposition testimony of Assistant Secretary of State Kimberly Turner as supporting their contention that both set of statutes apply.  Pl. Sum. Br. at 8.  In response to Plaintiffs' question about whether the definitions in Section 23-15-801 also govern constitutional

---

[9]  In its simplest form, Plaintiffs allege that the State enacted two separate and conflicting statutes governing constitutional initiatives.  This is simply counterintuitive.

[10]  As a general matter, the reporting requirements for non-constitutional initiatives are similar to the reporting requirements for constitutional initiatives.  Both have $200 reporting and itemization thresholds.  *See* Miss. Code Ann. §§ 23-15-801(c), 23-15-809; 23-17-47; 23-17-51. The main difference is in the timing of the reports.

initiatives, Assistant Secretary Turner explained that Section 23-17-47 – and not 23-15-801 – governs constitutional initiatives. *See* Turner Dep. at 18-19, 33, Ex. B.[11] Assistant Secretary Turner stated that the only time the definitions in Section 23-15-801 might be consulted would be *if* there was an ambiguity in Section 23-17-47, and only then as one of the tools available to determine legislative intent. *See* Turner Dep. at 20-22. This is neither confusing nor surprising. Under Mississippi and federal law, administrative agencies and courts turn to statutes enacted on similar subjects as an accepted form of statutory interpretation if an ambiguity exists in a statute. *See Mississippi Dept. of Transp. v. Allred*, 928 So.2d 152, 155 (Miss. 2006); *National Federation of Federal Employees, Local 1309 v. Department of Interior*, 526 U.S. 86, 105 (1999) ("It is well established that 'the interpretation of a doubtful statute may be influenced by language of other statutes which are not specifically related, but which apply to similar persons, things, or relationships.'" ( quoting 2B N. Singer, Sutherland on Statutory Construction § 53.03, p. 233 (rev. 5th ed.1992)). This acceptable method of statutory interpretation resolves ambiguities, it does not create ambiguities.

Plaintiffs present no competent summary judgment evidence that there exists any confusion regarding which statutes govern, and Plaintiffs have certainly not substantiated any widespread or substantial confusion.

---

[11] "So if political committee is defined specifically in that constitutional initiative section of the 23-17 series [Code Section 23-17-47], then that definition will pertain to those particular political committees, as opposed to this [Section 23-15-801] which is a general definition of political committees applicable to a myriad of candidates and other types of balloting measures." Turner Dep. at 19; *see* Miss. Code Ann. § 23-17-47(c) (defining political committees for constitutional initiative purposes); Turner Dep. at 33 ("It will be my interpretation that 807 is inapplicable to political committees that are specific to constitutional initiatives.")

### 2. The Secretary of State's guides do not conflict with 23-17-47.

Plaintiffs contend that the Secretary of State's citizen guides are inaccurate and conflict with the applicable code sections. Pl. Sum. Br. At 8. Plaintiffs are wrong. Plaintiffs readily acknowledge that there exists a separate citizen guide produced just for the constitutional initiative process and they attach that guide as their exhibit 6. *See* Pl. Sum. Br. at 8. This guide is aptly entitled "Constitutional Initiative in Mississippi: A Citizen's Guide." *See* Plaintiffs' Ex. 6. That guide discusses the reporting requirements for political committees and individuals who seek to influence voters regarding *constitutional* initiatives. This "Constitutional Initiative" guide addresses compliance with Section 23-17-47.

On the other hand, Plaintiffs note that there is a completely separate guide entitled the "Campaign Finance Guide" for candidates, candidate committees, political parties, and non-constitutional initiatives governed by Section 23-15-801. *See* Pl. Sum. Br. at 8; Plaintiffs Ex. 4 (2011 Campaign Finance Guide); Plaintiffs' Ex. 5 (2012 Campaign Finance Guide). Plaintiffs complain that the Campaign Finance Guides "never mention the reports that *constitutional* amendment ballot measure committees are to file." Pl. Sum. Br. at 8 (emphasis supplied). The Campaign Finance Guide addresses *non-constitutional* initiatives and compliance with Section 23-15-801. The "Constitutional Initiative" guide addresses constitutional initiatives and compliance with Section 23-17-47.

Plaintiffs present no competent summary judgment evidence that there exists any confusion regarding the guides, and Plaintiffs have certainly not substantiated any widespread or substantial confusion. Moreover, confusion about the guides would not render the statutes unconstitutional as confusion could be cured by merely redrafting the guides.

