**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
Oxford Division**

GORDON VANCE JUSTICE, JR.; SHARON BYNUM;
MATTHEW JOHNSON; ALISON KINNAMAN AND
STANLEY O'DELL;

      Plaintiffs,

                                        Civil Action No.

v.                                       3:11-CV-138-SA-SAA

DELBERT HOSEMANN, in his official capacity as
Mississippi Secretary of State; JIM HOOD, in his
official capacity as Attorney General of the State
of Mississippi,

      Defendants.

---

**PLAINTIFFS' SUPPLEMENTAL MEMORANDUM FOLLOWING ORAL ARGUMENT**

---

At oral arguments held on February 6, 2013, this Court asked for supplemental briefing regarding the following four issues: (1) whether Chapter 15 and/or Chapter 17 apply to Plaintiffs' speech; (2) an accounting of every small-group registration and reporting burden case; (3) whether the burdens and benefits of campaign finance laws are questions of law or of fact and the application of Dr. Primo's expert evidence to such questions; and (4) highlighting any documents from the State's campaign finance database. Plaintiffs submit this memorandum in response to the Court's request.

**I.     Plaintiffs' Speech Is Regulated by Both Chapters 15 and 17. Regardless, the Difficulty of Determining Which Statutes Regulate Plaintiffs' Speech Has a Chilling Effect and This Court Need Not Resolve This Difficult Issue to Find for Plaintiffs.**

This Court has noted the difficulty in determining whether speech about a voter-initiated ballot measure to amend the Mississippi Constitution is regulated exclusively under Chapter 15,

exclusively under Chapter 17, or under both Chapters. Plaintiffs share the Court's confusion about which statutes apply, indeed, they noted this issue in their Complaint. But, based on the plain language of the statutes and the State's own behavior, both Chapters appear to apply to Plaintiffs. This may not be an issue that the Court need resolve in order to resolve this case, however. That there is this much confusion as to which statutes apply to Plaintiffs' speech is sufficient evidence by itself that Mississippi's campaign finance regulation scheme chills speech. In addition, even assuming that only one Chapter applies to Plaintiffs' speech, each Chapter contains the same kind of formation, registration, record-keeping, record-retention, and reporting burdens that cannot be justified by the State's weak interest here. Indeed, of the two Chapters, Chapter 17—which the State contends applies—is the more burdensome one.

A.     **The Plain Language of the Statutes and the State's Own Acts Demonstrate that Both Chapters Apply.**

As this Court noted at oral argument, the plain language of the statutes indicates that Plaintiffs are a regulated "political committee" under both Chapters. When interpreting statutes, the plain language is to be the touchstone. *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002); *Finn v. State*, 978 So. 2d 1270, 1272 (Miss. 2008). A Chapter 17 "political committee" is "any person, other than an individual, who receives contributions or makes expenditures for the purpose of influencing the passage or defeat of a measure on the ballot." Miss. Code. Ann. § 23-17-47(c). For purposes of Chapter 17, a "measure" is "an amendment to the Mississippi Constitution proposed by a petition of qualified electors under Section 273, Mississippi Constitution of 1890." *Id*. § 23-17-1(1). A Chapter 15 "political committee" is, *inter alia*, any group that receives contributions or makes expenditures in excess of $200 in a calendar year "for the purpose of influencing or attempting to influence the action of voters for or against . . . balloted measures." *Id.* § 23-15-801(c). Chapter 15 does not further define or limit the phrase

2

"balloted measures"—and by the common understanding, the phrase "balloted measures" would include "a measure on the ballot."

To ignore the plain language, the State has essentially argued that the plain language results in an absurdity:  That the State "enacted two separate and conflicting statutes governing constitutional initiatives.  This is simply counterintuitive."  DOC 52 at 13 n.9.  But the requirements of Chapters 15 and 17 are not "conflicting"—they do not say "Do X" and "Don't do X."  Rather, they are cumulative—"Do X" and also "Do Y."  It is possible—if incredibly burdensome—to comply with the requirements of both Chapters simultaneously:  A group would have to file a multiplicity of reports keeping track of "contributions" and "expenditures" (which are defined differently, *see* part I.D., *infra*.) in different ways at different times.

Casting off the interpretive mooring of the plain language of the statutes highlights the confusion about the meaning of the laws.  The State's briefing never squarely explains why only Chapter 17, and not Chapter 15, applies to speech about voter-initiated constitutional amendment ballot measures.  *See* DOC 52 at 12-14.  The only explanation came in the deposition of Kimberly Turner, then-Senior Attorney for the Elections Division of the Secretary of State and now-Assistant Secretary of State for the Elections Division, who explained that "the specific section takes precedent over a more general section."  Dep. of Kimberly P. Turner, DOC 42-11 at 18:23-19:2, 20:23-21:1.  But reverting to a canon of construction is an admission that the scheme is ambiguous.  *Swearingen v. Owens-Corning Fiberglas Corp.*, 968 F.2d 559, 562 (5th Cir. 1992) (canons of construction used only if the plain language of a statute is ambiguous; *Oktibbeha County Hosp. v. Miss. State Dep't of Health*, 956 So. 2d 207, 209 (Miss. 2007) (same).  It also means that Mississippians must be familiar with and be able to apply canons of construction in order to speak about ballot measures.

