# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF MISSISSIPPI
## Oxford Division

GORDON VANCE JUSTICE, JR.; SHARON BYNUM;
MATTHEW JOHNSON; ALISON KINAMAN AND
STANLEY O'DELL;

    Plaintiffs,

v.

DELBERT HOSEMANN, in his official capacity as
Mississippi Secretary of State; JIM HOOD, in his
official capacity as Attorney General of the State
of Mississippi,

    Defendants.

Civil Action No.
3:11-CV-138-SA-SAA

## REBUTTAL MEMORANDUM IN SUPPORT OF PLAINTIFFS' SUPPLEMENTAL MEMORANDUM FOLLOWING ORAL ARGUMENT

### INTRODUCTION

The State Defendants' Supplemental Memorandum largely ignores the four specific issues this Court asked the parties to address. The State has not attempted to rebut Plaintiffs' arguments regarding the use of Dr. David Primo's empirical evidence or pointed to documents from its own database to support its arguments about the campaign finance scheme. The State has not squarely addressed this Court's concerns about, or the Plaintiffs' arguments regarding, the application of Chapters 15 and/or 17 to Plaintiffs' speech. And the State has attempted to avoid the small ballot-measure-group registration-and-reporting-burden cases by arguing for the first time that Plaintiffs are not a small group and pointing to non-ballot-measure-group cases and laws. The Plaintiffs briefly address the arguments the State has made; none of them are sufficient to prevent summary judgment for the Plaintiffs.

I. **The State Has Not Adequately Explained its Position That Only Chapter 17 Applies; the State's Arguments About Vagueness, Guidance From the State, and the State's Forms are Irrelevant.**

The State asserts that there is no question that, had they spoken as they had wished to during the 2011 election, Plaintiffs would have triggered the formation, registration, record-keeping, record-retention, and reporting requirements of Chapter 17. State Defs.' Supplemental Mem., DOC 71 ("State Mem.") at 20-22. Plaintiffs agree. But the question is whether Chapter 15 also applies to Plaintiffs. The State maintains it does not, but has not explained why the plain language of Chapter 15 means other than what it says. *See id*. at 27. Plaintiffs' statutory interpretation of Chapters 15 and 17 is unrebutted.

The State's substitute argument—that Plaintiffs must have understood the scheme and therefore that they cannot prevail here—is both factually wrong and misses the point. Plaintiffs' verified Complaint states that they thought they had to file both Chapter 15 and Chapter 17 reports. DOC 1 ¶¶ 35-37. In addition, the Complaint states that "[t]he burden of complying with Mississippi's regulations is compounded by the fact that there are multiple statutes contained in different sections of the Mississippi Code that one has to wade through to figure out all the relevant registration, reporting, and disclosure obligations." *Id.* ¶ 50 (citing to both Chapters). This "multiplicity of statutes creates traps for the unwary." *Id.* ¶ 51 (noting differences between Chapters 15 and 17 requirements). These are just some illustrative examples of the faults of the scheme. Indeed, courts have cited even hypothetical problems with campaign finance schemes to find them unconstitutional. *See, e.g.*, *Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 873 (8th Cir. 2012) (en banc) (illustrating statutory deficiencies with "two farmers" hypothetical). Plaintiffs have simply gone further by producing evidence of the real burdens of the scheme, including how it affected them. *See also* Mem. in Supp. of Pls.' Mot. for Summ. J., DOC 43 at 2-13. And, again, even if it were clear that only Chapter 17 applied to Plaintiffs, the

burdens of Chapter 17 would not be justified as to Plaintiffs. *See* Pls.' Supplemental Mem., DOC 70 at 6-9.

