# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

———————

No. 13-60754

———————

United States Court of Appeals
Fifth Circuit

**FILED**

November 14, 2014

Lyle W. Cayce
Clerk

GORDON VANCE JUSTICE, JR.; SHARON BYNUM; MATTHEW
JOHNSON; ALISON KINNAMAN; STANLEY O'DELL,

                              Plaintiffs – Appellees

v.

DELBERT HOSEMANN, in his official capacity as Mississippi Secretary of
State; JAMES M. HOOD, III, in his official capacity as Attorney General of
the State of Mississippi,

                              Defendants – Appellants

———————

Appeal from the United States District Court
for the Northern District of Mississippi

———————

Before DAVIS, DENNIS, and COSTA, Circuit Judges.

GREGG COSTA, Circuit Judge:

Reflecting Justice Brandeis's observation that "[s]unlight is said to be
the best of disinfectants,"[1] most states require disclosure of financial
contributions to political campaigns. Mississippi is one such state. This case
involves a challenge to Mississippi's disclosure requirements for ballot
initiatives proposing amendments to the state constitution. Plaintiffs are
Mississippi citizens who contend that the disclosure requirements

———————

[1] Louis Brandeis, *What Publicity Can Do*, HARPER'S WEEKLY, Dec. 20, 1913, at 10.

No. 13-60754

impermissibly burden their First Amendment rights. On competing summary judgment motions, the district court agreed with their "as-applied" challenge. It enjoined Mississippi from enforcing the requirements against small groups and individuals expending "just in excess of" Mississippi's $200 disclosure threshold.[2]

Before turning to the substance of Plaintiffs' First Amendment challenge, we must first address the following question: can these particular Plaintiffs—who had no history of contributions and did not identify how much they intended to raise in future ballot initiative cycles—pursue an as-applied challenge as a "small group" that would have spent "just in excess of" $200?

# I.

### A. Mississippi's Disclosure Requirements

In Mississippi, as in a number of other states, voters can amend their state constitution through ballot initiatives. This initiative process is a rigorous one. To even qualify for the ballot, a petition proposing an initiative must be signed by a number of qualified electors equal to at least 12% of the number of votes cast for all candidates for governor in the most recent gubernatorial election. Miss. Const. art. 15, § 273(3). Once it is in front of the voters, an initiative must receive both a majority of the votes cast for that initiative and 40% of the total votes cast in that election. Miss. Const. art. 15, § 273(7). In 2011, the year Plaintiffs brought this suit, only three constitutional initiatives were placed on the ballot.

Chapter 17 of the Mississippi Code sets out the following disclosure requirements for political committees and individuals who receive or spend

---

[2] The named Defendants in this case are the Mississippi Secretary of State, Delbert Hosemann, and the Mississippi Attorney General, James Hood, sued in their official capacities. For simplicity, we will refer to the Defendants collectively as Mississippi.

No. 13-60754

money in connection with an "amendment to the Mississippi Constitution proposed by a petition of qualified electors."[3] Miss. Code Ann. § 23-17-1(1).

**Registration Threshold:** Under Chapter 17, "[a] political committee that either receives contributions or makes expenditures in excess of Two Hundred Dollars ($200.00) shall file financial reports with the Secretary of State." Miss. Code Ann. § 23-17-51(1). This $200 threshold is higher than those that exist in a number of other states. In Washington, for instance, political committees must register on the "expectation of receiving contributions or making expenditures." Wash. Rev. Code Ann. § 42.17A.205. The same is true in Ohio and Massachusetts. *See* Ohio Rev. Code Ann. § 3517.12(A) (requiring "the circulator or committee in charge of an initiative or referendum petition" to register "prior to receiving a contribution or making an expenditure"); Mass. Office of Campaign & Pol. Fin., Disclosure and Reporting of Contributions and Expenditures Related to Ballot Questions, at 5 (revised Sept. 19, 2014), *available at* http://files.ocpf.us/pdf/legaldocs/IB-90-02-2011.pdf (groups must register "prior to raising or spending any funds"). Other states, like Oregon and Montana, require registration upon the first dollar

---

[3] In the district court proceedings, the parties contested whether Chapter 17 overlaps with Chapter 15 of the Mississippi Election Code, which requires political committees to disclose expenditures that they make "for the purpose of influencing . . . balloted measures." Miss. Code Ann. § 23-15-807(b). Although the district court was troubled by the potential for overlap and confusion between the Chapters, we conclude that Chapter 17's unambiguous definition of the "measures" it applies to—that is, "amendment[s] to the Mississippi Constitution proposed by a petition of qualified electors"—resolves those concerns. *See* Miss. Code Ann. § 23-17-1(1). And even if that were insufficient, Chapter 17 is expressly titled "Amendments to Constitution by Voter Initiative," and the specific generally governs over the more general. *See United States v. Neary (In re Armstrong)*, 206 F.3d 465, 470 (5th Cir. 2000) ("One basic principle of statutory construction is that where two statutes appear to conflict, the statute addressing the relevant matter in more specific terms governs."). We thus conclude—consistent with the Secretary of State's interpretation of a statute it is charged with administering—that Chapter 17 and Chapter 15 do not overlap, and would not cause potential confusion among Mississippi voters about which Chapter applies to constitutional ballot initiatives.

No. 13-60754

raised. *See* Or. Rev. Stat. Ann. § 260.118(2) (stating that groups must register "not later than the third business day after a chief petitioner or the treasurer receives a contribution or makes an expenditure relating to the initiative"); Mont. Code Ann. § 13-37-201 ("A political committee shall file the certification . . . within 5 days after it makes an expenditure or authorizes another person to make an expenditure on its behalf, whichever occurs first.").