15

### 3. Mississippi's constitutional initiative disclosure forms do not conflict with Section 23-17-47.

Plaintiffs next refer this Court to the disclosure forms applicable to candidates, candidate committees, political parties, and non-constitutional initiatives – which are governed by Section 23-15-801 – and declare that those forms do not match the requirements of Section 23-17-47 pertaining to constitutional initiatives. Pl. Sum. Br. at 7. That is true: Plaintiffs are purposefully referring to the wrong forms.

For example, Plaintiffs state that the "initiative monthly form, [Plaintiffs'] Exhibit 3, does not comport with the statutory requirements of Section 23-17-53." *See* Pl. Sum. Br. at 9. In fact, Plaintiffs are referring to the form for political committees (such as candidate committees and political parties) who seek to influence voters on behalf of candidates or non-constitutional initiatives and who are governed by Section 23-15-801. *See* Plaintiffs' Ex. 3. The form itself explicitly references Section 23-15-801. *See* Plaintiffs' Ex. 3 (stating "Refer to Miss. Code Ann. § 23-15-801 (1972) *et seq.* for statutory requirements"). Instead, the Secretary of State has a separate form used exclusively for *constitutional* initiatives and geared towards compliance with Section 23-17-47. *See* Exhibit B to the State Defendants' Motion for Summary Judgment (entitled: "Political Committee REPORT OF RECEIPTS AND DISBURSEMENTS Initiative Monthly Report" and stating "Refer to Miss. Code Ann. §§ 23-17-49 & 23-15-51 (1972) *et seq.* for statutory requirements.").[12]

---

[12] Plaintiffs do attach the correct itemization form used for constitutional initiatives. *See* Plaintiffs Ex. 7. However, Plaintiffs' argument that the form conflicts with Section 23-17-53 is wrong. *See* Pl. Sum. Br. at 10. For any person contributing over $200 to a political committee during the reporting period, the itemization form requires name, amount contributed in the reporting period, and the aggregate to date amount. *See* Plaintiffs Ex. 7. Plaintiffs contend that the statute does not require the disclosure of aggregate totals. Pl. Sum. Br. at 10. In fact, the

16

4.    **Atlee Breland's testimony demonstrates the constitutional operation and application of the State's initiative registration and disclosure requirements.**

Atlee Breland was listed in Plaintiffs' initial disclosures and was deposed by the State Defendants.  Breland, a private citizen with no previous experience as a political activist, wanted to influence voters to vote against the Constitutional Initiative 26 known as "Personhood.. Breland and two friends decided to pool their resources and time to create an internet campaign against Initiative 26.[13]  *Id*. at 15, 17.  Breland testified that she had "no idea what paperwork" was needed and contacted the Mississippi Secretary of State's office to inquire about registration and disclosure.  *Id*. at 21-22.  The Secretary of State's office answered her questions, directed her to their website for the forms, and offered to accept facsimile filings of the documents.  *Id*. at 22–24.  The Secretary of State's office told Breland what forms she needed to file, where she could find those forms on their website,  and when the forms were due.  *Id*. at 25, 28.  Breland testified that the Secretary of State's office was "very helpful" and when asked whether she believed that the office was available for any further questions, Breland answered "Oh, absolutely!  Absolutely!"  *Id*. at 25, 29.

---

statute does.  Code Section 23-17-53 requires itemization disclosures of:
> The name and street address of each person from whom a contribution(s) exceeding Two Hundred Dollars ($200.00) was received during the period covered by the financial report, together with the amount contributed, the date of receipt, **and the cumulative amount contributed by that person for each measure**.

Miss. Code Ann. § 23-17-53(b)(vii); Pl. Sum. Br. at 10.  The form and the statute are consistent.

[13]  While Breland might not have considered an internet campaign to be "traditional" campaigning, she quite readily acknowledged that she intended to pool resources and time with two partners to create an internet campaign with the express goal of influencing as many voters as possible to vote against Constitutional Initiative 26.