Setting these weighty issues aside, the definition of political committee at Section 23-17-47(c) is, apparently, the more specific because it is part of a chapter entitled "Amendments to Constitution by Voter Initiative." But the definition of political committee at Section 23-15-801(c) is part of a chapter entitled "Elections," a subchapter entitled "Mississippi Election Code," and an article entitled "Disclosure of Campaign Finances," which is also quite specific. if the State were right, its interpretation results in still more complexity and confusion: some constitutional amendment ballot measures—voter-initiated ones—would be subject to Chapter 17 but other constitutional amendment ballot measures—legislatively-referred ones, *see* Miss. Const. Art. XV, § 273(1-2)—would be subject to Chapter 15.[1]

Ultimately, the State's assertion that only Chapter 17, and not Chapter 15, applies to voter-initiated constitutional amendment ballot measures is belied by the State's own actions. First, the State's own guidance documents state that Chapter 15 does apply to initiated constitutional amendment ballot measure committees. *See* Constitutional Initiative Guide, DOC 42-6 at 10. Second, the State's Chapter 17 monthly report form does not match up with Chapter 17 requirements, but rather with Chapter 15 requirements. *See* Mem. in Supp. of Pls.' Mot. for Summ. J. ("Pls.' MSJ Mem."), DOC 43 at 9-10. Third, in the most recent initiated constitutional ballot measure election, groups filed, and the State accepted, Chapter 15 reports. *See* Section IV, *infra*. Fourth, as demonstrated by the lack of reports filed by media outlets, the State is not enforcing Chapter 17's definition of expenditure; it is enforcing Chapter 15's definition. *See* part I.D., *infra*. Fifth, as this Court noted, the Secretary of State has created forms for Chapter 17, even though only Chapter 15 provides such authority. Miss. Code Ann. § 23-15-815(a). Sixth

---

[1] Further, and as the Court has noted, the State expressly provided that Chapter 15 applied to a non-voter-initiated, non-constitutional statewide ballot initiative regarding the state flag. Miss. Code Ann. § 23-15-805(e). This provision would be mere surplusage if it was clear when Chapter 15 applied and when Chapter 17 applied.

and similarly, although only Chapter 15 grants authority to the Secretary of State to make public the completed campaign finance forms, *id.* § 23-15-815(b), the Secretary of State also publishes completed Chapter 17 campaign finance forms, *see* DOC 62-1 – 62-4.

Unfortunately, and contrary to the State's premise, there is a lot about Mississippi's campaign finance scheme that is "simply counterintuitive." DOC 52 at 13 n.9. This makes it difficult to conclusively construe Mississippi's statutory scheme, much less square Mississippi's arguments in this Court with its actions in implementing and enforcing the campaign finance scheme. Nevertheless, based on the plain language of the statutes and the State's actions, the best construction of the scheme is that both Chapters 15 and 17 apply to Plaintiffs' speech.

### B.  Confusion as to the Applicable Law Chills Speech.

Regardless of the ultimate construction given Mississippi's confusing and complex statutes, Plaintiffs have demonstrated that those statutes chill protected speech. The Plaintiffs' injury in this case is the chilling effect that the existence of Mississippi's regulatory scheme has on their political speech. Verified Compl., DOC 1 ¶¶ 19-63. Part of that chilling effect is that if Plaintiffs spend more than $200, they become subject to regulation and "would have to spend a great deal of time reviewing and complying with the campaign finance laws and the regulations that apply to political committees and to them as individuals." *Id.* ¶ 49. Or, as the Fourth Circuit put it, Plaintiffs would be forced "to navigate a maze of rules, sub-rules, and cross-references in order to do nothing more than project a basic political message." *N.C. Right to Life, Inc. v. Leake*, 525 F.3d 274, 296 (4th Cir. 2008). And as the Eighth Circuit has recognized, "even just the daunting task of deciphering what is required under the law," leads to chilled speech. *Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 873-74 (8th Cir. 2012) (en banc).

The confusion burden exists regardless of whether Chapters 15 and/or 17 is ultimately construed to apply to Plaintiffs. As Plaintiffs stated in their Complaint, "[t]he burden of complying with Mississippi's regulations is compounded by the fact that there are multiple statutes contained in different sections of the Mississippi Code that one has to wade through to figure out all the relevant registration, reporting, and disclosure obligations." DOC 1 ¶ 50 (citing to both Chapter 15 and Chapter 17). This "multiplicity of statutes create[s] traps for the unwary," *id.* ¶ 51 (noting differences between Chapters 15 and 17 requirements), and the State's own guidance documents even further exacerbate the confusion, *id.* ¶ 52 (citing the Campaign Finance Guide); *see also* Constitutional Initiative Guide, DOC 42-6 at 10 (referring would-be speakers to both Chapters 15 and 17 and also the Campaign Finance Guide).

As the Supreme Court has made clear,

> The First Amendment does not permit laws that force speakers to retain a campaign finance attorney . . . or seek declaratory rulings before discussing the most salient political issues of our day. Prolix laws chill speech for the same reason that vague laws chill speech: People of common intelligence must necessarily guess at [the law's] meaning and differ as to its application.

*Citizens United v. FEC*, 130 S. Ct. 876, 889 (2010) (internal quotation omitted).[2] The attorneys for the parties and the Court cannot immediately determine what regulations do and do not apply to Plaintiffs' speech. This fact alone demonstrates that the scheme chills speech in the way that Plaintiffs allege that it does.

### C.     The Burdens of Each Chapter Separately Are Not Constitutionally Justified.

Even assuming that only one of the two Chapters applies to Plaintiffs' speech, a choice between the two should not affect this Court's resolution of this case. Both Chapters apply to very small groups. And both Chapters mandate the same general kinds of "PAC burdens"—

---

[2] At oral argument, the Court asked whether Plaintiffs were making a vagueness claim. Plaintiffs are not making a "void-for-vagueness" claim. Rather, as in *Citizens United*, *Swanson*, and *Leake*, *supra*, Plaintiffs are arguing that the difficulty of understanding Mississippi's scheme is a burden that chills speech.

formation, registration, record-keeping, record-retention, and reporting—though, of course, the details differ between each Chapter in some important ways.

Under both Chapters, a group of individuals becomes a political committee subject to regulation once they raise or spend more than $200 in "contributions" or "expenditures." Miss. Code Ann. §§ 23-15-801(c); 23-17-49(1), -51(1). Under both Chapters a political committee must organize and file a Statement of Organization with the State within ten days of crossing the $200 threshold, though the requisite content of the Statement of Organization differs and each Chapter gives different deadlines for amending the Statement of Organization. Miss. Code Ann. §§ 23-15-803; 23-17-49. Under both Chapters a political committee must have a Treasurer who is legally responsible to keep the books and accounts. Miss. Code Ann. §§ 23-15-803(b)(ii); 23-17-49(2)(b). Under both Chapters a political committee must make regular reports of its contributions and expenditures—reporting that requires political committees to keep and retain financial records for accounting purposes—though the timing and exact content of these reports differs, at least according to the statutes. Miss. Code Ann. §§ 23-15-807(b, d); 23-17-51, -53(b).