The State also faults the Plaintiffs for not seeking informal or formal guidance from the Secretary of State as to which statutes apply to their speech. State Mem. at 23-28.[1] But there is no "helpful bureaucrat" exception to the First Amendment, and the availability of additional guidance does not save the scheme. *E.g.*, *Swanson*, 692 F.3d at 873 n.8 ("We do not expect potentially regulated associations to rely on [government's] informal assurance that it would not enforce the plain meaning of the statute[s].").[2] Indeed, that citizens must turn to the government to interpret the law for them—as Ms. Breeland did and as the State says Plaintiffs should have done—demonstrates the problem here: Mississippi's scheme requires speakers to closely parse statutory language just to speak about a measure on the ballot. This is a burden that chills speech. *Id*. at 873-74 ("even just the daunting task of deciphering what is required under the law" chills speech); *N.C. Right to Life, Inc. v. Leake*, 525 F.3d 274, 296 (4th Cir. 2008) (Campaign finance regulation "is an area in which speakers are now increasingly forced to navigate a maze of rules, sub-rules, and cross-references in order to do nothing more than project a basic political message."). Again, it bears repeating the Supreme Court's warning:

> The First Amendment does not permit laws that force speakers to retain a campaign finance attorney . . . or seek declaratory rulings before discussing the most salient political issues of our day. Prolix laws chill speech for the same reason that vague laws chill speech: People of common intelligence must necessarily guess at [the law's] meaning and differ as to its application.

---

[1] The State cites only the District Court decision in *Many Cultures, One Message v. Clements*, 830 F. Supp. 2d 1111 (W.D. Wash. 2011), for is argument. As noted at oral argument, the Ninth Circuit has ruled that plaintiffs in that litigation lacked standing. *Many Cultures, One Message v. Clements*, No. 11-36008, 2013 U.S. App. LEXIS 2429 (9th Cir. Feb. 4, 2013). A motion to vacate the District Court's decision is pending in the Ninth Circuit.

[2] For the same reason, the State's assurance that it would not impose penalties for what it calls "substantial compliance," State Mem. at 28-29, has no bearing on the burdens of the scheme. *See also United States v. Stevens*, 130 S. Ct. 1577, 1591 (2010) ("[T]he First Amendment protects against the Government; it does not leave us at the mercy of *noblesse oblige*. We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly.").

*Citizens United v. FEC*, 130 S. Ct. 876, 889 (2010) (internal quotation marks omitted); *see also id.* at 894-96 (describing the chilling effects of a scheme that relied on regulatory guidance).

The State spends pages attacking a straw man because Plaintiffs, as stated by counsel at oral argument, are not making a void-for-vagueness argument. *Cf.* State Mem. at 29-35. Rather, as in *Citizens United*, *Swanson*, and *Leake*, Plaintiffs are arguing that the difficulty of understanding Mississippi's scheme is a burden—one of several evident and inherent in that scheme—that chills speech. *E.g.*, *Swanson*, 692 F.3d at 873-74 ("Faced with these regulatory burdens—or even just the daunting task of deciphering what is required under the law," a hypothetical small group "reasonably could decide the exercise [of political speech] is simply not worth the trouble. And who would blame them?" (internal citations omitted)). Because speech is burdened, the State must justify the weight of the burdens heaped on Plaintiffs with a compelling, or at least sufficiently important, interest. *Citizens United*, 130 S. Ct. at 898 ("Laws that burden political speech are subject to strict scrutiny, which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." (internal citations and quotation marks omitted)); *Doe v. Reed*, 130 S. Ct. 2811, 2818 (2010) (Exacting scrutiny requires the government to prove "a substantial relation between the . . . requirement[s] and a sufficiently important governmental interest. To withstand this scrutiny, the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights." (internal citations and quotation marks omitted)). This the State must do even if the statutes would satisfy the void-for-vagueness standard.

Finally, Plaintiffs are not arguing in this case that the First Amendment "require[s] the Secretary of State to comply with state law," State Mem. at 38, though failure to so comply would seemingly present other constitutional issues. Plaintiffs' arguments are not dependent on

4

the State's understanding of the statutes. Rather, that before this litigation the State clearly incorporated Chapter 15 requirements into its guidance and forms for political committees like Plaintiffs would have been, *see* Pls.' Supplemental Mem., DOC 70 at 4-5, while it now claims in this litigation that only Chapter 17 would have applied to Plaintiffs, indicates that, up until it was taking a litigation position, the State actually did think that Chapter 15 applied to Plaintiffs. This change in position by the State shows that the law is difficult to understand and therefore a burden on First Amendment rights. Again, this is not a case about "simple forms," as the State continues to erroneously insist; it is about a complex scheme of regulation of core political speech. Plaintiffs' argument about the complexity of the Mississippi campaign finance regulatory scheme has nothing to do with claims under state law, the Eleventh Amendment, or abstention issues. *Cf*. State Mem. at 35-41