Some states with large populations set the registration bar higher. Texas, for example, requires political committees to designate a treasurer before receiving or expending $500. *See* Tex. Elec. Code Ann. § 253.031(b). Federal regulations governing political action committees start at a $1,000 threshold. 11 C.F.R. § 100.5(a).

**Registration Requirements:** When a group registers as a political committee in Mississippi, it must file a one-page "Statement of Organization" that asks it to list the following: the name and address of the committee; whether it is registered with the Federal Election Commission or authorized by a candidate; its purpose; the names of all officers; and its director and treasurer.[4] The one-page form is less onerous than those that exist in some other states. *See, e.g., Catholic Leadership Coal. of Tex. v. Reisman*, 764 F.3d 409, 440 (5th Cir. 2014) (observing that Texas has a three-page form seeking "basic information"; the form requires registrants to include the committee's acronym, its campaign treasurer, the person appointing the treasurer, and controlling entity information); *Worley v. Fla. Sec'y of State*, 717 F.3d 1238, 1250 (11th Cir. 2013) (citing Fla. Stat. Ann. § 106.03(1)(a), which requires committees to fill out "four pages of basic information"); *Human Life of Wash. Inc. v. Brumsickle*, 624 F.3d 990, 998–99 (9th Cir. 2010) (noting that

---

[4] *See* Miss. Sec'y of State, Statement of Organization for a Political Committee, *available at* http://www.sos.ms.gov/links/elections/home/tab1/Statement%20of%20Organization%20PC.pdf.

4

No. 13-60754

Washington requires political committees to file a two-page Political Committee Registration Form containing most of the information on Mississippi's forms plus the following: "the ballot proposition or candidate that the committee supports or opposes; how surplus funds will be distributed in the event of dissolution; and the name, address, and title of anyone who works for the committee to perform ministerial functions").

**Itemization and Reporting Requirements:** In Mississippi, political committees must file monthly reports with the Secretary of State that disclose contributions and expenditures, both monthly and cumulatively. Miss. Code Ann. §§ 23-17-51(3), 23-17-53. They also must itemize all contributions from individuals who have contributed $200 or more in a given month and list the donor's name, street address, and date of the donation. Miss. Code Ann. § 23-17-53(b)(vii). These are common reporting requirements, with Mississippi's $200 threshold on the high end of state disclosure laws. In Oregon, for instance, all donations from a single person or committee that aggregate to over $100 in a calendar year must be itemized. Or. Rev. Stat. Ann. § 260.083(1)(a). Montana sets its itemization level at $35, and its form asks for the donor's name, address, occupation, and employer. State of Montana, Form C-6: Political Committee Finance Report (revised May 2012), *available at* http://politicalpractices.mt.gov/content/C6CorporateAditonPDFform2012. Florida requires committees to itemize every contribution and expenditure regardless of amount. Fla. Stat. Ann. § 106.07(4)(a). The other two states in this circuit, Louisiana and Texas, also have lower itemization requirements than Mississippi does: Louisiana has no minimum threshold requirement for itemizing donations, La. Rev. Stat. Ann. § 18:1495.5(B)(4), and Texas has a $50 threshold for reporting "the full name and address of the person making the contributions, and the dates of the contributions." Tex. Elec. Code Ann. § 254.031(a)(1).

No. 13-60754

**Individual Reporting Requirements:** Plaintiffs also object to monthly reporting requirements for individuals who expend over $200 to influence voters. Miss Code Ann. §§ 23-17-51(2), 23-17-53(c). Again, other states impose similar reporting requirements. *See, e.g.*, Ohio Rev. Code Ann. § 3517.105(C)(2)(b) (requiring individuals who expend more than $100 on a ballot initiatives to file an expenditure report); Wash. Rev. Code Ann. § 42.17A.255(2) (requiring individuals who expend more than $100 on a candidate or ballot initiatives to file an expenditure report); Mass. Gen. Laws Ann. ch. 55, § 22 (setting a $250 threshold).

B. <u>This Lawsuit</u>

In 2011, a proposed amendment to the Mississippi Constitution, Initiative 31, asked voters whether the government should "be prohibited from taking private property by eminent domain and then transferring it to other persons." This was one of many attempts across the country to limit states' eminent domain power in response to the Supreme Court's decision in *Kelo v. City of New London*, 545 U.S. 469 (2005). The amendment passed with over 70% support.

Plaintiffs, five "like-minded friends and neighbors" with "no formal organization or structure" wanted to support the initiative; they "think it unconscionable that the government can take property from one person and give it to another." They contend that they would have pooled their resources, and with the funds on hand purchased posters, bought advertising in a local newspaper, and distributed flyers to Mississippi voters. These activities would have mirrored some of their previous political engagements; they are members of the Young Americans for Liberty and the Lafayette County Libertarian Party, and have organized rallies about political issues and distributed copies of the United States Constitution on Constitution Day. But in 2011, in the run-up to the election, they did not pursue any kind of political activity because

6

No. 13-60754

of what they view as Mississippi's onerous and complicated disclosure requirements. Those laws, they argue, relegated them to the sidelines by "creat[ing] a significant chilling effect that has prevented—and continues to prevent—the Plaintiffs and other similarly situated groups from exercising their constitutional rights of free speech and association."

Plaintiffs instead filed suit in the Northern District of Mississippi, raising as-applied and facial challenges to the requirements in Chapter 17 of the Mississippi Code. In the weeks prior to the vote on Initiative 31, they sought a preliminary injunction. The district court denied it, concluding that "the information required by Mississippi's registration and disclosure forms is not overly intrusive nor do the forms seem particularly complex" and that Plaintiffs had not shown a substantial likelihood of success on the merits of their claims.