17

Breland filled out the initial registration and subsequent three monthly reports by herself.[14]  *Id*. at 32.  She testified that downloading, completing, and filing the initial registration for took about an hour.  *Id*. at 35.[15]  She found the form to be "fairly straightforward."  *Id*. at 33. Breland and her two partners registered as a political committee under the name "Parents Against MS-26."  *Id*. at 15.  By contrast, Breland testified that determining whether they needed to register with the Federal Election Commission was much more complicated and time consuming.  *Id*. at 62. Breland spent several hours reviewing the federal registration requirements and believes that she needs a lawyer in order to properly register with the FEC.  *Id*. at 63.  She testified that registration with the FEC "is really hard, because it's not nearly as easy as calling up the Secretary of State."  *Id*. at 62.

Breland's testimony highlights benefits of the State's registration requirements previously not considered by this Court.  First, the reporting requirements actually *increased* Breland's speech and increased anti-Personhood speech in general.  *Id*. at 67.  Breland stated that she had never intended to take donations or expand beyond the internet campaign until she registered.  *Id*.  Because she had to register, she concluded: "Well, if we're going to do it, lets do it big.  You know, maybe we can make some noise."  *Id*. at 67, 37-38.  Once registered as a political committee, Parents Against MS-26 received over $22,000 in donations in just the six weeks from its registration on September 30 through the first week of November.  *Id*. at 45, Dep. Exhibit 2 (registration form, dated September 30).  After registering, Parents Against MS-26

_____

[14]  Unlike Plaintiffs, Breland was not confused about which forms to use.  She filed the correct forms.

[15]  Later, as their donation expenditures reached over $22,000, the monthly forms required more time.  Dep. 45-46.

18

moved well beyond its internet campaign. They influenced voters by purchasing and distributing "push cards," business cards, bumper stickers, and yard signs. Dep. at 42. Parents Against MS-26 organized a rally in Oxford and participated in other rallies. *Id*. at 40-41. They produced a video "when the money really started to roll in." *Id*. at 42. They produced and purchased numerous radio and newspaper advertisements. *Id*. at 43-44. As Breland summarized when questioned by Plaintiffs' counsel:

> Q:    Okay. All right, I think you said – and if I'm wrong, please let me know – that it was – it was the fact that you had to report already that drove you to get bigger; is that correct?
> A:    Uh-huh. Very much.
> Q:    Is that a yes?
> A:    Yes. Yes. Sorry. Yes, very much so.

Dep. at 67. Also relevant, Breland testified that the existence of the requirements did not cause her to either limit her speech or to change her plans by way of decreasing her speech. *Id*. at 58.[16] In fact, the registration requirement resulted in *increased* speech.

The second, previously unconsidered benefit came from transparency required by the reporting requirements. Breland was concerned that pro-Personhood advocates attempted to minimize speakers like Breland by linking them to Planned Parenthood. Dep. at 13. Breland wanted the voters to know that Parents Against MS-26 was completely independent from Planned Parenthood. *Id*. Because Parents Against MS-26 was legally obligated to disclose its donations, Breland was able to "waive" her reporting documents before the public to prove that they had received no donations from Planned Parenthood. *Id*. at 53-54. Breland knows "for a

---

[16] Plaintiffs contention that the requirements required Breland to "change her plans" is less than half the story given that Breland testified that the change in plans increased her speech. *See* Plaintiffs Br. at 11.

19

fact" that people reviewed the information disclosed on the forms. *Id*. at 55.

When asked whether the "burden" of reporting resulted in a decreased amount of speech from her or from Parents Against MS-26, Breland said no. Dep. at 58. When asked whether she would undertake the same speech/efforts in the future in light of the "burden" of reporting, Breland said yes. *Id*. at 60.

Finally, Plaintiffs make much of Breland's testimony that some donors gave only $199 in order to avoid being disclosed as donors. Pl. Sum. Br. at 12. First, Breland testified that only "five, maybe six" persons were concerned about being identified and, therefore, gave $199. Dep. at 51. Of those, two were husband and wife. *Id*. And Breland has no idea how much more, if any, those donors would have given if the could have remained anonymous. Dep. at 61. Second, the Supreme Court has already explicitly rejected the argument that statutory disclosures are unconstitutional because some potential donors will refrain from donating in order to avoid identification. *See Buckley*, 424 U.S. at 68 ("[i]t is undoubtably true that public disclosure of contributions to candidates and political parties will deter some individuals who otherwise might contribute," but "disclosure requirements certainly in most applications appear to be the least restrictive means of curbing the evils of campaign ignorance and corruption"); *Citizens Against Rent Control v. City of Berkeley*, 454 U.S. 290 (1981) ("The integrity of the political system will be adequately protected if contributors are identified in a public filing revealing the amounts contributed; if it is thought wise, legislation can outlaw anonymous contributions.").