Thus, each Chapter individually contains the very same burdens that chill speech, particularly of small groups. *E.g., Citizens United*, 130 S. Ct. at 897 ("PACs are burdensome alternatives" that are "expensive to administer and subject to extensive regulation"); *Mass. Citizens for Life v. FEC*, 479 U.S. 238, 255 (1986) (plurality opinion) ("Faced with the need to assume a more sophisticated organizational form, to adopt specific accounting procedures, to file periodic detailed reports . . . it would not be surprising if at least some groups decided that the contemplated political activity was simply not worth it."); *Swanson*, 692 F.3d at 873-74 ("[T]hese regulatory burdens" mean that small groups "reasonably could decide the exercise is simply not worth the trouble. And who would blame them?") (internal citation omitted).

**D.      Two Key Elements of Chapter 17 Burden Speech More Than Chapter 15.**

Notwithstanding the general similarities of Chapters 15 and 17, there are some notable differences between the two—and it is truly the case that "the devil is in the details."  These differences considered, Chapter 17 is, in at least two key ways, more burdensome than Chapter 15.  This creates more constitutional problems for the State, which has taken the position that only Chapter 17 applies to the core political speech at issue here.

The first difference is that, with regard to ballot measures, Chapter 15 requires only political committees, not individuals, to file reports of their activities, but Chapter 17 requires reports from both political committees and individuals.  *Compare* Miss. Code Ann. § 23-15-805 *with* Miss. Code Ann. § 23-17-51.  Thus, under Chapter 15, an individual may spend an unlimited amount of money to speak about a ballot measure without being subjected to Mississippi's campaign finance scheme, but under Chapter 17, spending just $200 triggers on-going reporting burdens.

Chapter 17 also regulates more political activity than does Chapter 15 because Chapter 17 encompasses a broader swath of "contributions" and "expenditures."  Both Chapters initially define "contribution" and "expenditure" broadly, as, in essence, anything of value given to influence the election or defeat of a measure.  Miss. Code Ann. §§ 23-15-801(e)(i), (f)(i); 23-17-47(a), (d).  But, in regard to ballot measures, Chapter 17 then excludes fewer things from these common broad definitions than does Chapter 15.

For purposes of "contribution," Chapter 17 only excludes "noncompensated, nonreimbursed volunteer *personal* services."  Miss. Code Ann. § 23-17-47(a) (emphasis added).  Chapter 15, however, excludes "the value of services provided without compensation by any individual who volunteers on behalf of a . . . political committee" without any reference to personal vs. professional services.  Miss. Code Ann. § 23-15-801(e)(ii).  Accordingly, under

Chapter 17, Atlee Breeland crossed the $200 registration/reporting threshold because her volunteer services setting up a website were professional, not "personal." *See* Pls.' MSJ Mem., DOC 43 at 11. But under Chapter 15, Ms. Breeland's same volunteer services would not have been a "contribution" at all.

Chapter 17 contains *no* exclusions from the broad definition of "expenditure." *See* Miss. Code Ann. § 23-17-47(d). But Chapter 15 excludes from its otherwise common definition of expenditure "any news story, commentary or editorial distributed through the facilities of any broadcasting station, newspaper, magazine, or other periodical publication . . . ." Miss. Code Ann. § 23-15-801(f)(ii).[3] If, as the State insists, only Chapter 17 applies to speech about constitutional amendment ballot measures, then any media outlet in Mississippi that opined for or against, or just had a news story regarding, any measure in the last election—which affected "personhood," eminent domain, and voter ID requirements, hot-button issues all—without registering and reporting was in violation of the plain language of the law. As the database proves, no media outlet in Mississippi did register or report. *Cf.* DOC 62-1 – 62-4.

Thus, even if Chapter 17 alone applies to voter-initiated constitutional amendment ballot measure speech, Chapter 17 is more burdensome that Chapter 15 because Chapter 17 regulates individuals and encompasses a broader scope of "contributions" and "expenditures."

*      *      *

For the reasons set forth above, Plaintiffs do not believe that this Court must determine whether Chapter 15, Chapter 17, or both, applies to Plaintiffs in order to find that Mississippi's regulatory scheme is unconstitutional. To the extent that this Court must determine whether

---

[3] The separate definition of "expenditure" in Miss. Code Ann. § 23-17-47 dates only to 1999. Laws 1999, Ch. 301, § 17. This new, different, definition indicates that the legislature intended a different meaning of "expenditure" for Chapter 17 than in Chapter 15.

Chapter 15, Chapter 17, or both, would apply to Plaintiffs, Plaintiffs believe that, based on the plain language of the statutes and the State's own actions, both Chapters apply.  Regardless of the statutory construction, however, this entire exercise belies the State's assertion that this case is just about simple forms, rather than incredibly complicated laws.

## II.     Those Few Cases Involving Small Ballot Measure Group Registration and Reporting Burdens Support Plaintiffs.

This Court requested supplemental briefing on all cases addressing the constitutionality of registration and reporting requirements as applied to small, ballot measure groups like the Plaintiffs.  While nearly all the following cases have been cited by the parties, a few had escaped the previous briefing.  These cases demonstrate that when courts address registration and reporting requirements foisted on small ballot measure groups, courts, by and large, find those burdens unconstitutional.  Instances in which courts have upheld challenged schemes have, with near uniformity, involved large groups and/or were outside of the ballot measure context.