This Court has had to wrestle with the complexities of the Mississippi campaign finance statutory scheme for purposes of deciding this case. But the First Amendment does not permit the State to force Plaintiffs to wrestle with that scheme just to speak about salient political issues of the day—and certainly not where the State's interests supporting that scheme are so low. This Court need not wrestle with the scheme any longer; regardless of which Chapter or Chapters applies, Plaintiffs' point about the complexity and burden of the scheme has been established.

II.     **Plaintiffs Are a Small Group; Nothing in the Complaint States They Were Going to Spend in Excess of $1000; Plaintiffs Do Not Have to Say How Much They Were Going to Spend, It Is Enough That They Would Have Spent More Than $200.**

Since the beginning of this case, the Plaintiffs have always maintained they are a small group of friends and neighbors. This assertion has never been questioned in this litigation until the State's supplemental memorandum, which fundamentally misreads the Complaint to assert that Plaintiffs must have been planning to spend "*at least* $1,000" in 2011 and are therefore not a

small group.[3] State Mem. at 1 (emphasis in original). Plaintiffs' as-applied claims are not dependent on determining precisely how much Plaintiffs would have spent—all they must show is that they would have triggered the statutory spending thresholds by their behavior.[4] And even if Plaintiffs were to spend $1,000, those existing cases dealing with specific amounts spent would still deem them a small group.

The Complaint must be read in light of the statutory scheme. Under the scheme, Plaintiffs are regulated as a political committee if they spend more than $200 of their own money as a group, or are regulated as individuals if they spend more than $200 of their own money individually. Miss. Code Ann. §§ 23-15-803(a) (political committee must register once $200 threshold met); 23-17-49(1) (same); 23-15-807(a) (political committee must file reports once $200 threshold met); 23-17-51(1) (same); 23-17-51(2) (individual must file reports once $200 threshold met). Thus, each Plaintiff noted his or her intention to trigger the $200 threshold; each Plaintiff said he or she "wishes to spend in excess of $200 of [his or her] own money, individually or in combination with the other Plaintiffs." Compl., DOC 1 ¶¶ 8-12. The Complaint further notes the ways that Plaintiffs are a small group. They have "no formal organization or structure[,] . . . no officers or directors, no bank account, and no member dues." *Id.* ¶ 16. Plaintiffs are "not experienced campaign organizers or politicians" but are instead "a small, informal group of lay persons," *id.* ¶ 49, who have "[o]n various occasions, individually and as a group, . . . engaged in . . . political activities and activism . . . . To fund these activities, Plaintiffs have simply pooled their money, by 'passing the hat' at meetings," *id.* ¶ 17. Further evidence that Plaintiffs are a small group is that the existence of the $200 threshold caused

---

[3] Needless to say, the parties were unable to reach a stipulation as to how much Plaintiffs would have spent in 2011.

[4] The State recognizes that Plaintiffs' "maximum spend" does not affect their facial challenges to the scheme. *See* State Mem. at 1.

6

Plaintiffs to "carefully monitor their spending to make sure they stay[ed] below" it. *Id.* ¶ 55, This was unlike other groups who wound up spending more than intended once they passed the threshold, *see* State Defs.' Opp. to Pls.' Mot. for Summ. J., DOC 52 at 18-19, because "if you're forced by the State of Mississippi to have that framework and to do all of the reporting, you might as well be able to get some benefit out of it," Dep. of Atlee Breeland, DOC 42-12 at 26:4-7. In short, the Complaint cannot be read to assert that Plaintiffs were going to spend in excess of $1,000, much less that they were other than a small group. All that the Complaint says is that Plaintiffs would have spent more than $200 on their speech, triggering Mississippi's campaign finance scheme, but refrained from doing so because of the burdens of the scheme.