Because Plaintiffs want to "speak out in the future about ballot initiatives without fear or threat of being prosecuted or investigated for violating the campaign finance laws," they continued to maintain their suit after the 2011 election. And on cross-motions for summary judgment, the district court ruled in their favor. The court first declined to reach their facial challenge, concluding that they had abandoned it in their summary judgment briefing. After finding that Plaintiffs had standing to pursue their as-applied challenge, the court applied exacting scrutiny to Mississippi's disclosure requirements and held that "as applied to a small group attempting to expend minimal funds in support of their grass-roots campaign effort, the State's requirements, particularly coupled with the confusion surrounding those

7

No. 13-60754

requirements, unconstitutionally infringe upon the First Amendment."[5] *Justice v. Hosemann*, 2013 WL 5462572, at *17 (N.D. Miss. Sept. 30, 2013).

The court also addressed the disclosure requirements that apply specifically to individuals and concluded that "Mississippi's current filing requirements are unconstitutional as applied to individual persons seeking to expend just over $200 in support or opposition to constitutional measures." *Id.* at *18.

Mississippi filed this timely appeal, contending that Plaintiffs cannot maintain an as-applied challenge; that even if they could, the challenge fails as a matter of law; and that their facial challenge also lacks merit.

## II.

### A. Standing

Although Mississippi does not challenge Plaintiffs' standing, we are obligated to ensure that we have jurisdiction. The procedural history of this case, in which Plaintiffs first raised their challenge in connection with a ballot initiative that has long since been decided, warrants that we address whether Plaintiffs still have standing to maintain this suit. Although their challenge is moot as to the 2011 election, Plaintiffs maintain that they still meet the injury requirement because Mississippi's disclosure laws will chill their political speech in future elections. *See Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 661–62 (5th Cir. 2006) (addressing and rejecting the argument that the plaintiff's challenge to state election laws was "moot because the election that gave rise to the complaint has already occurred").

The "essence of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Roark & Hardee*

---

[5] The court denied as moot Mississippi's motions to exclude Plaintiffs' expert witnesses because it did not rely on the experts' opinions in its analysis. The experts had offered testimony that voters do not benefit from the information required by disclosure laws.

No. 13-60754

*LP v. City of Austin*, 522 F.3d 533, 542 (5th Cir. 2008) (internal quotation marks omitted). To establish standing, a plaintiff must show that: (1) he has suffered, or imminently will suffer, a concrete and particularized injury-in-fact; (2) the injury is fairly traceable to the defendant's conduct; and (3) a favorable judgment is likely to redress the injury. *Id.*

In First Amendment pre-enforcement challenges, "chilling a plaintiff's speech is a constitutional harm adequate to satisfy the injury-in-fact requirement." *Hous. Chronicle Publ'g Co. v. City of League City*, 488 F.3d 613, 618 (5th Cir. 2007). As the Supreme Court has explained, "it is not necessary that [a plaintiff] first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights." *Steffel v. Thompson*, 415 U.S. 452, 459 (1974). Instead, once a plaintiff has shown more than a "subjective chill"—that is, that he "is seriously interested in disobeying, and the defendant seriously intent on enforcing, the challenged measure"—the case presents a viable "case or controversy" under Article III. *Int'l Soc'y for Krishna Consciousness of Atlanta v. Eaves*, 601 F.2d 809, 815 (5th Cir. 1979); *see also Hous. Chronicle*, 488 F.3d at 619.

Although Plaintiffs focused on their intent, as a group and as individuals, to pass a hat, hang fliers, and buy a local ad to support Initiative 31, they also planned on continuing their political advocacy in future ballot initiative cycles. Their past enthusiastic participation in the political process indicates that they would have done so; it is likely that a group motivated enough to organize political rallies would speak out about other ballot initiatives if given the opportunity. Eminent domain is not the only public policy issue that concerns these Plaintiffs. Not only have they organized political rallies, but they also are members of two libertarian organizations and have a demonstrated passion for the Constitution.

9

No. 13-60754

But Mississippi's disclosure laws, they contend, prevented—and still prevent—them from engaging in that kind of political activism, which unquestionably implicates Chapter 17's disclosure requirements. Plaintiffs have thus shown that they have a legitimate fear of criminal penalties for failure to comply with Chapter 17.[6] For that reason, they have standing to pursue this case.[7]

## B. As-Applied Challenge

The standing inquiry is distinct from one of the foundational issues in this case: is there is a sufficient basis in the record from which to evaluate Plaintiffs' as-applied challenge? As one of our sister circuits has implicitly recognized, even when a group of plaintiffs has general standing to challenge the constitutionality of a statute, the plaintiffs might not have developed a sufficiently concrete record to sustain their as-applied challenge. *See Human Life of Wash.*, 624 F.3d at 1022 (finding that the plaintiffs had standing because of a "reasonable fear of enforcement of the Disclosure Law," but rejecting their as-applied challenge because the complaint was "devoid of information from which [it] could conclude that the Disclosure Law is unconstitutional as applied to" them).

Confusion abounds over the scope of as-applied and other types of First Amendment challenges that a plaintiff can pursue when challenging a statute. *See* Scott Keller & Misha Tseytlin, *Applying Constitutional Decision Rules*

---

[6] The "traceability" and "redressability" elements of the standing requirements are uncontested and clearly met on these facts.

[7] During this appeal, one of the Plaintiffs, Sharon Bynum, moved out of Mississippi. Even assuming that she now lacks standing to maintain her suit, the remaining Plaintiffs still live in Mississippi and have standing to challenge Mississippi's laws. For that reason, Bynum's potential lack of standing does not affect the outcome of the case. *See Vill. Of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 n.9 (1977) ("Because of the presence of [one plaintiff with standing], we need not consider whether the other individual and corporate plaintiffs have standing to maintain the suit.").