In contrast to Breland's description of her personal experience with the reporting process, Plaintiffs attempt to support their unduly burdensome argument by claiming that citizens made errors on the forms that they filed with the Secretary of State. Pl. Sum. Br. at 12-13. Plaintiffs'

unsupported legal contention is that if citizens make errors on the forms, the forms must be too complex and are, therefore, burdensome. As evidence of these alleged errors, Plaintiffs rely exclusively on the testimony of Diana Simpson who is an attorney with the Institute for Justice. *See* Plaintiffs' Exhibit 15. There are several reasons why Simpson's testimony is of no legal or factual value. First, as set forth in the accompanying motion to exclude Simpson's testimony, Simpson was not disclosed as a witness in Plaintiffs' discovery responses. Thus, her testimony regarding her conclusion that some persons filed forms late, had errors in their forms, or filed the wrong forms should be excluded.

Second, Simpson's opinion that none of the ten constitutional amendment ballot measure committees "completely complied" with the statutory requirements is not appropriate lay testimony. *See* Simpson Dec. at ¶¶ 81- 83. Furthermore, had Simpson been disclosed as an expert witness, which she was not, her expert opinions on alleged errors are inappropriate and inadmissible legal conclusions.

Third, Simpson's opening statement that she is merely "summarizing" voluminous records is undoubtably incorrect. Dec. at ¶ 2. Simpson picks and chooses amongst forms, interprets deposition testimony of other witnesses (Dec. at ¶¶11, 12 n.1, 63, 66), interprets discovery responses (Dec. at ¶¶ 4, 10, 16) and interprets statutes (Dec. at ¶¶ 34, 43, 46, 66). Simpson then provides her own subjective understanding of those items and events. Simpson is providing testimony – albeit, inappropriate testimony -- but it is nonetheless testimony from an undisclosed witness.

Fourth, Simpson's opinion that each of the constitutional amendment ballot measure committees committed at least one error in connection with at least one of the forms they filed is

21

based on her and Plaintiffs' incorrect assumption that constitutional initiative committees (governed by Section 23-17-47) must complete forms required of other committees under Section 23-15-801.  *See* Simpson Decl. at 16, 45-49, 66, 81, 83, 84.  The opinion was also based unreliable and inadmissible handwriting analysis conducted by Simpson.  Dec. at ¶ 65 ("The signature on the November 7, 2011, form does not appear similar to the signature on any other document submitted by Mississippians for Healthy Families.").  Simpson's conclusion was also based on what she said "appears" to be "typographical errors, but they are errors nonetheless and they remain uncorrected."  Dec. at ¶ 55.

Fifth, what Simpson concludes to be errors are actually immaterial issues,[17] nitpick matters,[18] based on speculation,[19] based on simply bizarre interpretations of fact,[20] or based

---

[17]  Simpson concludes that Students Voting No on 26 committed an error by filing its statement of organization two days late (twelve days after exceeding the $200 threshold, rather than the required ten days).  Dec. at ¶ 38.

[18]  "Personhood PAC's monthly reports do not clearly identify which month each report is for."  Dec. at ¶ 54.

[19]  Simpson concludes that Personhood PAC's November form contains an error because, by virtue of it being filed nine days prior to the end of November, it does not reflect all of November's expenditures and contributions.  Dec. at ¶ 54.  Simpson merely assumes that Personhood PAC had expenditures or contributions during the last nine days of November following the November 8, 2011, election day.

[20]  Simpson notes that the Secretary of State sent a letter to David Waide, who is the president of Farm Bureau, reminding him that monthly reports must be filed.  Dec. at ¶ 77-80.  The letter, attached as Plaintiffs' Exhibit 13, is addressed to Farm Bureau's business mailing address.  Upon receipt of the letter, Farm Bureau filed the required reports.  Dec. at 79.  However, Simpson interpreted the letter to require Waide to file individual reports on behalf of himself and Simpson notes that Waide did not file any individual reports.  *Id*. at 80.  Waide was not required to file individual reports; Simpson is misreading the letter.

bizarre interpretation of the law.[21]

Sixth, the only arguable Rule 1006 summary associated with Simpson's declaration is Exhibit A to the declaration which evidences the millions of dollars spent to influence voters with respect to constitutional initiatives. This millions of dollars at issue underscore the State's interest in informing voters about who is speaking through those expenditures in an attempt to influence their vote.