Those cases most directly on point, in which courts have squarely addressed reporting requirements as applied to small groups speaking about ballot measures, have found the schemes unconstitutional.  *See* Pls.' MSJ Mem., DOC 43 at 22-24.  These cases are:  *Sampson v. Buescher*, 625 F.3d 1247 (10th Cir. 2010) (Colorado's reporting and disclosure requirements unconstitutional as applied to a group of neighbors who spent $782.02 in their efforts to oppose a ballot measure); *Canyon Ferry Rd. Baptist Church of E. Helena, Inc. v. Unsworth*, 556 F.3d 1021, 1034 (9th Cir. 2009) (Montana's reporting and disclosure requirements unconstitutional as applied to a church and its pastor and small in-kind contributions); *Hatchett v. Barland*, 816 F. Supp. 2d 583, 605-606 (E.D. Wis. 2011) (Wisconsin's registration and reporting threshold of $750 unconstitutional as applied to an individual wishing to speak about a ballot measure); *Swaffer v. Cane*, 610 F. Supp. 2d 962, 964-965, 968-969 (E.D. Wis. 2009) (Wisconsin's

reporting and disclosure statutes unconstitutional as applied to an individual who spent around $500 in his speech on a ballot measure); *see also Galassini v. Town of Fountain Hills*, No. CV-11-02097-PHX-JAT, 2011 U.S. Dist. LEXIS 128294, at *7, *16 (D. Ariz. Nov. 3, 2011) (at preliminary injunction stage, likely that Arizona's reporting and disclosure requirements unconstitutional as applied to an individual wanting to hold protests against a local bond issue with her friends and neighbors) (motions for summary judgment pending).

Beyond these cases, a few cases have involved small ballot-measure groups, but have not always addressed the issues here squarely. In *Volle v. Webster*, an individual and his unincorporated business association wanted to speak about certain ballot issues, but would have been deemed a political committee if they spent just $50, triggering formation, registration, and disclosure requirements. 69 F. Supp. 2d 171, 172 (D. Me. 1999). The court recognized that such requirements "would operate to deter spending in support of speech favoring or opposing ballot measures." *Id.* at 175. The court also found that the informational interest supporting the state's scheme was "not as significant as the corruption concern," *id.* at 176 (citing *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 356 (1995)), even though the court did not expressly address the low threshold at issue. Ultimately, the court found that, as applied, "the panoply of registration requirements Maine has implemented for noncandidate ballot measures is simply too broad under the *First Amendment*," and was therefore unconstitutional. *Id.*

The Northern District of Florida upheld Florida's reporting and disclosure requirements in a case that has not been reported or appeared on any online databases and is currently on appeal to the Eleventh Circuit. *Worley v. Detzner*, No. CV-00423-RH-CAS (N.D. Fla. July 2, 2012), attached Exhibit 1. *Worley* fails to engage in the necessary analysis for small-group ballot measure political speech. First, the court failed to note the differing treatment that courts have

11

given reporting and disclosure requirements. *See* Op. at 5-11; *cf.* Pls.' MSJ Mem., DOC 43 at 23-24; *Family PAC v. McKenna*, 685 F.3d 800, 810 n.10 (9th Cir. 2012). Second, the court did not draw any distinctions between small groups and large groups and failed to cite relevant case law, including *Sampson*, *Family PAC*, and *Canyon Ferry*. Third, the court erroneously attempted to distinguish Supreme Court precedent. *Compare Worley* op. at 13 ("*McIntyre* involved an individual who acted alone") *with McIntyre*, 514 U.S. at 337 (Mrs. McIntyre worked with her son and a friend).

The District of Colorado upheld the City of Golden's reporting requirements in the context of facial and as-applied challenges brought by an individual and her company that published a newspaper including advocacy on candidates and ballot measures. *Olson v. City of Golden*, 814 F. Supp. 2d 1123, 1126-27 (D. Colo. 2011). The case is distinguishable from Plaintiffs' in a number of ways. First, while that court did not state precisely how much money was spent, the plaintiff self-financed and distributed by mail monthly newspapers to Golden's residents—comprising 7,300 households—free of charge. *Id.* at 1127. Second, *Olson* involved a combination of candidate and ballot measure speech. *Id.* Third, the court chose not to apply *Sampson*—which was binding precedent—based on "the significant differences between the regulatory schemes at issue and the fact that *Sampson* resolved an as-applied challenge." *Id.* at 1132 n.7. The court did not describe why Golden's scheme was less burdensome, or why *Sampson's* premise—that substantial burdens are unconstitutional when spending on speech is small—was inapplicable. *See id.*

Beyond these cases, other cases have focused on the constitutionality of reporting requirements as applied to large groups while also recognizing that the analysis for small groups is quite different. *See Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464, 482 (7th Cir.

2012) (recognizing that, when applied to small groups, the informational interest "is at a low ebb"); *Swanson*, 692 F.3d at 874 (noting that the challenged law "manifestly discourages associations, particularly small associations with limited resources, from engaging in protected political speech."); *see also Family PAC*, 685 F.3d at 809-810 & nn.8 & 10 (recognizing distinctions between registration/reporting requirements and "disclosure" requirements and also that there is a low informational interest when little money is at stake).

Most cases challenging the constitutionality of campaign finance schemes have been brought by larger groups, and have not addressed the different benefits and burdens when those schemes are applied to smaller groups. These are the cases that the State has largely relied on. *See, e.g., Nat'l Org. for Marriage, Inc. v. McKee*, 669 F.3d 34, 38 (1st Cir. 2012) (nonprofit advocacy organizations operating nationwide); *Nat'l Org. for Marriage v. McKee*, 649 F.3d 34, 40 (1st Cir. 2011) ("New Jersey-based nonprofit corporation organized for the purpose of providing 'organized opposition to same-sex marriage in state legislatures'"); *Human Life of Wash., Inc. v. Brumsickle*, 624 F.3d 990, 994-995 (9th Cir. 2010) ("advocacy corporation" with an affiliated political action committee that was engaging in advocacy at least as early as 1991, and had "expended considerable time and resources" since its inception); *Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1091 (9th Cir. 2003) ("non-profit corporation that frequently takes a position on California propositions relating to abortion and assisted suicide"); *Vt. Right to Life Comm., Inc. v. Sorrell*, 875 F. Supp. 2d 376, 379 (D. Vt. 2012) (Section 501(c)(4) organization and a registered political committee that the organization created); *Protectmarriage.com v. Bowen*, 830 F. Supp. 2d 914, 916 n.1 & 917 (E.D. Cal. 2011) (state affiliate of the National Organization for Marriage and an individual who contributed more than $10,000 to a political committee).