Plaintiffs did not have to state the maximum they might have spent in 2011 in order to prevail here. As an initial matter, the Plaintiffs literally "'pass the hat' for donations at their meetings" to fund their political activities. Compl., DOC 1 ¶ 59, *see also* ¶¶ 16-17. This makes it difficult, if not impossible to "budget" for political spending. *See also Citizens United*, 130 S. Ct. at 895 ("It is well known that the public begins to concentrate on elections only in the weeks immediately before they are held. . . . . The decision to speak is made in the heat of political campaigns, when speakers react to messages conveyed by others.").

Moreover, establishing a bright-line "maximum spend" for small groups is not a job for this Court. *Sampson v Buescher*, 625 F.3d 1247, 1261 (10th Cir. 2010) ("We do not attempt to draw a bright line below which a ballot-issue committee cannot be required to report contributions and expenditures. The case before us is quite unlike ones involving the expenditure of tens of millions of dollars on ballot issues . . . ."). That is a job for the legislature in the first instance. *Hatchett v. Barland*, 816 F. Supp. 2d 583, 606 (E.D. Wis. 2011) ("Today, this Court simply holds that the new threshold remains well below the line."). Those courts that

have addressed specific dollar figures have never held that $1,000 is that "bright line." Indeed, they have indicated that $1,000 is below whatever line exists. *Sampson*, 625 F.3d at 1260, 1261 (the purposes for disclosure "have little to do with a group of individuals who have together spent less than $1,000 [$782.02] on a campaign"); *Hatchett*, 816 F. Supp. 2d at 605-606 ("Even if Hatchett spends $1,000 on the next referendum, his expenditure would be sufficiently small which in turn would provide little information about his financial interest on a given issue."). Other courts that have struck down campaign finance formation, registration, record-keeping, record-retention, and reporting requirements for small groups did not inquire into the maximum amount at issue, even where there was reason to believe that the group could have raised quite a bit of money. *E.g.*, *Volle v. Webster*, 69 F. Supp. 2d 171, 172 (D. Me. 1999) (individual and his "unincorporated business association that ordinarily engages in publishing, printing, typesetting and consulting on manufacturing and quality issues . . . both want to solicit money and make expenditures"), *see also Nat'l Org. for Marriage v. McKee*, 666 F. Supp. 2d 193, 206 (D. Me. 2009), *modified,* 765 F. Supp. 2d 38 (D. Me. 2011), *aff'd*, 669 F.3d 34 (1st Cir. 2012) ("Regulation tends to grow and to develop requirements appropriate for large organizations (like these plaintiffs) and to ignore the burdensome effects on the speech of individuals and small organizations. I reached that very conclusion in *Volle*, a case involving an individual asserting his First Amendment rights.").

Although at the preliminary injunction stage the Plaintiffs sought an injunction prohibiting enforcement of Mississippi's scheme in order to spend up to $1,000, *see* Mem. Op., DOC 18 at 3, that was in the context of seeking a ruling on the eve on an election and Plaintiffs needed immediate guidance as to the scope of their political activity. Today this case is in a far different posture. If there is a dollar figure below which a ballot measure committee cannot be

subjected to formation, registration, record-keeping, record-retention, and reporting requirements, the legislature has the time to amend the statutory scheme to determine that threshold in the first instance. Today, it is enough to simply hold that Mississippi's current $200 threshold is well below the line at which those burdens can be imposed.

Nothing the State has argued stops the Court from granting summary judgment to Plaintiffs because it cannot be contested that Mississippi's campaign finance scheme applies at the low amount of $200. Nor is it contested that even a single quarter-page advertisement in Plaintiffs' local paper costs more than that. Compl., DOC 1 ¶ 46. Nor could Plaintiffs have purchased more than 50 posters without exceeding the $200 threshold. *Id.* ¶ 47. And any spending on posters that Plaintiffs did necessarily decreased the already small number of flyers that they could have made while staying under the $200 threshold. *Id.* ¶¶ 48, 55. Because of the chilling effect of Mississippi's campaign finance scheme, Plaintiffs' speech has been limited to less than $200. That is unconstitutional.