No. 13-60754

*Versus Invalidating Statutes In Toto*, 98 VA. L. REV. 301, 307 (2012) ("The Supreme Court has explicitly acknowledged that there is much confusion over the definitions and attributes of facial, as-applied, and overbreadth challenges." (citing *United States v. Stevens*, 130 S. Ct. 1577, 1587 (2010))). Although as-applied challenges are generally favored as a matter of judicial restraint because they result in a narrow remedy, a developed factual record is essential. Particularized facts are what allow a court to issue a narrowly tailored and circumscribed remedy. *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010) ("The distinction [between as-applied and facial challenges] is both instructive and necessary, for it goes to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint."); *Sonnier v. Crain*, 613 F.3d 436, 459 (5th Cir. 2010), *withdrawn in part*, 634 F.3d 778 (5th Cir. 2011) (Dennis, J., concurring in part and dissenting in part) ("The facial/as-applied distinction merely 'goes to the breadth of the remedy employed' because a facial challenge is an argument for the facial invalidation of a law, whereas an as-applied challenge is an argument for the narrower remedy of as-applied invalidation." (citation omitted)); *see also, e.g.*, *United States v. Phillips*, 645 F.3d 859, 863 (7th Cir. 2011) ("[W]hen we are presented with an as-applied challenge, we examine only the facts of the case before us and not any set of hypothetical facts under which the statute might be unconstitutional.").

In this case, the record is bereft of facts that would allow us to assume that Plaintiffs intend to raise "just in excess of" $200 as a group or as individuals. At oral argument, their counsel asserted that they will hew closely to Mississippi's $200 threshold. And in a post-argument submission they went one better, declaring—in what may be a first for a nonprofit or for-profit entity—that they would turn away a $1 million donation. Their "just in excess

11

No. 13-60754

of" $200 group pledge, and the post-argument emphasis on how "modest" their fundraising goals are, is inconsistent with the scant record before us.

In their Complaint, each of the five Plaintiffs indicated an intent to spend "in excess of $200" to support Initiative 31. How much "in excess of" $200? Nothing in the record provides a clear answer. But what can be pieced together from the Complaint[8] indicates that the group would raise and spend at least a number of multiples above that $200 threshold. For one thing, even if each plaintiff gave just a $201 donation,[9] the result would be over $1000 in contributions. The expenditure side of the planned group also indicates an amount significantly above $200. The Complaint discusses Plaintiffs' desire to purchase posters at $4 apiece, buy ads in a local newspaper which would cost between $383 and $1200 per day depending on their size, and distribute flyers that would run $.20 each. The Complaint thus belies the assertion that the group would raise and spend an amount barely above $200. That contention also seems implausible. Plaintiffs describe the eminent domain power permitted in *Kelo*, the issue on the 2011 ballot, as "unconscionable." Why would a political group stop accepting contributions at an amount "just in excess of" $200 when additional funds could be used to oppose an unconscionable practice? "A group raising money for political speech will, we presume, always hope to raise enough to make it worthwhile to spend it."

---

[8] That Complaint is our start and end point because Plaintiffs were never deposed, nor did they offer sworn affidavits expanding on what they alleged in the Complaint.

[9] The Complaint alleges that each Plaintiff "wishes to spend in excess of $200 of his [or her] money, individually or in combination with the other Plaintiffs." Because they also seek to challenge the regulations governing individual spending on ballot initiatives, it is unclear how much of this amount would go to the group and how much would be spent individually. But Plaintiffs challenge the law requiring groups to disclose the names and addresses of contributors who donate more than $200, so in order to have standing on that claim the Complaint is best read as indicating that the Plaintiffs would donate $201 or more to the group.

No. 13-60754

*SpeechNow.org v. Fed. Election Comm'n*, 599 F.3d 686, 698 (D.C. Cir. 2010) (en banc).

Maybe, far from being a limited operation, their small group would have been a rousing fundraising success. Initiative 31 passed with over 70% support; that overwhelming outcome suggests that Plaintiffs are not the only Mississippians bothered by the *Kelo* decision. Moreover, the record contains a deposition of a novice political operator named Atlee Breland, who started a political committee to oppose a different 2011 ballot initiative and raised over $22,000 over several weeks. If Breland could raise that kind of money, these Plaintiffs, who have experience organizing political rallies, might have pulled off something similar. On this record, we cannot assume or find it plausible that these Plaintiffs, with their claimed bona fide interest in public issues, would have capped their spending at a specific low dollar amount. Nor can we accept that they would voluntarily cap their spending in future ballot initiatives that could very well hold some of their other strongly held political beliefs in the balance. As explained above, this case is not moot despite the passage of Initiative 31 because Plaintiffs profess a desire to support or oppose future ballot initiatives. We thus cannot assess their likely future contributions and expenditures in terms of a single constitutional amendment. *See Worley*, 717 F.3d at 1252 (noting that those challenging Florida's disclosure laws "acknowledge they seek to raise *more* money in the future" which further distinguished the case from an as-applied challenge in a prior case (italics in original)).

But even if we accepted that Plaintiffs want to limit their contributions, a problem still exists because of the uncertainty concerning the amount at which they would do so. As a result of that indefiniteness, the scope of the district court's as-applied ruling is necessarily vague, and the hallmarks of a traditional as-applied remedy—dependability and a limited scope—are