Finally, the complexity of the forms and the burden associated with completing the forms is a question of law to which Simpson's declaration is irrelevant. However, if the testimony was relevant, the testimony actually shows that the burden is less than argued by Plaintiffs. Simpson's conclusion that the Secretary of State will accept forms will errors, typographical mistakes, or which are late, evidences the Secretary of State's reasonable and appropriate efforts to facilitate disclosure in the least burdensome manner possible. Given that Mississippi's forms are simple when compared to the forms required by other states, Plaintiffs' contention that the forms are so complex as to render the entire reporting requirement unconstitutional finds neither legal nor factual support.

**V.      Decisions that pre-date the preliminary injunction hearing do not support Plaintiffs.**

Plaintiffs' claim that decisions pre-dating the preliminary injunction opinion were wrongly interpreted by this Court and actually support Plaintiffs' contentions. Pl. Sum. Br. at 22-23. These decisions were addressed in the State Defendants' summary judgment

---

[21] Simpson concluded that "even" Senator Joey Fillingane "submitted incorrect forms." Dec. at ¶ 84. However, Simpson's discussion of Fillingane's forms noted that he filed monthly reports indicating that he neither accepted contributions nor made expenditures in support of an initiative. Dec. at ¶¶ 71-76. Simpson does not explain why she believes those monthly reports to have been the "wrong forms."

memorandum and were thoroughly and correctly analyzed in this Court' preliminary injunction opinion.

**VI**.    **Decisions that post-date the preliminary injunction hearing do not support Plaintiffs.**

Plaintiffs next contend that post-preliminary injunction decisions demonstrate that this Court erred in its previous legal analysis.  Pl. Sum. Br. at 23.  Again, Plaintiffs are misreading the applicable law.

First, *Minnesota Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864 (8th Cir. 2012), is readily distinguishable as it is merely an application of *Citizens United* to Minnesota's law. Minnesota prohibited "corporations and limited liability companies from directly or indirectly contributing to" political parties or candidates.  *Id*. at 867-868.  The law further prohibited corporations and companies from making "independent" election expenditures (expenditures that are not given to, or coordinated with, a candidate) unless the entity established a separate PAC (political action committee).  *Id*.

Minnesota's law greatly restricted the manner in which the PAC could operate.  For example, the PAC could not "expend money unless the expenditure is authorized by the treasurer or deputy treasurer of that committee, fund, or party unit."  M.S.A. § 10A.17(1).  A PAC desiring to expend more than $20 (twenty dollars) in connection with a political campaign must receive "written authorization from the treasurer of the principal campaign committee of the candidate who approved the expenditure stating the amount that may be spent and the purpose of the expenditure."  M.S.A. § 10A.17(2).   And, the treasurer or deputy treasurer of the PAC could only "sign vouchers for petty cash of up to $100 per week for statewide elections or $20 per week for legislative elections, to be used for miscellaneous expenditures."  M.S.A. § 10A.17(3).

No such requirements exits in Mississippi; Mississippi does not limit the manner or amount Plaintiffs could spend in support of Constitutional Initiative 31.

The PAC's reporting requirements extended well beyond the requirements found in Mississippi and other states. For example, Minnesota PACs are required to itemize all campaign and *noncampaign* related expenditures over $100. *See* M.S.A. §§ 10A.20(j) (campaign expenditures); 10A.20(l) ("The report must disclose the name and address of each individual or association to whom noncampaign disbursements have been made that aggregate in excess of $100 within the year by or on behalf of the reporting entity and the amount, date, and purpose of each noncampaign disbursement."). By contrast, Mississippi requires political committees to report only "expenditures" – which are defined as funds intended to influence voters. *See* Miss. Code Ann. §§ 23-17-47(d) (defining expenditure as funds spent to influence voters); 23-17-53(b) (reporting and itemization limited to "expenditures"). Further, while Minnesota's law requires the itemization of any expenditure to one source, or contribution from one source, over $100 in a given year, Mississippi requires itemization only when an expenditure to one source, or contribution from one source, exceeds $199 in a given month. 692 F.3d at 869; Miss. Code Ann. § 23-17-53(b).