Other cases have challenged the constitutionality of campaign finance in the context of candidate elections, rather than ballot measure elections. The interests in candidate elections are dramatically different than those in ballot elections, even if brought by small groups. *See* Pls.' MSJ Mem., DOC 43 at 15-16; *see also McIntyre*, 514 U.S. at 356 (a burden on ballot measure speech "rests on different and less powerful state interests" than does a burden on speech about candidates). For example, a group in Ohio, which was created to "expose and criticize local government officials without fear of reprisals," was prosecuted for failing to register for its activity distributing pamphlets, holding informational events, and publishing a website. *Corsi v. Ohio Elections Comm'n*, 2012 Ohio App. LEXIS 4238, *P4 (Ohio Ct. App., 2012). The court upheld the requirements and distinguished the group's advocacy from that in *Canyon Ferry* and *Sampson*, *id.* at **P19-22, noting that "[T]he Council is not concerned with a single ballot initiative or issue. The Council's writings show a concern for candidates and locally-elected officials in a wide range of offices . . . ." *Id.* at *P22. *See also Nat'l Org. for Marriage v. Daluz*, 654 F.3d 115, 117 (1st Cir. 2011) (plaintiff sought to speak about "'clearly identif[ied] candidates for state or local office'"); *Alaska Right to Life Comm. v. Miles*, 441 F.3d 773, 776 (9th Cir. 2006) (plaintiff nonprofit corporation wanted to speak on the 2002 Alaska gubernatorial election); *Bailey v. State*, 2012 U.S. Dist. LEXIS 141310, *30 (D. Me. Sept. 30, 2012) ("Bailey was expressly advocating the defeat of a candidate for Governor shortly before an election.").

## III. Dr. Primo's Reliable Empirical Evidence is Useful For This Court's Consideration of the Burdens and Benefits, Yet Plaintiffs Can Prevail Without It.

Whether the burdens and benefits of campaign finance laws are "questions of law" or "questions of fact"—and courts are not clear on this question—courts have considered empirical evidence in campaign finance litigation, and such evidence is valuable when determining the burdens and benefits of such laws. Nevertheless, Plaintiffs can prevail in their claims without

presenting any empirical evidence. Moreover, because here the State's interest is low as a matter of common sense, but the burdens are evident and inherent, a higher quantum of empirical evidence is necessary to *justify* the scheme. But the State has not put forward any empirical evidence to justify its scheme. The only empirical evidence is that provided by Dr. David Primo, demonstrating that disclosure in ballot issue campaigns provides virtually no marginal informational benefit and that campaign finance laws impose real costs on would-be speakers.

### A. Whether Questions of Law or of Fact, Empirical Evidence is Valuable.

At oral argument the Court questioned whether the benefits of campaign finance disclosure and/or the burdens of campaign finance laws were questions of fact or questions of law. This is not an issue that has been given great consideration by the courts. A survey of the case law indicates, however, that courts may determine burdens and benefits in the absence of empirical evidence. However, at least as to the existence and weight of burdens, the Supreme Court has determined that empirical evidence is useful to a court's consideration. Whether the burdens and/or benefits are questions of fact or of law, the resolution of such questions is improved by reference to real-world evidence.

The Supreme Court's most recent campaign finance case establishes that Plaintiffs do not need to present empirical evidence, but that if presented, the courts can consider such evidence. In *Arizona Free Enterprise Club's Freedom Club PAC v. Bennett*, 131 S. Ct. 2806 (2011) ("*AFEC*"), the Court held that courts "do not need empirical evidence to determine" that a challenged scheme is burdensome, at least where those burdens are "evident and inherent" in the scheme itself. *Id.* at 2823. This is, in part, because "'it is never easy to prove a negative,'" *i.e.*, that individuals "and groups did not speak or limited their speech because of" a campaign finance law. *Id.* (quoting *Elkins* v. *United States*, 364 U.S. 206, 218 (1960)). Nevertheless, the Court also noted that plaintiffs had presented empirical evidence—in fact it was expert evidence

from Dr. Primo—that demonstrated the burdens of the campaign finance scheme at issue in that case. *Id.* at 2822-23.

The Supreme Court's decision in *California Democratic Party v. Jones*, 530 U.S. 567 (2000), also demonstrates that expert empirical evidence can be used to demonstrate harms to political association, even if otherwise obvious. There, expert testimony about a similar scheme in another state was used to demonstrate that "under California's blanket primary system, the prospect of having a party's nominee determined by adherents of an opposing party [was] far from remote—indeed, it [was] a clear and present danger." *Id.* at 578. And the Court further noted expert testimony regarding the "obvious proposition" that crossover voters did not share policy views with the parties in whose primaries they ultimately voted. *Id.* at 578-79.

Empirical evidence has not played much of a role in the determination of the burdens and benefits of laws similar to the ones at issue here, but neither has any (final) court said such evidence was not useful. The only court to have expressly ignored empirical evidence was the district court in *Sampson v. Coffman*, No. 06-cv-01858-RPM, 2008 U.S. Dist. LEXIS 70583 (D. Colo. Sept. 18, 2008). That court disregarded expert evidence from both plaintiffs and defendants based not on any *Daubert* finding, but rather on the court's belief that "[t]here is no scientific method that can measure the adverse effects" of the challenged laws. *Id.* at *54. This decision not only conflicts with *AFEC's* treatment of empirical evidence, it was reversed by the Tenth Circuit, which determined—without a word about the expert evidence one way or the other—that the campaign finance scheme was not justified given the weight of the burdens and the State's "minimal" interest supporting the scheme. *Sampson*, 625 F.3d at 1261. In *Citizens United*, 130 S. Ct. at 897-99, and *Swanson*, 692 F.3d at 873-74, the courts found burdens to be substantial just by looking at the statutes. On the other hand, in upholding a disclosure law in a

16

case involving a large group, the Ninth Circuit pointed to a study that purported to show that informational cues had some impact on voters. *Getman*, 328 F.3d at 1106 n.25.