### III. Federal Law and the Cases the State Relies On Are Readily Distinguishable.

To support its scheme, the State notes that federal law requires groups that spend $1000 in federal elections to register as a political committee. State Mem. at 5-8. But the Supreme Court has already held the federal political committee formation, registration, record-keeping, record-retention, and reporting requirements to be unconstitutionally burdensome in *Citizens United*, even when applied to multinational corporations:

> Even if a PAC could somehow allow a corporation to speak--and it does not--the option to form PACs does not alleviate the First Amendment problems with § 441b. PACs are burdensome alternatives; they are expensive to administer and subject to extensive regulations. For example, every PAC must appoint a treasurer, forward donations to the treasurer promptly, keep detailed records of the identities of the persons making donations, preserve receipts for three years, and file an organization statement and report changes to this information within 10 days.

9

> And that is just the beginning. PACs must file detailed monthly reports with the FEC, which are due at different times depending on the type of election that is about to occur . . . .
>
> PACs have to comply with these regulations just to speak. This might explain why fewer than 2,000 of the millions of corporations in this country have PACs. PACs, furthermore, must exist before they can speak. Given the onerous restrictions, a corporation may not be able to establish a PAC in time to make its views known regarding candidates and issues in a current campaign.
>
> Section 441b's prohibition on corporate independent expenditures is thus a ban on speech.

130 S. Ct. at 897-98 (internal citations omitted).

The Supreme Court has also already held that laws that affect ballot measure elections "rest[] on different and *less powerful* state interests" than the federal campaign finance laws. *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 356 (1995) (emphasis added). The federal campaign finance laws "regulate[] only candidate elections, not referenda or other issue-based ballot measures." *Id.* This means that federal campaign finance law can be justified by "a compelling state interest in avoiding . . . corruption." *Id.* But there is no risk of quid pro quo corruption in ballot measure elections. *Id.* at 356 & n.20; *Citizens Against Rent Control v. City of Berkeley*, 454 U.S. 290, 298 (1981); *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 790 (1978). The only interest here is the less powerful "informational interest," held in *McIntyre* to be "plainly insufficient to support the constitutionality of [the Ohio] disclosure requirement" at issue there. 514 U.S. at 349.

The remainder of the cases cited by the State, State Mem. at 8-19, have already been treated by the Plaintiffs. For the reasons the Plaintiffs have previously stated, the cases most directly on point factually and legally are *Sampson*, 625 F.3d at 1254-61, *Canyon Ferry Rd. Baptist Church of E. Helena, Inc. v. Unsworth*, 556 F.3d 1021, 1034 (9th Cir. 2009), *Hatchett*, 816 F. Supp. 2d at 605-606, and *Swaffer v. Cane*, 610 F. Supp. 2d 962, 964-965, 968-969 (E.D.

10

Wis. 2009). In addition, *Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464, 482 (7th Cir. 2012); *Swanson*, 692 F.3d at 874, and *Family PAC v. McKenna*, 685 F.3d 800, 809-810 & nn.8 & 10 (9th Cir. 2012), have had noteworthy points that affect the issues here.

Plaintiffs further note only that the State asserts that the "most on-point decision" is *Worley v. Detzner*, No. 4:10-CV-00423-RH-CAS (N.D. Fla. July 2, 2012). State Mem. at 15. But *Worley* is unpublished (even electronically) and pointedly failed to address many of the issues that this Court must confront—indeed, failed to confront issues that the *Worley* court had previously recognized, *see Worley v. Roberts*, 749 F. Supp. 2d 1321, 1325-26 (N.D. Fla. 2010) ("To be sure, political-committee regulation is burdensome; the Court said so in *Citizens United*. If a multinational corporation can speak without being subjected to this burden, it is hard to explain why four individuals with modest resources cannot.")—and is currently on appeal. This is not strong precedent on which to base a First Amendment decision.

## IV. The State's Position Precludes Pre-Enforcement Challenges.

An underlying theme of the State's brief is that Plaintiffs cannot complain about the scheme because, rather than try (and likely fail) to comply with the scheme, they looked at it and thought "it's not worth the trouble." The State wants to fault them for that. But the courts recognize that the Plaintiffs cannot be faulted. *E.g.*, *FEC v. Mass. Citizens for Life, Inc.*, 479 U.S. 238, 255 (1986) (plurality opinion) ("Faced with the need to assume a more sophisticated organizational form, to adopt specific accounting procedures, to file periodic detailed reports . . . it would not be surprising if at least some groups decided that the contemplated political activity was simply not worth it."); *Swanson*, 692 F.3d at 873-74 ("And who would blame them?").