13

No. 13-60754

entirely absent. *See* Nathaniel Persily & Jennifer Rosenberg, *Defacing Democracy?: The Changing Nature and Rising Importance of As-Applied Challenges in the Supreme Court's Recent Election Law Decisions*, 93 MINN. L. REV. 1644, 1647 (2009) (observing that in an as-applied challenge, if possible, "a court will excise the plaintiff and those similarly situated from the statute's constitutional reach by effectively severing the unconstitutional applications of the statute from the unproblematic ones").   What minimal level of contributions is "just in excess of" $200 for which the district court ruling affords protection?   Is a group raising $300 exempt from the disclosure requirements?   What about $500, or $800?   At oral argument, Plaintiffs' counsel could not identify a definite level at which the order applies.   This is problematic from the perspective of both the regulator and the regulated. Recall that standing rules are relaxed for First Amendment cases so that citizens whose speech might otherwise be chilled by fear of sanction can prospectively seek relief.   The speech of Plaintiffs, or of others hoping to engage in fundraising for constitutional amendments, has not been "unchilled" in any meaningful sense by the district court's ruling because they do not know the dollar amounts at which the ruling provides protection.   To find out, they would need to either risk violating the law or go back to federal court in a separate pre-enforcement suit to determine the constitutionality of the disclosure laws as applied to their planned fundraising level for the next initiative.   Mississippi faces a problem from the other side of the coin.   It does not specify at what levels it may enforce Chapter 17, which the district court did not invalidate as whole.   Like Plaintiffs, Mississippi does not know where the constitutional line is, and thus has no reliable method of enforcing its own laws while ensuring compliance with a federal court order.

   Based on these concerns, other courts, when faced with similar "as-applied" challenges that lack a sufficiently specific record, have declined to

No. 13-60754

issue as-applied remedies. For instance, the Eleventh Circuit concluded that the plaintiffs in *Worley v. Florida Secretary of State*, 717 F.3d 1238 (11th Cir. 2013), who brought claims against Florida's disclosure requirements almost identical to the claims in this case, could not maintain an as-applied challenge, reasoning:

> [W]e are not equipped to evaluate this case as an as applied challenge because the record does not tell us enough about what Challengers are doing. While Challengers have emphasized that they are merely a grassroots group of four people who want to spend a modest amount of money in a ballot issue election, they also emphasize their desire to solicit contributions. We know little if anything about how much money they intend to raise or how many people they wish to solicit. We will not speculate about their future success as fundraisers. Based on the record we do have, we consider this challenge to the Florida PAC regulations to be a facial challenge.

*Id.* at 1249–50; *see also, e.g.*, *Human Life of Wash.*, 624 F.3d at 1022 ("Not only is the complaint devoid of information from which we could conclude that the Disclosure Law is unconstitutional as applied to Human Life, it is not clear from the record that the complaint was verified by a Human Life official with personal knowledge of the facts alleged therein."); *Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464, 475–76 (7th Cir. 2001) ("Here, the Center has not broadcast *any* communications in Illinois, so it would be impossible for this court to fashion a remedy tailored to its own particular speech activities and those of similar groups, for we have only a general idea of what its hypothetical broadcasts would say. The Center has not laid the foundation for an as-applied challenge here. We analyze its claims under the standards governing facial challenges." (emphasis in original)).

The cases Plaintiffs rely on do not counsel a different result; rather, they illustrate the concrete facts that properly underlie an as-applied challenge to a statute. In *Sampson v. Buescher*, for instance, Colorado plaintiffs alleged

No. 13-60754

that they spent $782.02 to oppose a petition that would have annexed their neighborhood to a nearby town. 625 F.3d 1247, 1251–52 (10th Cir. 2010). The court found that the disclosure laws as applied to them were unconstitutional given how little they had spent to oppose the petition. *Id.* at 1261. And in two district court cases out of Wisconsin, the plaintiffs who brought pre-enforcement challenges to disclosure statutes testified that they would have spent roughly $300 and $500, respectively, for their causes. *See Hatchett v. Barland*, 816 F. Supp. 2d 583, 593 (E.D. Wis. 2011); *Swaffer v. Cane*, 610 F. Supp. 2d 962, 964–65 (E.D. Wis. 2009). The courts found constitutional violations only as to those named plaintiffs, and accordingly issued remedies tailored to their specific situations. *See Hatchett*, 816 F. Supp. 2d at 610; *Swaffer*, 610 F. Supp. 2d at 972; *see also, e.g., Canyon Ferry Rd. Baptist Church of East Helena, Inc. v. Unsworth*, 556 F.3d 1021, 1028 (9th Cir. 2009) (considering an as-applied challenge to Montana's disclosure law based on a church's actual *de minimis* contribution to a campaign). Those kinds of stipulations and facts, which the courts drew on in issuing their orders, are entirely absent here. Plaintiffs' as-applied challenge, asserted both as a collective group and by each Plaintiff individually, therefore fails.

## C. Facial Challenge

In the normal course, when a plaintiff alleges an insupportable as-applied challenge, courts instead treat the constitutional challenge as a facial one. *See Worley*, 717 F.3d at 1249–50 (concluding that plaintiffs could not maintain an as-applied challenge and instead "consider[ing] this challenge to the Florida PAC regulations to be a facial challenge"); *Vt. Right to Life Comm., Inc. v. Sorrell*, 758 F.3d 118, 127 (2d Cir. 2011) ("[W]here plaintiffs asserting both facial and as-applied challenges have failed to [lay] the foundation for an as-applied challenge, courts have proceeded to address the facial challenge." (internal quotation marks omitted) (alterations in original)); *United States v.*

16

No. 13-60754

*Fisher*, 149 F. App'x 379, 383 (6th Cir. 2005) (treating defendant's as-applied challenge, which the court deemed "irrelevant" based on circuit precedent, as a facial challenge). This makes sense because absent a viable as-applied challenge, a facial challenge is the only means of providing the relief sought. *Cf. Citizens United*, 558 U.S. at 331 ("[T]he distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge.").