Finally, the PAC's reporting requirements continued for the life of the PAC, regardless of whether the PAC had ceased excepting contributions or making expenditures. The court found the requirement that the corporation's PAC must continually report its activities and balances "regardless of whether the association ever again makes an independent expenditure" to be perhaps the "most onerous" part of the law. 692 F.3d at 873. In contrast, Mississippi terminates the reporting requirements once the contributions and expenditures "cease." Miss. Code Ann. §

23-17-51(3). The *Swanson* court concluded that "Minnesota has not stated any plausible reason why *continued* reporting from nearly all associations, regardless of the association's major purpose, is necessary to accomplish these interests." 692 F.3d at 877 (emphasis supplied).

In sum, *Swanson*'s application of *Citizens United* is just as far removed from this matter as is *Citizens United* itself.

Plaintiffs next attempt to make the best of an overall damaging opinion from the Seventh Circuit that affirmed the dismissal of a facial challenge to Illinois law requiring registration of, and disclosures from, certain political committees. *Center for Individual Freedom v. Madigan*, 697 F.3d 464 (7th Cir. 2012).[22] The Seventh Circuit noted that since *Citizens United*, every federal court of appeals hearing a facial challenge to the reporting and disclosure laws has upheld the laws. *Id*. at 470. The Seventh Circuit noted in dicta that, at some point, a low threshold "may foreclose application of disclosure laws" (citing *Sampson*), but declined to address what that low threshold may be. *Id* at 482. In contrast, numerous courts who have actually addressed the low threshold argument have affirmed thresholds lower than $200.[23]

---

[22] Illinois requires a group to register as a political committee if it makes expenditures of more than $3,000 within one year. 697 F.3d at 472. Mississippi's threshold is not substantially different as it only requires registration if the expenditure is equal to or greater than $200 in any given month, which would permit expenditures of in excess of $2,300 per year without registration. *See* Miss. Code Ann. § 23-17-51. Further, it is undoubtedly more expensive to campaign in Illinois than in Mississippi.

[23] *See, e.g., Buckley*, 424 U.S. at 82–83 ($10 threshold for reporting contributors' names and addresses and its $100 threshold for reporting contributors' names, addresses, occupations, and principal place of business not "wholly without rationality"); *Family PAC*, 685 F.3d at 811 (affirming a $25 threshold for reporting contributors' names and addresses and a $100 threshold for reporting names, addresses, occupations, and employers); *Daluz*, 654 F.3d at 119 (finding Rhode Island's $100 reporting threshold not "wholly without rationality"); *McKee*, 649 F.3d at 60–61 (affirming a $100 reporting threshold even though it was not indexed for inflation); *Daggett*, 205 F.3d at 466 (finding a $50 reporting threshold not illegitimate); *Vermont Right to*

Moreover, several cases decided since the preliminary injunction reinforce this Court's conclusions. In *Vermont Right to Life Committee, Inc. v. Sorrell*, 2012 WL 2370445 (D.Vt.2012), the court granted summary judgment to the state affirming the constitutionality of a requirement that any group of persons who receive contributions or made expenditures in excess of $500 in one calendar year must register as a political committee and file disclosure reports. *Id*. at 2, 17. The court also affirmed the constitutionality of Vermont's requirement that all contributions over $100 be itemized. *Id*. The *Sorrell* court rejected the argument that Vermont's $100 itemization threshold was too low.

> Vermont's $100 level has a rational foundation. It is higher than twenty-eight states' and the District of Columbia's. Report of Robert Stern, Defs.' Mot. for Summ. J. Ex CC ("Stern Report"), at 8, ECF No. 168–32. In fact, Alaska, Louisiana, Michigan, and New Mexico require disclosure of all contributions to PACs. Stern Report 8. Only five states and the federal government set their thresholds above Vermont's. Stern Report 8; see also *ProtectMarriage.com v. Bowen*, 599 F.Supp.2d 1197, 1221 (E.D.Cal.2009) ("California's current $100 threshold falls well within spectrum of those mandated by its sister states, which range from no threshold requirement to $300."). Nor has Vermont arrived at $100 haphazardly: the legislative history reflects a concerted effort to adjust the amount over the years. The present level appears well-calculated for transparency without being overly burdensome. Based on a review of 2006 and 2008 campaign data in Vermont, the $100 level permits transparency for 80 percent of PAC contributions, compared to only 40 percent under a hypothetical $500 threshold. Decl. of Michael Franz ¶ 22, Defs.' Mot. for Summ. J., ECF No. 71–47.