Courts have determined that there is little informational interest in the activities of small groups as a matter of "common sense," without reference to any evidence. This observation was first made by the Ninth Circuit in *Canyon Ferry*, 556 F.3d at 1033, without citation. The Tenth Circuit then adopted the same view in *Sampson*, 625 F.3d at 1260, with only a citation to *Canyon Ferry*. Similarly, the Supreme Court held in *McIntyre* that "[t]he simple interest in providing voters with additional relevant information" did not justify the statutory scheme at issue in that case without any reference to evidence. 514 U.S. at 348-49. The Seventh Circuit cited only *Sampson* and *McIntyre* in determining that in cases involving small groups and individuals, "the state's interest in disseminating such information to voters is at a low ebb." *Madigan*, 697 F.3d at 482. And, although the Ninth Circuit has recently cited scholarship in support of its conclusion as to the low interest in small groups, *Family PAC*, 685 F.3d at 809 n.8, that scholarship itself lacks any empirical basis.

To date, perhaps the best explanation of the courts' use, or not, of empirical evidence may be from *McConnell v. FEC*, 540 U.S. 93, 144 (2003): "'The quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty or the plausibility of the justification raised.'" (quoting *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 391 (2000)). Thus, where large contributions to candidates and political parties were at issue, the Court thought it "neither novel nor implausible" that the appearance of corruption may exist. *Id.* In contrast, when faced with a provision that prohibited contributions from minors, the Court found the empirical evidence insufficient to believe that parents were

17

making contributions "through their minor children to circumvent contribution limits applicable to the parents." *Id.* at 232.

In summary, the courts have often resolved issues of benefits and burdens without considering factual evidence, but it is not clear why courts have done so. Possibly this has been because no empirical evidence was presented, because burdens are "evident and inherent" on the face of statutes, and/or because the questions were thought to be "common sense" and not challenged. Thus, although such evidence is useful, *see AFEC* and *California Democratic Party, supra*, it may not be necessary to a court's determination.

At a minimum, Plaintiffs' case is just like those cases where the courts have found the burdens not justified by the benefits even in the absence of empirical evidence. Plaintiffs do not have to present evidence to prevail because the burdens on their speech are "evident and inherent" in the State's scheme, and, even if this Court believes the general existence of the informational interest to be essentially established as a matter of law, as a matter of "common sense" the state's interest here is "at a low ebb" because of the small amounts of spending at issue. Moreover, because the interest is low as a matter of common sense but the burdens are evident and inherent, a higher quantum of empirical evidence is necessary to *justify* the scheme. But the State has not put forward any empirical evidence to justify the scheme; the only empirical evidence here is Plaintiffs'.

## B. Political Science—Understanding How People React to Regulations

At oral argument this Court expressed concern that Dr. Primo had subjectively put himself in the heads of Mississippi voters to determine the burdens and benefits of Mississippi's campaign finance scheme. Dr. Primo's work, however, is not subjective—it is based on objective measurement of such effects on real people and an extrapolation of those objective measurements to the situation at hand here.

Political scientists like Dr. Primo study the effects of public policies. *See* Primo Decl., DOC 57-1 at ¶ 22; Primo Report, DOC 42-14 at 2-3; *see also AFEC*, 131 S. Ct. at 2822-23 (citing political science evidence—from Dr. Primo—about the effects that Arizona's "matching funds" system had on the timing of fundraising activities and expenditures of certain candidates for office); *Cal. Dem. Party*, 530 U.S. at 578-79 (citing political science evidence about the effects of a "blanket" primary system on "cross-over" voting). For example, Dr. Primo has studied the effects that campaign finance laws have on "competitiveness, turnout, and perceptions of government." Primo Report, DOC 42-14 at 2. In this case, and as explained below, Dr. Primo used the tools and methods of political scientists—reference to his own and others' political science research that measured the effects of campaign finance laws—to determine how Mississippi's campaign finance laws affect voters and speakers, both positively and negatively. As Plaintiffs have previously demonstrated, he is qualified to do so and his work here more than satisfies the *Daubert* reliability standard. Pls.' Mem. in Opp. to State Defs.' Mot. to Exclude Pls.' Expert and Other Relief ("Pls.' Expert Mem."), DOC 58 at 7-24.

### 1.    Lack of Marginal Benefits Generally

Until recently, academics, and therefore also the courts, "have tended to rely on assumptions about" campaign finance laws. "Academic researchers are only just now beginning to study and estimate the effects of these laws." Primo Decl. DOC 57-1 at ¶¶ 13-14; *see also* Elizabeth Garrett, *Voting with Cues,* 37 U. Rich. L. Rev. 1011, 1041 (2003) ("Before we can be confident in drawing conclusions about information and voter competence, however, we need more data. Most importantly, we need additional data about whether the voting cues I have described actually increase voter competence, undermine it, or leave it unaffected."). Dr. Primo has studied empirically what others have only made assumptions about to date.

19

Dr. Primo studied the marginal benefits—a common measurement in political science and economics—of campaign finance disclosure. Primo Decl. DOC 57-1 at ¶ 18-22. As Dr. Primo explained,

> The benefits (utility) of campaign finance disclosure laws ought to be assessed [by examining marginal utility]. In other words, given all of the other information already available, how much of an *incremental* benefit do these laws provide? A failure to engage in marginal analysis leads to an improper measurement of these laws' benefits and may overstate the effects of these laws by attributing to them benefits that are actually derived from information readily available without disclosure.

> A food analogy is useful here. When considering whether to eat a piece of cake at the end of a meal, one should assess the benefits it will provide, *given all of the food consumed in the meal*, not the benefits it would provide had one not eaten all day. Campaign finance disclosure laws are often assessed as though voters are "starving" for information. Marginal analysis correctly takes into account that voters and the media already "consume" significant amounts of information in ballot issue campaigns, and asks whether the information produced from disclosure provides additional, measurable benefits.