That is precisely why the Supreme Court permits pre-enforcement challenges like Plaintiffs': "In an effort to avoid the chilling effect of sweeping restrictions, the Supreme Court has endorsed what might be called a 'hold your tongue and challenge now' approach rather than

11

requiring litigants to speak first and take their chances with the consequences." *Ariz. Right to Life PAC v. Bayless*, 320 F.3d 1002, 1006 (9th Cir. 2003) (citing, *inter alia*, *Dombrowski v. Pfister*, 380 U.S. 479, 486 (1965)). Here, "speaking first and taking their chances" risked significant consequences, including civil penalties, fines, and jail time. Miss. Code Ann. §§ 23-15-811(a) (a "wilful[] and deliberate[] and substantial[] violat[ion] . . . shall be punished by a fine in a sum not to exceed Three Thousand Dollars ($3,000.00) or imprisoned for not longer than six (6) months or by both fine and imprisonment"); 23-15-813(a)(ii) (civil penalties of up to $500); 23-17-61 ("*Any* violation of Sections 23-17-49 through 23-17-59 is punishable by imprisonment in the county jail for not more than one (1) year, or by a fine not to exceed One Thousand Dollars ($1,000.00), or by both such fine and imprisonment." (emphasis added)). The State cannot fault the Plaintiffs for avoiding becoming a political committee, for not attempting to fill out forms, and for not trying to comply with the political committee regulations the State admits they would be subject to. It is the State's fault that they did not so attempt.

## CONCLUSION

This case remains about five friends from Oxford who just wanted to talk about a ballot measure during the 2011 election. But they could not even run a single quarter-page advertisement in their local newspaper without having to grapple with Mississippi's campaign finance scheme. Ultimately, they had to limit their own political speech and association to avoid the possible consequences of that burdensome scheme. Nothing the State has argued or could argue can detract from these simple facts. Because political speech and association are at the very core of First Amendment protections, political speech and association "must prevail against laws that would suppress [them], whether by design or inadvertence." *Citizens United*, 130 S. Ct. at 898. This Court should grant summary judgment in favor of Plaintiffs.

Dated: March 18, 2013

Respectfully Submitted on Behalf of Plaintiffs

| | |
|---|---|
| **WELLS MARBLE & HURST, PLLC** | **INSTITUTE FOR JUSTICE** |
| /s/ Russell Latino III | /s/ Paul V. Avelar |
| Russell Latino III | Paul V. Avelar |
| (MS Bar No. 102281) | 398 South Mill Avenue, Suite 301 |
| P. O. Box 131 | Tempe, AZ 85281 |
| Jackson, MS 39205-0131 | Telephone: 480.557.8300 |
| Telephone: 601.605.6900 | Facsimile: 480.557.8305 |
| Facsimile: 601.605.6901 | Email: pavelar@ij.org |
| Email: rlatino@wellsmar.com | *Pro Hac Vice* |
| ljennings@wellsmarble.com | |
| | Steven M. Simpson |
| | 901 North Glebe Road, Suite 900 |
| | Arlington, VA 22203 |
| | Telephone: 703.682.9320 |
| | Facsimile: 703.682.9321 |
| | Email: ssimpson@ij.org |
| | *Pro Hac Vice* |

## **CERTIFICATE OF SERVICE**

      I hereby certify that the foregoing Rebuttal Memorandum in Support of Plaintiffs' Supplemental Memorandum Following Oral Argument has been filed electronically with the Clerk of Court using the Court's ECF system and thereby served on the following persons:

Harold E. Pizzetta, III
Assistant Attorney General
Office of the Attorney General
Post Office Box 220
Jackson, MS 39205-0220
hpizz@ago.state.ms.us

THIS the 18th day of March, 2013.

                                                /s/ Paul Avelar
                                                Paul V. Avelar