There is a potential complication in this case, however, because the district court stated that Plaintiffs had "abandoned" their facial challenge. Although the district court correctly refused to consider a facial challenge given that it granted Plaintiffs relief on an as-applied basis, *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008) (explaining that facial challenges "are disfavored" and "run contrary to the fundamental principle of judicial restraint"), we do not read the record as indicating any affirmative waiver of the facial challenge in the event the narrower as-applied challenge failed to provide the requested relief. In the district court, Plaintiffs challenged the entire statutory scheme as too burdensome. Although emphasizing their argument that the laws were unconstitutional as applied to small groups, the arguments seeking application of strict scrutiny and contesting any informational interest in the disclosure of financial contributions to ballot initiatives sought facial invalidation of the statute. And any doubt is resolved by their brief on appeal, in which they ask us to "hold Mississippi's scheme unconstitutional for *all* ballot measure committees."

Because the challengers have standing and both parties request a ruling on the facial constitutionality of Mississippi's disclosure laws, we will consider whether Plaintiffs can "establish that no set of circumstances exists under which [the law] would be valid or that the statute lacks any plainly legitimate

17

No. 13-60754

sweep." *Catholic Leadership Coal.*, 764 F.3d at 426 (internal quotation marks omitted) (alteration in original) (quoting *United States v. Stevens*, 559 U.S. 460, 472 (2010)).[10]  This is a high hurdle to overcome; "[o]f the federal courts of appeals that have decided these cases, every one has upheld the disclosure regulations against the facial attacks." *Madigan*, 697 F.3d at 470; *see also SpeechNow.org*, 599 F.3d at 696 ("The Supreme Court has consistently upheld organizational and reporting requirements against facial challenges.").

Plaintiffs attempt to meet this difficult burden by arguing that Mississippi's disclosure requirement should be subject to strict scrutiny.  We recently rejected this position, holding that disclosure and organizational requirements are subject to the lesser but still meaningful standard of exacting scrutiny.  *Catholic Leadership Coal.*, 764 F.3d at 424.  That label means that "the government must show a 'sufficiently important governmental interest that bears a substantial relation' to the requirement." *Id.* (quoting *SpeechNow.org*, 599 F.3d at 696).  Other circuits have uniformly adopted the same standard.  *See Worley*, 717 F.3d at 1244 (collecting cases from the First, Fourth, Seventh, Eighth, Ninth, and Tenth Circuits).  The circuits' consensus is true to Supreme Court precedent, which from *Buckley v. Valeo*, 424 U.S. 1, 19 (1976), to *Citizens United v. Federal Election Commission*, 558 U.S. 310, 370–71 (2010), to *McCutcheon v. Federal Election Commission*, 134 S. Ct. 1434, 1459 (2014), has treated disclosure requirements far more favorably than laws that limit political contributions and expenditures.  *See, e.g.*, *McCutcheon*, 134 S. Ct. at 1459–60 (observing that disclosure requirements are "justified based on a governmental interest in provid[ing] the electorate with information about

---

[10] Plaintiffs may also seek invalidation of a statute as overbroad if they "demonstrate that 'a substantial number of [the law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *Catholic Leadership Coal.*, 764 F.3d at 426 (alteration in original) (quoting *Stevens*, 559 U.S. at 473).  But Plaintiffs disclaim any reliance on an overbreadth theory in this case.

18

No. 13-60754

the sources of election-related spending" and "often represent[] a less restrictive alternative to flat bans on certain types or quantities of speech").

Plaintiffs acknowledge this overwhelming body of case law rejecting the higher level of scrutiny they seek, but argue that other language in *Citizens United*, which discussed "burdensome" political action committee requirements that apply to corporations, supports their position. In *Worley*, the Eleventh Circuit thoroughly and persuasively rejected that argument:

> [T]he Court [in *Citizens United*] analyzed the prohibition on political contributions by corporations under strict scrutiny because it entirely prevented a corporation from speaking *as a corporation,* and the only justification given for the ban was that it was "corporate speech." In this context, strict scrutiny applied "notwithstanding the fact that a PAC created by a corporation can still speak" because "[a] PAC is a separate association from the corporation." "So the PAC exemption from § 411b's [corporate treasury] expenditure ban, § 441b(b)(2), [still did] not allow corporations to speak.*" It is true, of course, that *Citizens United* discussed PAC regulations as "burdensome alternatives." But nowhere did *Citizens United* hold that PAC regulations themselves constitute a ban on speech or that they should be subject to strict scrutiny.

717 F.3d at 1244 (citations and emphasis omitted) (alterations in original). We agree with *Worley*'s reading of *Citizens United*. For these reasons, we apply exacting scrutiny to Mississippi's disclosure requirements.

The first question under the exacting scrutiny standard is whether the government has identified a "sufficiently important governmental interest" in its disclosure scheme. The government typically asserts two interests to justify disclosure laws: (1) an interest in rooting out corruption, and (2) an interest, as the Supreme Court described it in *Buckley*, in "provid[ing] the electorate with information as to where political campaign money comes from and how it is spent by the candidate in order to aid the voters in evaluating those who seek federal office." 424 U.S. at 66–67 (citation and internal quotation marks

No. 13-60754

omitted).[11]   As Mississippi acknowledges, the corruption rationale is not implicated in ballot initiatives as it is in candidate elections.   Plaintiffs argue that neither is the informational interest and urge us to follow the Tenth Circuit's lead in *Sampson* and hold, at a minimum, that this informational interest "is significantly attenuated when the organization is concerned with only a single ballot issue and when the contributions and expenditures are slight."  625 F.3d at 1259.