*Id*. at 21.

Similar conclusions were reached by *ProtectMarriage.com v. Bowen*, 830 F.Supp.2d 914 (E.D.Cal. 2011), in which the court granted the State's motion for summary judgment and found

---

*Life Committee,* 2012 WL 2370445, 21-22 (Vermont's $100 threshold above which a committee must disclose a donor's name, address and date of contribution is not "wholly without rationality"); *Olson*, 2011 WL 3861433, at *1 (upholding reporting requirement for any expenditure of $50.00 or more "by any person or organization").

the $100 itemization requirement to be constitutional. The *Bowen* court also found the *Sampson*

decision to be unpersuasive. *Id*. at 943.

> Thus, disclosure requirements, by their very nature, are the least restrictive means
> through which to educate the electorate. The requirements do not limit the amount
> of contributions or expenditures by the entity or the contributor. They do not limit
> the entity's ability to raise funds, nor do they impose burdensome structural
> requirements on Plaintiffs. *See Alaska Right to Life Committee v. Miles*, 441 F.3d
> 773, 791 (9th Cir.2006). Moreover, Plaintiffs point to no threshold that would be
> more narrowly tailored to serve the State's interest. The Court simply cannot say
> that the cumulative effect of the disclosure of the contributors of $100 is not
> narrowly tailored to the Government's compelling informational interest.

*Id*. at 947-948.

Since this Court's preliminary opinion, the Ninth Circuit has affirmed a district court's

summary judgment which upheld the constitutionality of Washington's requirement that political

committees report the name and address of each person contributing more than $25 to the

committee and that political committees must report the occupation and employer of each person

contributing more than $100 to the committee. *Family PAC v. McKenna*, 685 F.3d 800, 803

-804 (9th Cir. 2012). After finding reporting requirements to be a "modest burden," the court

noted that it did "not agree with Family PAC's contention that disclosure of small contributors

does not provide information that enables the electorate to evaluate campaign messages and

make informed decisions." *Id*. at 810. "It is true that the public disclosure of a single $25.01

contribution to a ballot measure campaign may provide little relevant information to voters. As

the district court recognized, however, small contributions may provide useful information to

voters when considered in the aggregate," including indicating whether a measure is financed by

"out-of-state contributors." *Id*.; *see also Many Cultures, One Message v. Clements*, 830

F.Supp.2d 1111, 1123 (W.D.Wash. 2011) (granting state summary judgment; finding registration

and disclosure of grass roots lobbying campaigns to satisfy exacting scrutiny).

This Court's previous legal conclusions have been reaffirmed by cases decided since the preliminary injunction opinion.

## Conclusion

For the reasons set forth by this Court in *Justice v. Hosemann*, 829 F.Supp.2d 504 (N.D.Miss. 2011), in addition to the reasons set forth in the State Defendants' summary judgment memorandum and in the above opposition, this Court should deny Plaintiffs' motion for summary judgment and grant summary judgment to the State Defendants.

This the 6th day of December, 2012.

**DELBERT HOSEMANN, in his official capacity as Mississippi Secretary of State**

**BY:  JIM HOOD, ATTORNEY GENERAL
STATE OF MISSISSIPPI**

BY:      /s/ Harold E. Pizzetta III
HAROLD E. PIZZETTA, III, MSB NO.99867
ASSISTANT ATTORNEY GENERAL

Office of the Attorney General
Civil Litigation Division
Post Office Box 220
Jackson, Mississippi  39205-0220
Telephone: (601) 359-3816
Facsimile:  (601) 359-2003
hpizz@ago.state.ms.us

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that the foregoing document has been filed electronically with the Clerk of Court using the Court's ECF system and thereby served on the following persons:

Russell Latino, III
Post Office Box 131
Jackson, MS  39205-0131
rlatino@wellsmarble.com

Paul V. Avelar
398 S. Mill Avenue, Suite 301
Tempe, AZ 85281
pavelar@ij.org

Steven M. Simpson
901 North Glebe Road, Suite 900
Arlington, VA 22203-1854
ssimpson@ij.org

**THIS**, the 6th day of December, 2012.

BY:    /s/ Harold E. Pizzetta III
           HAROLD E. PIZZETTA, III