*Id.* at ¶ 20-21.

The Supreme Court has recognized the concept of marginal benefits is important in free speech cases and has struck down state laws that infringed on First Amendment rights because they resulted in little marginal benefit. In *AFEC*, the state argued that its matching funds program for candidates deterred corruption. But the Court noted that the state already had several other ways that it combatted corruption and that it was therefore "hard to imagine what *marginal* corruption deterrence could be generated by the matching funds provision." *Id.* at 2827. And in *Brown v Entertainment Merchants Association*, the Court noted that "the government does not have a compelling interest in each *marginal* percentage point by which its goals are advanced." 131 S. Ct. 2729, 2741 n.9 (2011) (emphasis added). Accordingly, the State could not justify a ban on the sale of violent video games to minors, given the many other systems in place to ensure that minors could not purchase violent games on their own and to assist parents in evaluating the games their children brought home. *Id.* at 2741-42.

20

### 2. Weight of Burdens Generally

The State does not claim that the challenged laws do not burden speech at all. Rather, the State has asserted, without any empirical evidence, that the burdens of campaign finance schemes are "minimal." *See* Mem. Op., DOC 18 at 7. Courts have long recognized that campaign finance laws impose real costs on would-be speakers. *E.g., Citizens United*, 130 S. Ct. at 897-98 (political committees are "burdensome alternatives" to free speech because they are "expensive to administer and subject to extensive regulations"); *Buckley v. Valeo*, 424 U.S. 1, 83 (1976) ("Contributors of relatively small amounts are likely to be especially sensitive to recording or disclosure of their political preferences."). And if a Court must refer to more than just the "evident and inherent" burdens of a statutory scheme, empirical evidence studying the scheme's real-world effects can be used to demonstrate the scheme's burdens. *AFEC*, 131 S. Ct. at 2823.

The research that Dr. Primo relied on to understand and explain the burdens in Mississippi, is among the very first in this new area of inquiry, Primo Decl., DOC. 57-1 at ¶ 14, demonstrates that those burdens are weightier than the State claims. Those burdens include the loss of anonymity from disclosure, the struggles to understand and comply with registration and reporting laws, and the fear of the penalties for failing to understand and comply with the laws. *See* Primo Report, DOC 42-14 at 5-6; Pls.' Expert Mem, DOC 58 at 14-21.

### 3. Extrapolation to Mississippi

Because the research and literature that Dr. Primo examined were not about Mississippi's scheme in particular, Dr. Primo had to extrapolate effects in Mississippi from this existing body of research. Such extrapolation is permissible under *Daubert*. "Trained experts commonly extrapolate from existing data." *GE v. Joiner*, 522 U.S. 136, 146 (1997). Indeed, in cases involving political science, courts regularly consider evidence of effects of similar regulatory

schemes in other jurisdictions.  *E.g., Cal. Dem. Party*, 530 U.S. at 578-79 (evidence in First Amendment challenge to California "blanket" primary rule included expert testimony on the "crossover" voting phenomenon in Washington state, which had a similar rule).  And extrapolation makes sense.  For example, if disclosing personal information, such as name, address, and employer, makes people less likely to make small contributions, that will be true in all states because that reaction is not related to anything unique about a state.

To do this extrapolation, Dr. Primo reviewed Mississippi's campaign finance disclosure scheme to determine if and how that scheme aligned with the existing body of research.  As Dr. Primo explained in his Report, his extrapolations are based on comparing the circumstances of the underlying literature with the characteristics of Mississippi's scheme.  *See* Primo Report, DOC 42-14 at 5 ("In each section, I discuss the existing theoretical and empirical literature on disclosure laws, and I then show how the logic of the research applies to Mississippi.").  Thus, on the "benefits" side, Dr. Primo's prior research had demonstrated that "once [would-be voters] look at news, ads or, most importantly, the voter guide, there are virtually no informational benefits from looking at disclosure-related data."  *See id.* at 10.  He therefore determined whether voters in Mississippi had access to the same kinds of news, ads and voter guides as in the research.  Having determined that such information was readily available in Mississippi, Dr. Primo was able to extrapolate that "disclosure-related information provides virtually no marginal informational benefits for Mississippi voters" as had been determined by his (peer-reviewed and very-likely-to-be-published) research.  *Id.* at 10-13; Primo Decl., DOC 57-1 at ¶ 22.

On the burdens side, Dr. Primo looked to existing research identifying and quantifying the "costs" of campaign finance laws.  Primo Report, DOC 42-14 at 5-6.  Research had demonstrated that disclosure of personal information, such as name, address, and employer,

deterred political involvement due to concerns about loss of privacy/anonymity and other potential negative repercussions. *Id.*; Pls.' Expert Mem., DOC 58 at 15-17. Research had also demonstrated that people found the paperwork required of ballot measure committees to be difficult and frustrating thought that such paperwork would deter political involvement, especially when backed by the possibility of fines and punishment for incorrect compliance with the paperwork requirements. Primo Report, DOC 42-14 at 6; Pltfs' Expert Mem., DOC 58 at 19-20. Dr. Primo therefore looked to see whether Mississippi's campaign finance scheme had the same characteristics that lead to the findings of costs in the literature. Primo Report, DOC 42-14 at 5-8. He found that, as in the studies, Mississippi's scheme included disclosure of personal information; red tape and paperwork in order to participle in a ballot measure elections; the same issues that people found difficult and frustrating in completing the mandatory paperwork; and punishment for failure to understand and comply with the laws. *Id.* He was, therefore, able to extrapolate that Mississippi's campaign finance scheme imposed the same costs on would-be speakers as was found in the existing literature.

*　　*　　*

Dr. Primo has not engaged in mind reading; he has engaged in political science. He studied (through his own and others' research) the effects of campaign finance laws on voters and speakers, both positive and negative. He examined Mississippi's campaign finance scheme to determine whether the findings of those studies can be applied to Mississippi. And he determined, based on his familiarity with the academic research and Mississippi's campaign finance scheme, that Mississippi's scheme shares characteristics common to the schemes previously studied. Therefore, Dr. Primo was able to extrapolate the effects of Mississippi's campaign finance scheme based on existing political science literature and research findings.