It is true that our cases recognizing a governmental interest in disclosure did so in the context of candidate elections.  *See Catholic Leadership Coal.*, 764 F.3d at 440 (stating the public "has an interest in knowing who is speaking about a candidate and who is funding that speech, no matter whether the contributions were made toward administrative expenses or independent expenditures" (quoting *SpeechNow.org*, 599 F.3d at 698)); *Let's Help Fla. v. McCrary*, 621 F.2d 195, 200 (5th Cir. 1980) (observing that measures that "require political committees to register with the state and to file information about each contribution and contributor throughout the campaign . . . . provide adequate disclosure without directly restricting contributions or other important first amendment rights").   But the informational interest that the Supreme Court described approvingly in *Buckley* seems to be at least as strong when it comes to ballot initiatives.   The vast majority of our sister circuits to have considered the issue have so held.  *See Worley*, 717 F.3d at 1247–48 (citing cases from the First, Seventh, Ninth, and D.C. Circuits).   Candidate elections are typically partisan contests, in which the candidate's party affiliation provides voters who cannot research every candidate with a general sense of whether they are likely to agree with a candidate's views.   Ballot initiatives

_____

[11] A third interest that is sometimes mentioned—"gathering the data necessary to detect violations of . . . contribution limitations," *Buckley*, 424 U.S. at 68—is also not implicated in this case because Mississippi does not limit contributions.

No. 13-60754

lack such a straightforward proxy.   The initiatives on a ballot are often numerous, written in legalese, and subject to the modern penchant for labelling laws with terms embodying universally-accepted values.   Disclosure laws can provide some clarity amid this murkiness.   For example, if disclosure laws reveal that unions are supporting a proposed constitutional amendment, that may indicate to antiunion voters that they may want to vote against the measure and to prounion voters that they may want to vote for it.   *See Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1106 (9th Cir. 2003). ("[B]allot-measure language is typically confusing, and the long-term policy ramifications of the ballot measure are often unknown.   At least by knowing who backs or opposes a given initiative, voters will have a pretty good idea of who stands to benefit from the legislation.").   Or as the First Circuit put it:

> In an age characterized by the rapid multiplication of media outlets and the rise of internet reporting, the "marketplace of ideas" has become flooded with a profusion of information and political messages.   Citizens rely ever more on a message's source as a proxy for reliability and a barometer of political spin.

*See Nat'l Org. for Marriage v. McKee (Nat'l Org. for Marriage I)*, 649 F.3d 34, 57 (1st Cir. 2011).   These benefits accrue to the voters even when small-dollar donors are disclosed.   *See Nat'l Org. for Marriage, Inc. v. McKee (Nat'l Org. for Marriage II)*, 669 F.3d 34, 41 (1st Cir. 2012), *cert. denied*, 133 S. Ct. 163 (2012) ("The issue is . . . not whether voters clamor for information about each 'Hank Jones' who gave $100 to support an initiative.   Rather, the issue is whether the cumulative effect of disclosure ensures that the electorate will have access to information regarding the driving forces backing and opposing each bill." (citations and internal quotation marks omitted)); *see also Worley*, 717 F.3d at 1251 ("[D]isclosure of a plethora of small contributions could certainly inform voters about the breadth of support for a group or a cause.").   For these reasons, we conclude that Mississippians—who in deciding constitutional amendments

21

No. 13-60754

act "as lawmakers"—"have an interest in knowing who is lobbying for their vote."[12]  *Cal. Pro-Life Council*, 328 F.3d at 1106.

The only remaining question is whether Mississippi's disclosure requirements are "substantial[ly] relat[ed]" to this informational interest. *Doe v. Reed*, 561 U.S. 186, 196 (2010).  Plaintiffs' concerns with Mississippi's disclosure requirements begin with the Statement of Organization that political committees must file.  (Individuals do not have to file a comparable registration document.)  Their claim that the Statement of Organization is unconstitutionally burdensome, however, is incompatible with our reasoning in *Catholic Leadership Coalition of Texas v. Reisman*, 764 F.3d 409 (5th Cir. 2014).  The disclosure provision at issue there was actually more burdensome than Mississippi's requirement; unlike Chapter 17 in Mississippi, Texas's election code provision requires general-purpose political committees to appoint a treasurer *before* receiving contributions in excess of $500 or engaging in more than $500 in aggregate expenditures and contributions.  764 F.3d at 416.  By contrast, political committees in Mississippi must file a statement of organization "no later than ten (10) days after receipt of contributions aggregating in excess of" $200.  Miss. Code Ann. § 23-17-49(1).  And political committees in Texas must fill out a three-page form that asks them questions

---

[12] The longstanding recognition of this important informational interest also defeats Plaintiffs' argument that Mississippi's laws are unconstitutional because fear of losing anonymity will chill individuals' political speech.  Plaintiffs cite *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 466 (1958), in which the Supreme Court held that the NAACP's "immunity from state scrutiny of membership lists . . . is here so related to the right of the members to pursue their lawful private interests privately and to associate freely with others in so doing as to come within the protection of the Fourteenth Amendment."  They cite no cases finding that this anonymity interest overcomes the governmental interest in disclosure in the campaign finance context, and similar arguments have failed in other contexts.  *See, e.g.*, *Doe v. Reed*, 561 U.S. 186, 228 (2010) (Scalia, J., concurring) ("There are laws against threats and intimidation; and harsh criticism, short of unlawful action, is a price our people have traditionally been willing to pay for self-governance.  Requiring people to stand up in public for their political acts fosters civic courage, without which democracy is doomed.").

No. 13-60754

like the group's acronym and whether it has a controlling entity. *Catholic Leadership Coal.*, 764 F.3d at 440. Mississippi's form asks only eight questions on a single page. *See* Statement of Organization, *supra* note 4.

We upheld Texas's treasurer-appointment requirement because "all that the provision requires is that a general-purpose committee take simple steps to formalize its organizational structure and divulge additional information to the government." *Catholic Leadership Coal.*, 764 F.3d at 439. *Catholic Leadership Coalition* found that "any burden created by the treasurer-appointment requirement—essentially filling out and mailing a three-page form—appears to be exceedingly minimal." *Id.* at 440 (citation omitted). Those burdens were more than justified, we reasoned, because the "treasurer serves as the cornerstone of Texas's entire general-purpose committee campaign-finance disclosure regime." *Id.* at 441. Mississippi's minimal registration burdens, which are central to its disclosure scheme and proportional to its relatively small population, thus also survive exacting scrutiny review.