23

Notably, Dr. Primo's conclusions bolster, and in turn are bolstered by, the real-world experience of Mississippians, such as Plaintiffs and Ms. Breeland, and by the State's own campaign finance database. *See* Pls.' MSJ Mem., DOC 43 at 2-13.

## IV. Documents From The Database Evidence Confusion About Mississippi's Campaign Finance Scheme and the Difficulty Speakers Have in Confirming to the Laws.

This Court also requested the parties highlight any documents regarding voter-initiated constitutional amendment ballot measure committees from the State's campaign finance database that were particularly important. Plaintiffs therefore provide the following document exemplars that demonstrate the confusion about, and the difficulty of complying with, Mississippi's campaign finance scheme.

Some groups filed Chapter 15 reports. *E.g.,* DOC 62-2, PageID# 1648 (Personhood Mississippi report filed January 15, 2010, characterized by the State as an "annual report"); DOC 62-4, PageID# 1847-57 (Farm Bureau "periodic" reports).

Some groups failed to properly itemize contributions pursuant to Section 23-17-53(b)(vii). *E.g.*, DOC 62-1, PageID# 1628 (Voter ID PAC April 2011 monthly report showing $375 in itemized contributions but not including the name, address, amount contributed, date of receipt, nor the cumulative amount from itemized contributor); DOC 62-1, PageID# 1576-82 (Yes on 26 itemized receipts accompanying the September 2011 monthly report do not show the cumulative amount received from 190 entries on a spreadsheet)

Many groups itemized their expenditures, which, though a Chapter 15 requirement, *see* Miss. Code Ann. § 23-15-807(d)(ii)(2), is not a Chapter 17 requirement. *E.g.*, DOC 62-1, PageID# 1615 (Parents Against Personhood October monthly report); DOC 62-1, PageID# 1623 (Personhood PAC termination report).

Several groups restarted their total contributions and expenditures at the beginning of a new calendar year, thus reporting "year-to-date" contributions and expenditures, as instructed by Chapter 15, rather than Chapter 17's required "cumulative" reporting, *see* Miss. Code Ann. § 23-17-53(b)(iii).  *E.g*., Students Voting No on 26, DOC 62-1, PageID# 1607-08; Personhood Mississippi, DOC 62-2, PageID# 1677-79; the Farm Bureau, DOC 62-4, PageID# 1824-27.

Some groups failed to file Statements of Organization within ten days of receiving contributions or making expenditures in excess of $200, in violation of both Chapters 15 and 17. *Compare* DOC 62-1, PageID# 1562 (Yes on 26 statement of organization filed August 8, 2011), *with* DOC 62-1, PageID# 1564 (Yes on 26 itemized receipts accompanying the July 2011 monthly report, showing receipt of a $20,000 contribution on July 1, 2011).

Some groups failed to comply with the content requirements of a Chapter 17 statement of organization, found at Miss. Code Ann. § 23-17-49(2)(a-c).  *E.g.*, DOC 62-3, PageID# 1708 (Mississippians for Healthy Families did not identify which ballot measure it sought to pass or defeat); DOC 62-1, PageID# 1596 (Students Voting No on 26 did not include the name and address of its officers on its statement of organization).

Some groups filed reports that were obviously incomplete on their face, but no evidence of enforcement action exists.  *E.g.*, DOC 62-4, PageID# 1802 (admitting that year-to-date figures are wrong); DOC 62-4, PageID# 1805 (same).

One group claimed to make an "independent expenditure" in a ballot measure election, even though independent expenditures cannot be made in Mississippi ballot measures.  *Compare* DOC 62-3, PageID# 1791-92, *with* Dep. of Kimberly P. Turner, DOC 42-11 at 65:8-11; Miss. Code Ann. § 23-15-801(j) ("independent expenditures" limited to candidate elections).

## CONCLUSION

Campaign finance law is hard. The statutes are difficult to understand and the courts have drawn such fine distinctions that we "risk[] transforming First Amendment jurisprudence into a legislative labeling exercise." *Swanson*, 692 F.3d at 873, 875. But here, both the clear weight of case law and common sense weighs in favor of at least finding Mississippi's campaign finance scheme unconstitutional as applied to small groups that speak about ballot measures, like the Plaintiffs. This Court can so find with or without the otherwise reliable evidence of Dr. David Primo. And, in a practical sense, a finding of unconstitutionality here may prompt the Mississippi Legislature to re-evaluate its campaign finance scheme and rectify the issues that this Court has already raised.

Dated: February 25, 2013

Respectfully Submitted on Behalf of Plaintiffs

WELLS MARBLE & HURST, PLLC
/s/ Russell Latino III
Russell Latino III
(MS Bar No. 102281)
P. O. Box 131
Jackson, MS 39205-0131
Telephone: 601.605.6900
Facsimile: 601.605.6901
Email: rlatino@wellsmar.com
ljennings@wellsmarble.com

INSTITUTE FOR JUSTICE
/s/ Paul V. Avelar
Paul V. Avelar
398 South Mill Avenue, Suite 301
Tempe, AZ 85281
Telephone: 480.557.8300
Facsimile: 480.557.8305
Email: pavelar@ij.org
*Pro Hac Vice*

Steven M. Simpson
901 North Glebe Road, Suite 900
Arlington, VA 22203
Telephone: 703.682.9320
Facsimile: 703.682.9321
Email: ssimpson@ij.org
*Pro Hac Vice*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing PLAINTIFFS' SUPPLEMENTAL MEMORANDUM FOLLOWING ORAL ARGUMENT has been filed electronically with the Clerk of Court using the Court's ECF system and thereby served on the following persons:

Harold E. Pizzetta, III
Assistant Attorney General
Office of the Attorney General
Post Office Box 220
Jackson, MS 39205-0220
<u>hpizz@ago.state.ms.us</u>

THIS the 25th day of February, 2013.

/s/ Paul Avelar
Paul V. Avelar