That leaves the question whether the $200 disclosure thresholds for group reporting and individual itemizations, as well as the various reporting requirements that kick in at that level, are facially unconstitutional. There must be "no set of circumstances" under which Mississippi's disclosure requirements are constitutional. *See id.* at 434. Consider, as one illustration, a group that raises $1,000 to support a constitutional ballot initiative in Mississippi, which is the level at which federal regulations kick in. That group must fill out a one-page Statement of Organization form and file monthly expenditure reports. Even then, although it must keep track of all contributions received, it only has to itemize contributions that exceed $200.

The district court was correct in its preliminary injunction ruling that "the information required by Mississippi's registration and disclosure forms is not overly intrusive." *Justice v. Hosemann*, 829 F. Supp. 2d 504, 519 (N.D.

23

No. 13-60754

Miss. 2011). Mississippi is not asking groups to adopt a complex structure; instead, it is asking them to do "little more if anything than a prudent person or group would do in these circumstances anyway." *Worley*, 717 F.3d at 1250 (internal quotation marks omitted). Such requirements are commonplace, and often more onerous, in other states with constitutional ballot initiatives. *See, e.g.*, *id.* at 1251 (noting that Florida committees must itemize every donation, at any level, by the donor's name and address, and include the donor's occupation if the donation exceeds $100); N.D. Cent. Code Ann. § 16.1-08.1-03.1 (requiring committees to itemize each contribution over $100); Ohio Rev. Code Ann. § 3517.10(A), (B)(4)(e) (requiring all contributions to be itemized except "contributions totaling $25 or less received at a specific fund-raising activity"). All of these state-level requirements are magnitudes lighter than federal regulations governing political action committees that have withstood First Amendment challenge, *see SpeechNow*.org, 599 F.3d at 698, and require, among other things, that a PAC designate a treasurer and submit monthly reporting forms that are supplemented by 31 pages of instructions. Federal Election Commission (FEC), *Campaign Guide for Nonconnected Committees* (May 2008), *available at* http://www.fec.gov/pdf/nongui.pdf, at 3–9; FEC Form 3X, Report of Receipts and Disbursements, *available at* http://www.fec.gov/pdf/forms/fecfrm3x.pdf; Instructions for FEC Form 3X and Related Schedules, *available at* http://www.fec.gov/pdf/forms/fecfrm3xi.pdf.

Even at lower levels of fundraising and expenditure, the disclosure regulations further Mississippi's interest in providing information to voters. *See Worley*, 717 F.3d at 1251 ("Florida also advances its informational interest through a first-dollar disclosure threshold because knowing the source of even small donations is informative in the aggregate and prevents evasion of disclosure."); *Nat'l Org. for Marriage II*, 669 F.3d at 41 ("The issue is . . . not whether voters clamor for information about each 'Hank Jones' who gave $100

No. 13-60754

to support an initiative. Rather, the issue is whether the cumulative effect of disclosure ensures that the electorate will have access to information regarding the driving forces backing and opposing each bill." (internal quotation marks omitted)). And the less money groups or individuals expend, the fewer forms they have to fill out. A group that raises only $250 in a month, for instance, would fill out the one-page Statement of Organization and an expenditure report that would also double as a termination report. *See* Miss. Code Ann. § 23-17-51(3). Taking all of those considerations into account, we conclude that Mississippi's calibrated reporting and itemization requirements for committees engaged in campaigns related to constitutional amendments survive First Amendment scrutiny at most levels—and certainly at enough levels to withstand this facial challenge.[13]

For the same reasons, we conclude that the disclosure requirements for individuals who, independent of any committee, wish to expend funds to support or oppose constitutional amendments survive a facial challenge. These reporting requirements, which kick in when a person spends more than $200, further the informational interest in disclosure and are not burdensome. An individual donating more than $200 must complete one form, a monthly report, and only expenditures exceeding $200 to a single source within that month need be itemized. Plaintiffs are unable to show that these disclosure requirements for individuals are unconstitutional in all applications.

For all of these reasons, the requirements that Mississippi has enacted in Chapter 17 of the Mississippi Code[14] survive Plaintiffs' facial challenge.

---

[13] We therefore need not consider whether the $200 threshold is subject to exacting scrutiny or the much lighter "wholly without merit" standard of review. *Cf. Worley*, 717 F.3d at 1251–52 (noting that the First Circuit's adoption of the "wholly without rationality" standard was "instructive" but applying exacting scrutiny to Florida's disclosure threshold).

[14] Plaintiffs contend that the Chapter 17 forms Mississippi provides do not match up with the actual requirements in Chapter 17. Even assuming that is the case (and the district

No. 13-60754

\*       \*       \*

Plaintiffs' as-applied and facial constitutional challenges therefore fail. Accordingly, we REVERSE the district court and RENDER judgment in favor of Defendants.

---

court declined to make such a finding), we do not see how this gives rise to a First Amendment violation.  In general, it makes little sense to assume, even viewing the evidence in the light most favorable to Plaintiffs, that Mississippi will prosecute someone who fills out a form correctly because the form itself is incompatible with Chapter 17.  There is no evidence in the record that anything of that nature has ever happened in Mississippi. Moreover, because we conclude that Plaintiffs' arguments, discussed at length above, are insufficient to establish a First Amendment violation, "the existence of a federal constitutional question" based on the forms confusion is "entirely contingent on an unresolved interpretation of Mississippi law." *Moore v. Hosemann*, 591 F.3d 741, 745 (5th Cir. 2009).  We therefore would find it appropriate to abstain from deciding that difficult state law question, to the extent it exists, under *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496 (1941).